Case 1:14-cr-00122-JL Document 56 Filed 01/12/15 Page 1 of 113

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                                *
UNITED STATES OF AMERICA                        *
                                                *  14-mj-123-01-JL
              v.                                *  June 30, 2014
                                                *  11:30 a.m.
ALKIS NAKOS                                     *
                                                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

### TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
### BEFORE MAGISTRATE JUDGE ANDREA JOHNSTONE

Appearances:

For the Government:    Terry Ollila, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301

For the Defendant:     Robert S. Carey, Esq.
                       Orr & Reno, PA
                       One Eagle Square
                       P.O. Box 3550
                       Concord, NH  03302-3550

Probation Officer:     Scott Davidson

Transcriber:           Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

1                          I N D E X

2

3   Witness                  Direct    Cross    Redirect    Recross

4
    JENNIFER MACKENZIE
5
    By Ms. Ollila            5
6   By Mr. Carey                       67

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   THE FOLLOWING PROCEEDING WAS TRANSCRIBED FROM AN FTR

2   GOLD TAPE:

3        THE CLERK:  The court has before it for

4   consideration a preliminary hearing and detention

5   hearing in the matter of Alkis Nakos, case number

6   14-mj-123-01-JL.

7        THE COURT:  Attorney Carey, my understanding

8   is that you have a preliminary matter that you would

9   like to put on the record before we proceed.  Is that

10  correct?

11       MR. CAREY:  Correct, your Honor.  And this is

12  the matter regarding a conflict check.  When I was

13  appointed to represent Mr. Nakos a matter came up, an

14  old matter that was closed in 2009.  That was a matter

15  in which River Crossing LLC sued attorney Steven Maynard

16  and his firm Jordan, Maynard & Parodi.  Mr. Nakos and

17  his mother I believe were the plaintiffs in that case

18  and were connected with that LLC.  Attorney Emily Rice

19  represented Attorney Maynard and his firm in the

20  professional malpractice claim.  I was not involved in

21  that case, not familiar with its facts, and Emily Rice

22  no longer works for our firm.  And it's my understanding

23  that matter was closed in 2009.  I've talked with Mr.

24  Nakos about it, but I think for purposes of the record

25  we should probably put his position on the record.  It's

1    my understanding he has no conflict and no objection to

2    my representation.

3            THE COURT:  Thank you.  Mr. Nakos, if you'd

4    stand, please.  Do you understand the issue that your

5    attorney has raised revealing the conflict check that

6    someone in his office had handled a matter that your

7    family was involved in?

8            THE DEFENDANT:  Yes, your Honor.

9            THE COURT:  And do you have any concerns about

10   that conflict?

11           THE DEFENDANT:  No, your Honor.

12           THE COURT:  And to the extent that there is a

13   conflict, and I think we've reached the general

14   consensus that we don't believe that there is, but to

15   the extent that there is a conflict, are you waiving

16   that conflict for the purposes of your representation in

17   this matter?

18           THE DEFENDANT:  Yes.

19           THE COURT:  I'm satisfied.  Thank you.  We can

20   proceed.

21           Mr. Nakos, just one other thing before we get

22   started.  The last time you were before me we reviewed

23   your right to remain silent, not to speak about this

24   particular matter.  Are you comfortable that you still

25   understand that those rules are applicable to you today?

1   Would you like me to go through and remind you about

2   those rights again?

3            THE DEFENDANT:  No, I understand them, your

4   Honor.

5            THE COURT:  Thank you.  Why don't we proceed

6   with the preliminary hearing in this matter.

7            MS. OLLILA:  Yes.

8            THE COURT:  Attorney Ollila.  Thank you.

9            MS. OLLILA:  Thank you, your Honor.  The

10  United States calls Sergeant Jennifer Mackenzie to the

11  witness stand.

12           THE CLERK:  Please stand and raise your right

13  hand.

14                    JENNIFER MACKENZIE

15       having been duly sworn, testified as follows:

16           THE CLERK:  For the record, please state your

17  full name and spell your last name.

18           THE WITNESS:  My name is Jennifer Mackenzie,

19  and it's M-A-C-K-E-N-Z-I-E

20           MS. OLLILA:  Your Honor, for housekeeping

21  matters I do anticipate that Sergeant Mackenzie will

22  testify for approximately an hour.  And as your Honor is

23  aware, this is a long-term investigation.  The affidavit

24  is about a hundred pages.  It's the United States'

25  understanding that I will focus in on the information

1    involving Mr. Nakos, but notwithstanding that it will

2    take at least in the United States' estimation an hour

3    for Sergeant Mackenzie.

4            THE COURT:  I understand that.  I appreciate

5    that and we will proceed accordingly.  If we need to

6    take a break, and Sergeant Mackenzie, to the extent that

7    you need a break, an hour sometimes feels like a long

8    time to be on the witness stand, just let us know and we

9    will take a short recess and resume if we need to.

10           MS. OLLILA:  Thank you for your understanding,

11   your Honor.

12                    DIRECT EXAMINATION

13   BY MS. OLLILA:

14       Q.   Sergeant Mackenzie, how you employed?

15       A.   I'm employed with the New Hampshire State

16   Police.

17       Q.   How long have you been with the New Hampshire

18   State Police?

19       A.   I've been with the New Hampshire State Police

20   for approximately 16 and a half years.

21       Q.   And what is your rank?

22       A.   Right now I'm a sergeant.

23       Q.   What does that mean to be a sergeant with the

24   New Hampshire State Police?

25       A.   I am a supervisor.

1      Q.    Approximately how many individuals do you

2   supervise?

3      A.    Approximately eight.

4      Q.    And what is -- are you currently assigned to a

5   particular unit?

6      A.    Yes.  I'm assigned to the Narcotics and

7   Investigations Unit.

8      Q.    Is that also known as NIU?

9      A.    Yes.

10     Q.    Do you supervise those eight individuals

11  within the Narcotics and Investigations Unit?

12     A.    I do.

13     Q.    What does NIU do in the state of New

14  Hampshire?

15     A.    Most of the investigations that we do are

16  narcotics-related, but we also do other investigations.

17     Q.    Do you work hand in hand with other agencies?

18     A.    Yes.  We work with federal and local agencies

19  as well.

20     Q.    With respect to federal agencies, what are

21  some of those federal agencies that you work with?

22     A.    The Drug Enforcement Administration, FBI,

23  Homeland Security, Liquor Commission.

24     Q.    Is it fair to say with respect to this

25  investigation members of NIU have worked hand in hand

1    with members of the DEA?

2         A.   Yes.

3         Q.   And when you conduct an investigation, do you

4    gather intelligence from other law enforcement agencies?

5         A.   Yes, we do.

6         Q.   In 2008 are you aware that members of the

7    Oklahoma police stopped a motor vehicle being driven by

8    an individual named Brandon Anderson?

9         A.   Yes, I am.

10        Q.   And what happened when that motor vehicle was

11   stopped, and in answering the question if you can

12   identify the license plate that was on the vehicle.

13   Where was the tag from?

14        A.   The registration that Mr. Anderson was

15   operating was from New Hampshire.  The exact --

16        Q.   You don't have to give the exact tag.

17        A.   Okay.

18        Q.   So was the vehicle stopped in Oklahoma?

19        A.   Yes, it was.

20        Q.   What did law enforcement find in that vehicle?

21        A.   Law enforcement did a search of the vehicle

22   and found over $2 million in Mr. Anderson's vehicle.

23        Q.   Did Mr. Anderson cooperate with law

24   enforcement?

25        A.   He did.

1    Q.    And what did he say with respect to where that

2    money came from?

3    A.    He advised that it was proceeds from marijuana

4    distribution that he was transporting from the east

5    coast to California.

6    Q.    Did Mr. Anderson during the brief period of

7    his cooperation identify the individual for whom he was

8    engaged in the transportation of proceeds of the

9    distribution of marijuana?

10   A.    He did.  It was Jeffrey Colgrove and Steven

11   Sarti.

12   Q.    Is that Steven Sarti?

13   A.    Sarti.

14   Q.    Now Jeffrey Colgrove, do you know where

15   Jeffrey Colgrove resides?

16   A.    Yes, in Canada.

17   Q.    And what -- strike that.  Based upon the

18   information that law enforcement received from Brandon

19   Anderson, did law enforcement, including members of DEA,

20   execute search warrants in Vermont at some point in

21   2009?

22   A.    Yes, they did.

23   Q.    Just by way of background, can you advise

24   Magistrate Johnstone what the focus of the investigation

25   was.  There was a marijuana investigation initiated in

1   Canada, but where was the marijuana going to?

2       A.   The marijuana was going from Canada to

3   Vermont, to Massachusetts, to New Hampshire, and we were

4   primarily focusing on it coming into New Hampshire.

5       Q.   Now, in addition to the marijuana coming into

6   Vermont, did it also come in to upper state New

7   Hampshire?

8       A.   It did.

9       Q.   And what about New York?

10      A.   And New York as well.

11      Q.   Are there areas in both states that are

12   essentially a stone's thrown away from Canada?

13      A.   Yes.

14      Q.   Now, what do you know about marijuana

15   trafficking in the District of New Hampshire.  Are there

16   various types of traffickers in this state?

17      A.   Yes.  We have street level and we also have

18   larger scale traffickers.

19      Q.   How would you know the difference between the

20   two?

21      A.   Street level mainly focus on smaller amounts

22   of marijuana where the larger traffickers traffic in

23   hundreds of pounds of marijuana.

24      Q.   Now what would, the larger scale traffickers,

25   is there a difference in the quality of marijuana in

 1   someone who is involved in a large scale operation

 2   versus someone who is engaged in small scale operation?

 3        A.   Yeah.  The quality of the marijuana can range

 4   from a thousand dollars for a pound to $5,000 for a

 5   pound.

 6        Q.   That's a huge difference.  How do you account

 7   for that difference?

 8        A.   Again, it depends on the actual quality of the

 9   marijuana, the THC level.

10        Q.   Now, what about this investigation.  Did this

11   investigation establish that the individuals involved

12   were engaged in distribution of a high quality

13   marijuana, low, or midway?

14        A.   It was more of a higher quality marijuana.

15        Q.   So the marijuana would be smuggled into the

16   United States from Canada?

17        A.   Correct.

18        Q.   Now, what did the information establish.  Are

19   there numerous individuals who occupied various roles in

20   getting marijuana from Canada into the United States?

21        A.   Yes.  Typically you have a person who is at

22   the top in Canada who is pretty much running the

23   distribution of the marijuana.  That person will

24   coordinate where the marijuana goes in the United

25   States, what person it goes to, and then that person

1    will coordinate in those states where it's going.

2        Q.    Are there individuals in marijuana

3    organizations who are simply tasked with literally

4    dragging marijuana across the border from Canada into

5    the United States?

6        A.    Yes.

7        Q.    Are there individuals in organizations like

8    this who are simply tasked with staying at a stash

9    location?

10       A.    Yes.

11       Q.    Are there yet other individuals who are simply

12   tasked with driving marijuana from place A to place B?

13       A.    Yes.

14       Q.    And are yet there still individuals who are

15   involved with only counting proceeds for trafficking?

16       A.    Yes.

17       Q.    Are there individuals whose job is only to

18   transport proceeds?

19       A.    Yes.

20       Q.    Why is it in drug law enforcement there are so

21   many people occupying so many different roles?

22       A.    Because the organizations can be so big, and

23   especially when distributing a large amount of marijuana

24   you need certain people in certain parts of the

25   operation to fulfill what needs to be done, and a lot of

1    times that can, you know, you have one person in control

2    of where the marijuana is actually going and where it's

3    going to be stashed, and then you have another person

4    that can actually coordinate where that marijuana is

5    distributed to.

6         Q.   Does it make it hard for law enforcement when

7    you, for example, might stop the one whose only role was

8    to drag a load of marijuana across the border, is that

9    hard to try to get that person to flip and testify about

10   the larger organization?

11        A.   Yes.  Typically that person will not cooperate

12   with law enforcement, so we only have a small part of

13   what actually is occurring within the network.

14        Q.   Do organizations like this attempt to insulate

15   the individuals at the top in that the multiple

16   personalities don't know the big picture?

17        A.   Yes.

18        Q.   Has that happened here?

19        A.   Yes.

20        Q.   What about telephones, Sergeant Mackenzie.

21   What do you typically see in an organization like this

22   with how they utilize the telephone?

23        A.   Well, this case specifically, and I've done

24   many large scale cases, but this case specifically the

25   number of phones that they used is more than I've ever

1    seen and what I mean by that is, you know, we will have

2    information that a person is using a certain phone

3    number and then a month or two months later that person

4    is using a totally different phone number which

5    basically tells me that they're trying to not be

6    intercepted by law enforcement, and the way to do that

7    is to continuously change their phone numbers or use

8    phone numbers for specific marijuana loads, you know, so

9    basically if it's a hundred-pound load coming into New

10   Hampshire, they will actually sometimes put phones in

11   the load and tell the people that are at the other end

12   distributing the marijuana utilize this phone for this

13   load, and then once that load is distributed that phone

14   is no longer used.

15        Q.   Why don't law enforcement, and I will take

16   your example, if a telephone is placed in a load of

17   marijuana that comes across the border, why don't law

18   enforcement send out a subpoena for that phone to find

19   out in whose name it was purchased?

20        A.   Because 99.9 percent of the time those phones

21   are called phone-in-a-box which basically means there's

22   no subscriber and there's no way to track where exactly

23   who that phone is being utilized by.

24        Q.   Is it fair to say that in this case it was

25   almost impossible to locate who purchased phones, when

1   they were purchased?

2        A.   Yes, it was impossible.

3        Q.   Now, you testified that there's a reason why

4   there are so many phones.  Do you know what a Title III

5   intercept is?

6        A.   Yes, I do.

7        Q.   What is a Title III intercept?

8        A.   Basically a Title III is when enforcement

9   actually can listen to a live call.  When one of these

10  drug dealers makes a call, we can actually listen to

11  that conversation while it's happening.

12       Q.   Is that also known as a wiretap?

13       A.   Yes.

14       Q.   Is it easy to get a wiretap?

15       A.   It is not easy.

16       Q.   Is it incredibly difficult?

17       A.   Very, very difficult.

18       Q.   Does it take months and months in order to get

19  authorization to obtain a wiretap?

20       A.   Yes, it does, yes.

21       Q.   What happens when you obtain authorization and

22  you're listening to a phone and then one week later that

23  person drops the phone, what does law enforcement then

24  have to do?

25       A.   Pretty much we have to start from the

1    beginning and try to determine what phone this person is

2    now using.

3        Q.    Now, with respect to individuals who are

4    involved in investigations like this, do they typically

5    use one phone to call everyone in an organization?

6        A.    Typically they have different phones for

7    different people.

8        Q.    Why?

9        A.    So, well, if you have somebody on the higher

10   end of the organization you obviously want to insulate

11   them from the people that are at the lower end.  So then

12   you will talk to your distributors, say your

13   distributors are distributing pounds at a time, you give

14   them a certain number so that if anything ever happens

15   and they get arrested by law enforcement and they decide

16   to cooperate they won't have the information or the

17   phone number on the person that's actually at the top.

18       Q.    Let's talk about insulating individuals at the

19   top.  People who are at the higher levels of the drug

20   organization, is it typical for them to touch controlled

21   substances?

22       A.    No.  They pretty much have people that work

23   for them that do, as I say, the dirty work, and what I

24   mean by that is the actual distribution of the marijuana

25   or coordinating who is going to distribute it.

1     Q.    Why don't they touch the drugs?

2     A.    Because that will, again, keep them insulated

3  from actually getting in trouble.  So, if law

4  enforcement arrests somebody who is down the chain of a

5  big organization and that person doesn't cooperate, then

6  this person hasn't really made any phone calls to actual

7  sources, hasn't made any phone calls to actual people

8  that are selling on the street, then the head person is

9  actually insulated from who he thinks is getting in

10  trouble.

11     Q.    How often or how easy is it to break the

12  barrier from getting the street level distributor to

13  that individual above him and ultimately to the people

14  at the higher echelon of the conspiracy?

15     A.    It can be difficult.

16     Q.    Now, you indicated that people involved in

17  drug organizations utilize various methods such as

18  having a lot of people occupy small roles such as using

19  telephones.  What about surveillance.  Can law

20  enforcement just follow someone like Alkis Nakos around

21  and see where he goes and see what he does?

22     A.    Surveillance can be utilized.  The problem

23  with surveillance is, first of all, you're only getting

24  a certain amount of information, and the information

25  you're getting is maybe where he goes, who he meets

1    with.  But a lot of times people when they have been

2    doing this for a while are savvy to the fact that law

3    enforcement might follow them and what they try to do is

4    they do counter surveillance moves which they will drive

5    down side streets, drive down into neighborhoods, goof

6    around, do things, you know, pull into parking lots, do

7    things that are out of the ordinary, nobody is supposed

8    to do it, and when law enforcement is following it's

9    obvious to us that they're trying to see if anybody is

10   actually following them.

11        Q.   Have you seen that in this case in particular,

12   that individuals involved in this case have engaged in

13   counter surveillance?

14        A.   Yes, yes.

15        Q.   Can you give an example of that?

16        A.   One of the individuals, again, we were

17   following an individual, and the individual pulled into

18   a public parking lot, looped around the building, pulled

19   out only to go to a restaurant and have lunch with

20   somebody.  So, it was obvious based on the streets and

21   the areas they were going that they weren't going there

22   for any reason, they were just going there to simply see

23   if anybody was following them.  And this particular

24   individual actually just went to a restaurant, which

25   tells us that this is something that's common practice

1    for that person.  No matter what they're doing, they're

2    constantly checking to see if they're being followed.

3         Q.   Now, you were testifying earlier that Brandon

4    Anderson, his motor vehicle with a New Hampshire tag was

5    stopped in Oklahoma and there was $2 million seized, and

6    that law enforcement took that information and you

7    indicated -- were there search warrants executed in

8    Vermont?

9         A.   Yes, there were.

10        Q.   As a result of those search warrants, was

11   someone arrested that was located at one of the search

12   warrants who became a cooperating source?

13        A.   Yes.

14        Q.   What's a cooperating source?

15        A.   A cooperating source is someone who works with

16   law enforcement for consideration on maybe pending

17   charges that they have.

18        Q.   Now, would you ever rely exclusively upon the

19   information from a cooperating source in making an

20   investigation against someone?

21        A.   No.  We always, whatever the cooperation

22   source tells us, we always try to corroborate that.  And

23   in this particular case in Vermont the cooperating

24   source had told us that the marijuana that was coming

25   down from Canada was specifically labeled NH, and all

1    the marijuana that was labeled NH went to a subject

2    called Alkis Nakos.  This cooperating source was able to

3    identify Alkis Nakos, and this cooperating source was

4    able to tell us where Alkis Nakos lived and also where

5    Alkis Nakos worked at.

6        Q.   So, okay, the cooperating source is arrested

7    in Vermont, and the cooperating source begins

8    cooperating.  By the way, is it a dangerous proposition

9    to cooperate with law enforcement?

10       A.   Yeah, it can be, especially depending who

11   you're cooperating against.

12       Q.   Now, is that why law enforcement label

13   cooperatives as CS, cooperating source, or CI,

14   confidential informant?

15       A.   Yes.

16       Q.   Do you ever disclose the identity of a

17   confidential informant or a CS?

18       A.   We try not to but obviously if it comes down

19   to having them testify sometimes we have to.

20       Q.   Now, in this investigation has law enforcement

21   seized information that there had been threats of harm

22   to individuals who have cooperated?

23       A.   Yes, we have.

24       Q.   And has that information been very recent?

25       A.   Yes.

1      Q.    And what do you mean by very recent?

2      A.    Last week, as a matter of fact, we received a

3  phone call that they were making allegations that they

4  were going to cause harm to people that are cooperating

5  in this investigation.

6      Q.    Now, let's just back up a little bit.  You

7  testified that the confidential source in Vermont

8  identified Alkis Nakos.  Do you see Alkis Nakos in the

9  courtroom?

10     A.    Yes, I do.

11     Q.    Could you please point to him and describe an

12  article of clothing that's he wearing?

13     A.    He's wearing a beige jumpsuit.

14           MS. OLLILA:  Your Honor, may the record

15  reflect the witness has identified the defendant, Alkis

16  Nakos.

17           THE COURT:  The record should reflect that.

18           MS. OLLILA:  Thank you, judge.

19     Q.    You also indicated that the confidential

20  source identified Alkis Nakos through a photograph?

21     A.    Yes.

22     Q.    And that the confidential source identified

23  where Alkis Nakos worked?

24     A.    Correct.

25     Q.    Where did the CS say Alkis Nakos works?

1      A.    He advised Amory House of Pizza.

2      Q.    Now, by the way, how long has the New

3  Hampshire State Police along with other law enforcement

4  officers been involved in this investigation?

5      A.    This particular one, over a year.  But this

6  whole total, since 2008 is when it first came to our --

7      Q.    So the present investigation, law enforcement

8  had been looking at this group for at least a year?

9      A.    At least a year, yes.

10      Q.    Now, and I didn't want to ask you specific

11  hours, but is it fair to say that law enforcement had

12  been watching Amory Pizza for many, many hours?

13      A.    Yes.

14      Q.    Why Amory Pizza?

15      A.    Because that was the location that we were

16  advised that Alkis Nakos worked.

17      Q.    And is it a pizza operation?

18      A.    If it is we've never seen a pizza come out of

19  that operation.

20      Q.    Have you seen a sub package, a pizza being

21  delivered, anything leaving that establishment that

22  resembled food in any capacity?

23      A.    We've never seen anything come out of the

24  establishment that resembled food.

25      Q.    Now, is that fair to say that that's a

```
 1   business, there's now a lis pendens on that business

 2   that was filed by the U.S. Attorney's office?

 3        A.   Yes.

 4        Q.   And is that business being forfeited by the

 5   U.S. Attorney's Office?

 6        A.   Yes, it is.

 7        Q.   And have records been received by the U.S.

 8   Attorney's Office in conjunction with this information

 9   involving Amory Street Pizza?

10        A.   Yes.

11        Q.   What do those records show with respect to how

12   much is being spent a month on food at Amory Street

13   Pizza?

14        A.   I believe it was approximately $12 a month is

15   what they purchased for food.

16        Q.   So Amory Street Pizza, an ongoing business,

17   utilized $12 in U.S. currency a month to purchase food?

18        A.   Correct.

19        Q.   Now, you briefly touched upon the confidential

20   source, and what you said was the confidential source

21   indicated that marijuana coming from Canada and

22   ultimately headed to Alkis Nakos was labeled NH?

23        A.   Correct.

24        Q.   What does that mean to you in law enforcement?

25        A.   To me it means if Canada is distributing to
```

1    multiple states within New England or the east coast,

2    they have to distinguish where each load is going, and

3    anything that was marked NH involved marijuana typically

4    coming to New Hampshire.

5         Q.   Okay.  Now let me just try to jump way ahead

6    at some point.  Now, is it fair to say that a search

7    warrant was executed at the residence of Kosmas Koustas

8    at some point in time during this investigation?

9         A.   Yes.

10        Q.   Did that occur in March of 2014?

11        A.   Yes.

12        Q.   And in addition to -- what was seized at that

13   residence?

14        A.   What was seized were two firearms,

15   approximately 15 cell phones, approximately two pounds

16   of MDMA which is Methylenedioxyamphetamine or also known

17   on the street as Molly, and one pound of marijuana that

18   was actually labeled NH.

19        Q.   Okay.  So, in March of 2014 law enforcement

20   took out a search warrant at Kosmas Koustas's residence.

21   During that investigation did you establish that Kosmas

22   Koustas had ties directly with Alkis Nakos?

23        A.   Yes.

24        Q.   So during the execution of the search warrant

25   law enforcement seized approximately one pound of

1    marijuana?

2         A.    Correct.

3         Q.    And it was labeled what?

4         A.    NH.

5         Q.    What does that say to you?

6         A.    To me that says that this is one of the loads

7    coming down from Canada which we believe had information

8    on in 2009 that would specifically go to Alkis Nakos for

9    distribution.

10        Q.    You also testified that law enforcement seized

11   how many cell phones?

12        A.    Approximately 15 cell phones.

13        Q.    What does that say to a law enforcement

14   officer?

15        A.    What it says to me is Kosmas Koustas was

16   involved in drug trafficking and frequently changed his

17   cell phone.

18        Q.    You also indicated that law enforcement seized

19   two pounds of Molly or MDMA; is that correct?

20        A.    Correct.

21        Q.    Is that a lot of Molly or MDMA to find in New

22   Hampshire?

23        A.    Yes, that is a lot.

24        Q.    Now, let me just back up again.  So the

25   confidential source in 2009 identified Alkis Nakos and

1  said that he was NH; is that correct?

2      A.   Correct.

3      Q.   Did the confidential source identify how much

4  weight was being distributed to Alkis Nakos on a weekly

5  basis between 2008 and 2009?

6      A.   Yes, it was approximately 100 to 200 pounds a

7  week.

8      Q.   Did the confidential source indicate whether

9  it had ever met with Alkis Nakos in order to obtain

10  amounts of currency?

11      A.   Yes, it met Alkis Nakos at Amory House of

12  Pizza.

13      Q.   And what did the confidential source say with

14  respect to how much currency it had obtained from Alkis

15  Nakos during that time frame which represented proceeds

16  from the distribution of marijuana?

17      A.   The proceeds were approximately three to $5

18  million.

19      Q.   And what about the quantity of drugs, the

20  quantity of marijuana that the CS identified as being

21  delivered to Alkis Nakos with the label NH?

22      A.   Approximately 3,000 to 5,000 pounds during

23  that period of time.

24      Q.   Now, that occurred in 2009; correct?

25      A.   Correct.

1    Q.   Is it fair to say that many individuals were

2    arrested at that time with respect to the drug

3    trafficking organization?

4    A.   Yes, they were.

5    Q.   Was Jeffrey Colgrove arrested?

6    A.   No, he was not.

7    Q.   Was Alkis Nakos arrested?

8    A.   No, he was not.

9    Q.   Was Kosmas Koustas arrested?

10   A.   No, he was not.

11   Q.   So, now let's span forward to 2012.  Why do

12   members of the New Hampshire State Police still care

13   about Alkis Nakos?

14   A.   Unfortunately in 2009 we didn't have enough

15   evidence to prove what his role was, but obviously we

16   were still interested in investigating him because

17   that's a large quantity of marijuana to be coming into

18   New Hampshire and be distributed, so it was obviously

19   something we were still interested in.

20   Q.   Once someone comes up on the radar screen with

21   law enforcement, do you ever just let it go by or do you

22   always keep their name in mind?

23   A.   No, we always keep their name definitely in

24   mind and typically it always comes back around, might

25   take a year or two, but usually more information comes

1    in, somebody else comes in to cooperate and we get more

2    information that the person is still distributing.

3         Q.   In or around 2012 did law enforcement increase

4    their investigation involving Alkis Nakos and

5    individuals connected with Alkis Nakos?

6         A.   Yes.

7         Q.   Did you utilize a confidential informant

8    numbered CI#2?

9         A.   Yes, we did.

10         Q.   What did CI#2 say with respect to Alkis Nakos?

11         A.   CI#2 was speaking with a subject by the name

12    of Charles Fowle, and CI#2 received information from

13    Charles Fowle that Kosmas Koustas was getting hundreds

14    of pounds of marijuana from Alkis Nakos.  Koustas also

15    had another source that the CI said came from the

16    Worcester, Massachusetts, area and Koustas would use

17    that person when he was picking up smaller quantities of

18    marijuana.

19         Q.   So now you have CI#2 in 2012 indicating very

20    much similar information as to the confidential source,

21    what the confidential source said in 2009; is that

22    correct?

23         A.   Correct.

24         Q.   What was the game plan in 2012 with respect to

25    CI#2?

1    A.    We were actually going to see if CI#2 would

2   actively cooperate.   Unfortunately CI#2 was not able to

3   do anything directly with Alkis Nakos.

4    Q.    Why?

5    A.    Typically, like I said, people that are at the

6   top try to insulate themselves and utilize people that

7   are under them to actually do the actual distribution.

8   CI#2 did have contact with Charles Fowle and he also was

9   able to have contact with Kosmas Koustas.

10    Q.    So, if one or two go up on a wiretap or Title

11   III intercept, do law enforcement have to have what's

12   known in the business as a dirty call?

13    A.    Yes, we do, either a phone call or a text

14   message.

15    Q.    So before you receive authorization from the

16   court to initiate a wire intercept you have to utilize,

17   for example, a confidential source in order to make a

18   dirty call or a drug-related call to a target; correct?

19    A.    Correct.

20    Q.    Was CI#2 in a position to engage in a dirty

21   call to Alkis Nakos?

22    A.    He was not.

23    Q.    Was CI#2 in a position to engage in a

24   drug-related call to Kosmas Koustas?

25    A.    Yes, he was.

1      Q.    Did that happen?

2      A.    Yes, it did.

3      Q.    And based upon that investigation did law

4   enforcement receive authorization from Judge Barbadoro

5   to engage in a wiretap intercept starting on

6   October 23rd, 2013, over a telephone that was being

7   utilized by Kosmas Koustas?

8      A.    Yes, we did.

9      Q.    Now, like that telephone, was that telephone

10  actually in Kosmas Koustas's name?

11     A.    It was not.

12     Q.    What was the goal, your ultimate goal was

13  Alkis Nakos; correct?

14     A.    Correct.

15     Q.    Well, why would you want to go and intercept

16  calls involving Kosmas Koustas?

17     A.    Because we knew that Kosmas Koustas had more

18  of a direct tie to Alkis Nakos.

19     Q.    Did you expect that the wire intercept that

20  was authorized in October would link Kosmas Koustas

21  directly to Alkis Nakos?

22     A.    Yes, we were.

23     Q.    And did that happen on that telephone?

24     A.    It did not on that telephone.

25     Q.    Why?  What would you attribute that to?

1    A.    Typically like I said before, people that are

2  distributing marijuana or other drugs utilize certain

3  phones for certain people.  So Charles Fowle, or the

4  confidential source, Kosmas Koustas spoke to those two

5  people because they were lower on the chain of

6  distribution when you utilize one phone.  When he was

7  talking to other people involved in the organization, he

8  had other phones.  And like I said, we seized 15 phones

9  from this residence.

10    Q.    By the way, is it difficult to obtain

11  authorization to get search warrants for phones once you

12  seize them?

13    A.    Yes.

14    Q.    And even if you get search warrants to

15  authorize searching of the telephones when you seize

16  them, is it easy to unlock the password on a phone?

17    A.    No.  Nine times out of ten we're unable to

18  actually unlock the phone.

19    Q.    At times does it take three to six months just

20  to gain access to a telephone that you have seized and

21  have a search warrant for?

22    A.    Yes.

23    Q.    Do most drug traffickers know this?

24    A.    I assume they would know, that's why they lock

25  their phones.

1      Q.    Okay.  Now, going back.  The wiretap intercept

2   was authorized October 23rd, 2013; correct?

3      A.    Correct.

4      Q.    What happened on that night?

5      A.    We almost immediately received a phone call

6   between Kosmas Koustas and a subject that we had later

7   identified as Dean Sieger, and in the context of that

8   conversation we determined that Kosmas Koustas was going

9   to travel to Massachusetts to pick up a quantity of

10  marijuana from Mr. Sieger.

11     Q.    So you're listening to this call in realtime;

12  correct?

13     A.    Correct.

14     Q.    When you heard that, that Kosmas Koustas was

15  making arrangements to go to Massachusetts to pick up

16  from someone believed to be Dean Sieger, do you scramble

17  your unit and try to get surveillance units out in order

18  to watch this happen?

19     A.    Unfortunately we weren't able to go down to

20  Massachusetts just because we had really no way of

21  knowing where the transaction was going to happen, and

22  even at that time I think we had determined that it was

23  maybe down in the Worcester area.  By the time we got

24  units down there pretty much we determined that Koustas

25  would have been coming back to New Hampshire, so we

1    decided to set up surveillance in the New Hampshire

2    area.

3        Q.   When individuals engage in communication over

4    their telephones and they're dealing with drugs, do they

5    say something of the sort, I want a hundred pounds of

6    marijuana, I will meet you at this address, will you be

7    there.  Do they do anything like that?

8        A.   No, they do not.  We typically call it a coded

9    language, and what we mean by coded language is they

10   will say, hey, I want one, or I want a hundred.

11   Sometimes they'll actually use terminology like they'll

12   say shoes, and we'll determine, okay, one shoe is let's

13   say a pound of marijuana, and through the course of the

14   investigation you are actually able to figure out what

15   that code actually means.

16       Q.   What about in this case.  Was there ever any

17   particular code that law enforcement were able to break

18   and understand what they were talking about?

19       A.   I know many times Koustas would use the term

20   Molly which is a street term for MDMA.

21       Q.   Now, on October 23rd when law enforcement

22   intercepted the call, did law enforcement attempt to

23   pick up Kosmas Koustas when he arrived back in New

24   Hampshire?

25       A.   Yes.  Kosmas Koustas actually placed a phone

1    call to Charles Fowle.  Through the context of that call

2    we determined that he actually was going to drop off a

3    quantity of marijuana to Charles Fowle.  And of course

4    we knew where Charles Fowle lived so we actually set up

5    surveillance on Charles Fowle's house.

6        Q.    So the original call is between Kosmas Koustas

7    and someone law enforcement believed to be Dean Sieger,

8    and the call is arranging a meet; correct?

9        A.    Correct.

10       Q.    And after Kosmas Koustas met with Dean Sieger

11   that law enforcement do not surveil, does Kosmas Koustas

12   as he's driving back to New Hampshire contact Charles

13   Fowle?

14       A.    Yes, he does.

15       Q.    And what does he say to Charles Fowles?

16       A.    Basically the context was that he had

17   something for him, which we in turn because we just met

18   with Mr. Sieger, meant that he picked up a load of

19   marijuana and he wanted to distribute some of that

20   marijuana to Charles Fowle to actually distribute to his

21   customers.

22       Q.    Okay.  So on October 23rd during the nighttime

23   Kosmas Koustas, after a meet with Sieger, contacts

24   Charles Fowles and says I've got something for you.  Is

25   that accurate?

1       A.    Correct.

2       Q.    So, do law enforcement then see Kosmas Koustas

3  arrive at Charles Fowle's residence?

4       A.    Yes, we do.

5       Q.    And by the way, where does Charles Fowle live?

6       A.    He lives on Waverly Street in Manchester, New

7  Hampshire.

8       Q.    Were you able to confirm that Kosmas Koustas

9  in fact dropped off marijuana after Kosmas Koustas left

10  that residence?

11       A.    Yes.

12       Q.    And how is that?  Did he, he, Kosmas Koustas,

13  engage in another telephone call with Charles Fowle?

14       A.    Yes.  They had a conversation and basically

15  were talking about the quality of the marijuana.  One

16  term was used to fluff it up, you know, Charles Fowle

17  wasn't sure he was happy with it or not.

18       Q.    What does that mean to fluff it up in drug

19  language?

20       A.    It sounds almost like the marijuana was a

21  little compressed and Koustas actually advised to fluff

22  it up a little bit, meaning break it up a little bit.

23       Q.    In addition to contacting Charles Fowle during

24  that night, did Kosmas Koustas also contact as he was

25  traveling back from Massachusetts, somebody by the name

1    of Jeremy Blevens?

2         A.    Yes, he did.

3         Q.    Did he make arrangements to meet with Jeremy

4    Blevens?

5         A.    Yes, he arranged to meet him up in the area

6    where Kosmas Koustas lives in Hooksett.

7         Q.    Did law enforcement establish surveillance

8    where Kosmas Koustas lives in Hooksett?

9         A.    Yes.

10        Q.    Did you observe Kosmas Koustas meet with

11   someone who you believed to be Jeremy Blevens?

12        A.    Yes, we did.

13        Q.    What did you see with respect to whether

14   Kosmas Koustas was carrying anything when he went to

15   meet with Jeremy Blevens?

16        A.    What we saw on that night is we saw Kosmas

17   Koustas leave his residence and actually drive down

18   street a ways and there's a little parking area off the

19   side of the street.  He pulled up next to another

20   vehicle, got out of the car and he had a bag in his hand

21   briefly, and got back into his car.  Unfortunately the

22   way the area was, we weren't able to actually directly

23   sit on where they were meeting and had to do periodic

24   drive-bys.

25        Q.    Why is that?  Do individuals such as Kosmas

1    Koustas and Alkis Nakos engage in transactions in the

2    middle of a parking lot so that they can see law

3    enforcement who are attempting to surveil them?

4         A.   Yes.   In this type of parking lot that they

5    were in is very small, probably three or four cars could

6    actually fit in the area.   There would be no way that

7    you would be able to park on the side of the road

8    because you would be seen.

9         Q.   Now, that transaction occurred on

10   October 23rd, 2013.   Drug traffickers, when they pick up

11   loads of any drugs, do they typically engage in what's

12   known as cash and carry, meaning here's my money, I'm

13   taking the drugs?

14        A.   Sometimes when you're only picking up a small

15   quantity of drugs you actually hope that the distributor

16   will actually get paid for them, but a lot of times when

17   they're dealing with like multiple pounds of marijuana,

18   again, they will front the marijuana to the individual,

19   and what we mean by that is, say, they give them five or

20   10 pounds of marijuana, that individual then will sell

21   that marijuana, get the proceeds, and then will actually

22   pay for the marijuana at a later date.

23        Q.   That's known as being fronted with quantities

24   of drugs?

25        A.   Correct.

1    Q.   Now, between October 23rd through early

2    December 2013, is it fair to say that law enforcement

3    continued to intercept numerous telephone calls between

4    Kosmas Koustas and Charles Fowle, between Kosmas Koustas

5    and Jeremy Blevens, involving Kosmas Koustas's attempt

6    to obtain money from them which represented proceeds

7    from the distribution of marijuana?

8    A.   Yes, numerous calls.  I remember it was

9    actually a month had gone by and Charles Fowle, you

10   know, made a comment to Kosmas Koustas that it had only

11   been a couple weeks, and Koustas actually had to point

12   out that it had been almost four weeks since he had

13   received any money.

14   Q.   And what was the, what was the nature of the

15   call?

16   A.   Basically it sounded like Koustas was trying

17   to get the money from the marijuana that he had

18   distributed to Charles Fowle so that he could then in

19   turn pick up an additional amount of marijuana.

20   Q.   Now, is it fair to say that on or around

21   December 3rd and December 4th, 2013, law enforcement

22   received information over the wire intercept that

23   Koustas was about to go back to Massachusetts in order

24   to pick up another load?

25   A.   Yes.  Koustas spoke to the subject we believed

1    to be Dean Sieger again, and during that phone call it

2    again sounded like he was arranging to pick up another

3    load of marijuana.

4         Q.    And when did that occur?

5         A.    I believe that was December 3rd, December 4th.

6         Q.    Now, did law enforcement identify on

7    December 5th that Koustas in fact arranged to meet with

8    an individual who law enforcement believed is Dean

9    Sieger in order to obtain another quantity of marijuana?

10        A.    Yes.

11        Q.    And what happened during the night of December

12   5th?

13        A.    Basically law enforcement had an intercept on

14   Mr. Koustas, unfortunately we had lost him, but through

15   phone calls we did determine that he actually did meet

16   with Mr. Sieger at the Staples in Millbury, Mass.

17        Q.    And then what happened?

18        A.    Then basically law enforcement set up

19   surveillance back in New Hampshire on 140 Porter Street.

20   We actually saw Mr. Koustas who was actually at the time

21   driving a different vehicle, he was driving a Honda

22   registered to an individual who actually lived at Porter

23   Street.  We were able to see the car arrive at the

24   house, unfortunately at nighttime, whether he exited or

25   not, but he did go into the house.

1      Q.   All right, we're going to back up a little

2  bit.  So Kosmas Koustas, you know that the first load

3  occurred on October 23rd, 2013?

4      A.   Correct.

5      Q.   On that night you intercepted a phone call

6  between Kosmas Koustas and someone believed to be Dean

7  Sieger; correct?

8      A.   Correct.

9      Q.   Now, that telephone, did law enforcement

10  attempt to identify the subscriber to the telephone that

11  Koustas was calling that we believe Dean Sieger was

12  holding on to?

13      A.   Yeah, that phone again was a phone-in-the-box

14  is what the subscriber was.

15      Q.   And how long was the phone on, for example.

16  Did this phone last for five weeks, 10 weeks or two or

17  three days?

18      A.   Yeah, this particular phone only lasted I

19  think it was like maybe three days during the actual

20  times that Koustas was trying to arrange to pick

21  something up.

22      Q.   All right.  Now, span forward to December 5th.

23  You indicated that Kosmas Koustas made another call to

24  the individual believed to be Dean Sieger.  Was it to

25  the same number or a different number?

1       A.   It was actually a different number.

2       Q.   Now, how long did this individual hold on to

3   the second phone that Koustas called?

4       A.   Again, it was just a few days between the time

5   that they were actually trying to contact each other.

6       Q.   Were arrangements made between Kosmas Koustas

7   and the individual believed to be Dean Sieger for

8   Koustas to travel in order to pick up a load?

9       A.   Yes.

10       Q.   And you indicated, you made mention to the

11   vehicle Koustas was in.  Was it registered in his name?

12       A.   No, it was to an Andreas (ph) Nakos.

13       Q.   And it was registered to what address?

14       A.   140 Porter Street in Manchester, New

15   Hampshire.

16       Q.   Now, at some point in time do law enforcement

17   execute a search warrant at 140 Porter Street in

18   Manchester, New Hampshire?

19       A.   Yes.  On the same day, March 30th, same day

20   that we did the search warrant at Koustas's residence,

21   we also did one at 140 Porter Street.

22       Q.   And what did law enforcement seize in, I'm not

23   sure if it was a basement or not, in 140 Porter Street?

24       A.   It was a hockey bag which actually had a tag

25   inside of it that said Boston and on the other side it

1  had the reference to it a type of marijuana.

2       Q.    Was that Diamond Kush?

3       A.    Yes.

4       Q.    And did it say Diamond Kush times 50?

5       A.    Correct.

6       Q.    What does that mean to you as a law

7  enforcement officer.  First, what's the significance of

8  a hockey style bag?

9       A.    Typically a hockey bag is what marijuana is

10  actually distributed or moved in from one place to the

11  another.  You can typically put 50 to a hundred pounds.

12  So when we saw the times 50, we determined that that

13  particular bag most likely had 50 pounds of marijuana in

14  it, and the Boston reference, most likely it come from

15  Canada down into the Boston area.

16       Q.    And that was seized at 140 Porter Street?

17       A.    Correct.

18       Q.    Now, if it's Diamond Kush times 50 or whatever

19  the brand is, what is the value of this marijuana?  It's

20  being sold for how much a pound?

21       A.    Typically through this investigation the

22  marijuana was about 3,500 a pound.

23       Q.    So if it was 50 pounds of marijuana, what is

24  the street value of that 50 pounds of marijuana?

25       A.    Can I have a calculator?

43

1      Q.   Is it 50 pounds times --

2      A.   Yeah, 3,500, that's at the low end because

3  obviously if somebody wants to break the marijuana down

4  to smaller quantities you can get more money for it.

5      Q.   Is that $150,000 of the marijuana that could

6  have been in that bag?

7      A.   Approximately, yes.

8      Q.   Now you mention Porter Street.  Let's go back

9  to December 5th.  You had jumped ahead to say in March

10 there was a search warrant executed at 140 Porter

11 Street.  Now, let's back up to December 5th.  After

12 Koustas left Massachusetts, he traveled back to 140

13 Porter Street, is that what you testified to?

14     A.   Correct.

15     Q.   What happened when he was there?  What did law

16 enforcement see during surveillance, and was it easy to

17 see things on surveillance that night?

18     A.   Again, the location of that house, it's not

19 easy to park and actually sit on the house so to speak,

20 you have to do drive-bys.  It was a dark location, so,

21 you know, we were able to see limited stuff.  But we

22 were able to see Koustas arrive there.  We also a short

23 time after were able to see Mr. Nakos arrive at the

24 house as well.

25     Q.   So, was it approximately 10:00 at night that

1    law enforcement observed a 2014 Mercedes Benz registered

2    to Alkis Nakos arrive at that residence?

3         A.   Correct.

4         Q.   Did law enforcement observe Alkis Nakos enter

5    the residence?

6         A.   We observed an individual, but I don't believe

7    at the time with how dark it was they were able to

8    determine it was actually him.

9         Q.   And how long did either Alkis Nakos or Kosmas

10   Koustas remain inside and what happened to them after?

11        A.   It's a short period of time, ten minutes

12   approximately, then they both left and surveillance

13   actually followed Mr. Nakos back to 366 Arah Street,

14   which was his residence, and Mr. Koustas back to his

15   Hooksett residence.

16        Q.   So, Alkis Nakos, a person believed to be Alkis

17   Nakos, arrived in a 2014 Mercedes Benz registered to

18   him, stayed ten minutes, and later went back to his own

19   residence; correct?

20        A.   Correct.

21        Q.   Now, that was December 5th.  What happened on

22   December 6th?

23        A.   On December 6th Mr. Koustas actually contacted

24   Mr. Sieger again.  Again, it seemed like they were

25   trying to arrange something.  Mr. Sieger had made

1   statements that he hadn't heard from them yet.

2        Q.   Hadn't heard from them?

3        A.   Correct.

4        Q.   What does that mean?

5        A.   To us that meant that Mr. Sieger was arranging

6   most likely for someone to come down from Canada and was

7   in contact with those people.  Mr. Koustas in turn said

8   no, it's not going to happen, which told us that maybe

9   Mr. Koustas had more information than Mr. Sieger

10  actually had.

11       Q.   Was that unusual to you?

12       A.   Yes, it was.

13       Q.   Why?

14       A.   Because we thought Mr. Sieger actually had

15  more of a tie to the actual source of the marijuana.

16       Q.   So on December 6th after Koustas had just

17  obtained a load December 5th, there was another call

18  between Koustas and the person believed to be Dean

19  Sieger?

20       A.   Correct.

21       Q.   And during that call Dean Sieger says I'm

22  waiting to hear from them, and Koustas replied it's not

23  going to happen?

24       A.   Correct.

25       Q.   And what did you do with respect to trying to

 1    find out who Kosmas Koustas might have spoken to in

 2    addition to Dean Sieger on that date, December 5th?

 3        A.   We had received telephone toll records on

 4    another number, New Hampshire number, and those toll

 5    records actually showed that Mr. Koustas and Mr. Nakos

 6    actually had a conversation at approximately 10:40 in

 7    the morning, and we believed based on the conversation

 8    with Mr. Sieger, that Mr. Koustas received information

 9    from Mr. Nakos that this load was not going to happen,

10    which Mr. Koustas actually relayed to Mr. Sieger later

11    that night when he spoke to him.

12        Q.   Now, you have just, you mentioned that you

13    received information involving a different telephone.

14    Now, let me just make it clear.  Kosmas Koustas is

15    speaking to Dean Sieger on a telephone that has been

16    identified as 508-479-6296; is that correct?

17        A.   Correct.

18        Q.   And that is the phone that law enforcement are

19    up on the wire on; is that correct?

20        A.   Correct.

21        Q.   But law enforcement received additional

22    information that Kosmas Koustas had another telephone

23    with the number 603-261-0853; is that correct?

24        A.   Correct.

25        Q.   So, when Koustas spoke to the person believed

1    to be Dean Sieger on the 508 number, there was no

2    communication between Koustas and Nakos on that number;

3    right?

4         A.    Not on that number, no.

5         Q.    But directly before Koustas spoke to Sieger,

6    Koustas had a conversation with Alkis Nakos utilizing a

7    different cellular telephone number, and after that

8    conversation Koustas told Sieger the load is off?

9         A.    Correct.

10        Q.    What does that say to you as law enforcement?

11        A.    What it says to me or what our initial

12   information was was that Mr. Nakos was actually the

13   person that had direct communications with the Canadian

14   sources, and Mr. Nakos was then in turn telling Mr.

15   Koustas that, you know, he must have spoken to somebody

16   up there because he had information that the load was

17   not going to come through, which Mr. Koustas then in

18   turn told Mr. Sieger.

19        Q.    Now, the following day, December 7th, 2013,

20   was there another call between Koustas and the person

21   believed to be Dean Sieger?

22        A.    Yes.

23        Q.    And what what happened

24        A.    They actually (inaudible) to me.

25        Q.    And was there a meeting?

1        A.    Yes, law enforcement was able to set up on Mr.

2   Koustas who was actually driving the same Honda Accord

3   listed to Andreas (ph) Nakos, 140 Porter Street.   Mr.

4   Koustas met who we believed to be Mr. Sieger at a mall

5   in Millbury, Massachusetts.   We were then able to follow

6   both individuals from that mall to a house in Millbury,

7   Massachusetts, on 4 Coldbrook Road.

8        Q.    Okay, so, there was a load on October 23rd, a

9   load on December 5th, Koustas said to Sieger on December

10  6 it's off, but on December 7th there's going to be

11  another load; is that accurate?

12       A.    Correct.

13       Q.    And you just identified a residence located on

14  4 Coldbrook Road in Millbury, Massachusetts?

15       A.    Correct.

16       Q.    What did law enforcement see with respect to

17  that residence?   Had law enforcement been watching that

18  residence for a significant period of time?

19       A.    Yes.

20       Q.    During law enforcement surveillance, did law

21  enforcement ever observe someone by the name of Goldberg

22  Hassan (ph) arrive at that residence?

23       A.    Yes, and she was operating a rental car.

24       Q.    And the rental car was rented out of where if

25  you know?

1          A.    I know it was Budget, I'm not sure, upper

2    state, I'm not sure.

3          Q.    What did law enforcement find out about

4    Goldberg Hassan (ph)?

5          A.    We found out that she actually works for Bank

6    of Montreal.

7          Q.    Where does she live?

8          A.    Up in Canada.

9          Q.    So the residence, 4 Coldbrook Road, law

10   enforcement were watching that and observed a woman,

11   Goldberg Hassan (ph), who lives in Canada and works for

12   Bank of Montreal arrive at that residence?

13         A.    Correct.

14         Q.    Now, you testified about the individual known

15   as Dean Sieger, believed to be Dean Sieger, and you've

16   identified two telephones that Dean Sieger had but were

17   not in his name; correct?

18         A.    Correct.

19         Q.    And you also testified that those phones were

20   held on for just days; is that correct?

21         A.    That's correct, yes.

22         Q.    Although the phones were held on to for days,

23   did law enforcement get toll records for those phones?

24         A.    Yes, it did.

25         Q.    What does it mean to get toll records?

1       A.      Basically it gives you a history of the phone

2   numbers that those particular phones actually called.

3       Q.      When law enforcement engaged in the toll

4   records, was it even a five-day period of time?

5       A.      I believe it was only three days.

6       Q.      Did you see any information which would

7   connect the phone being held and used by the individual

8   believed to be Dean Sieger in any connection with

9   individuals located in Plattsburgh, New York?

10      A.      Yes.

11      Q.      How close is Plattsburgh, New York, to Canada?

12      A.      Very close.

13      Q.      What's the information law enforcement

14   obtained with respect to who the individual believed to

15   be Dean Sieger was contacting near the Plattsburgh, New

16   York, area?

17      A.      I believe it was Mr. Lafave.

18      Q.      Was it Marshall Lafave?

19      A.      Yes.

20      Q.      I direct your attention to paragraph 60 of the

21   arrest warrant affidavit.

22      A.      I know Mr. Lafave was involved in drug

23   trafficking as well.  I believe that $32,500 was

24   actually seized from him at one time.

25      Q.      So, law enforcement connected one of the

1    numbers belonging to or believed to be held by Sieger to

2    someone by the name of Marshall Lafave?

3         A.    Correct.

4         Q.    Is it accurate to say that law enforcement

5    stopped Marshall Lafave in upper state New York and

6    ultimately seized $32,500 in U.S. currency that was

7    contained in a hermetically sealed package?

8         A.    Yes.

9         Q.    Was that currency believed to be the proceeds

10   of marijuana?

11        A.    Yes, it was.

12        Q.    Now let's back up again to December 7th.  When

13   law enforcement observed Kosmas Koustas go to 4

14   Coldbrook Road in Millbury, Mass. along with an

15   individual believed to be Dean Sieger, what happened

16   after?

17        A.    We were then able to follow Mr. Koustas back

18   to Manchester, New Hampshire, where he again went to 140

19   Porter Street.

20        Q.    And did he arrive at approximately 8:30 p.m.?

21        A.    Yes, he did, when he exited the vehicle he

22   actually brought a bag into the residence with him.

23        Q.    So, when he arrived it was approximately 8:30;

24   correct?

25        A.    Correct.

1        Q.   At 8:41 did the second telephone identified as

2   belonging to Kosmas Koustas, the 603 number, the

3   261-0853 number, did Kosmas Koustas receive an incoming

4   call on that line?

5        A.   Yes.  He received a call from Alkis Nakos.

6        Q.   And what happened?

7        A.   Shortly thereafter Mr. Koustas left Porter

8   Street and we were able to follow him directly over to

9   Mr. Nakos's residence on Arah Street.

10        Q.   What does that say to law enforcement when you

11   observed them now on the 5th and the 7th meeting right

12   after Koustas comes back with a load of marijuana?

13        A.   Well, what it says to us is that Mr. Koustas

14   brought back a load of marijuana and actually on the 5th

15   Mr. Nakos met him at Porter Street to pick up a quantity

16   of marijuana, but then on the 7th Mr. Koustas actually

17   drove over to Mr. Nakos's residence to deliver the

18   marijuana.

19        Q.   Now, on -- and by the way, is this arrest

20   warrant affidavit, is it fair to say that there are a

21   lot of intercepted calls that are referenced in the

22   affidavit?

23        A.   Yes.

24        Q.   But are there hundreds of additional

25   conversations that were monitored that are not in this

1    affidavit?

2         A.   Yes, hundreds.

3         Q.   How successful were law enforcement with

4    monitoring conversation between Kosmas Koustas and Alkis

5    Nakos?

6         A.   On this particular --

7         Q.   Throughout the investigation?

8         A.   Oh, we did intercept him on another telephone

9    line, unfortunately a lot of it was in Greek which made

10   it difficult as well, but again, everything, when Mr.

11   Koustas and Mr. Nakos spoke, it was all in coded

12   language.

13        Q.   Now, let's -- I'll direct you to March 15th of

14   2014, and if you will I'd like you to turn to paragraph

15   95 of the affidavit.

16        A.   Yup.

17        Q.   What happened on March 15, 2014, on the wire

18   intercept?  Was Kosmas Koustas intercepted speaking to

19   someone by the name of Christopher Ranfos?

20        A.   Yes.

21        Q.   And what happened during the call?  Law

22   enforcement believed that Ranfos would obtain a quantity

23   of marijuana from Koustas?

24        A.   Yes, Mr. Koustas told Mr. Ranfos where he was.

25   At that time law enforcement set up on Cedar Street.  We

1    did observe Mr. Ranfos arrive at the location.  We also

2    observed Mr. Ranfos take a bag out of the back of Mr.

3    Koustas's van.

4         Q.    And then what did law enforcement observe

5    Christopher Ranfos do once he had a bag from Koustas's

6    van?

7         A.    We then observed Mr. Ranfos actually go back

8    to his residence on Boutwell Ave.

9         Q.    That van that you're referencing, Sergeant

10   Mackenzie, is that the same van where the pound of

11   marijuana was seized that had the label NH?

12        A.    Yes.

13        Q.    So, after law enforcement observed Kosmas

14   Koustas meet with Christopher Ranfos on March 15, 2014,

15   Ranfos then went back to his, Ranfos's, residence?

16        A.    Correct.

17        Q.    And then what did law enforcement see?

18        A.    Then a short time later an individual by the

19   name of John Horne actually arrived at Mr. Ranfos's

20   residence.

21        Q.    And what happened next?

22        A.    And we observed Mr. Horne actually go into the

23   residence, come out a short time later and actually had

24   a bag in his hand which he put into his vehicle.

25        Q.    Then what happened?

1      A.    Law enforcement was able to follow Mr. Horne

2   back to Raymond, New Hampshire, where we had the state

3   police stop him.  Upon stopping him the trooper received

4   consent to search his vehicle and actually took a half

5   pound of marijuana out of the bag that Mr. Horne had

6   taken out of Ranfos's house.

7      Q.    So Ranfos gets marijuana from Koustas.  Ranfos

8   goes home.  Horne drove to Ranfos's home, gets the

9   marijuana, puts it in his car, and law enforcement

10   stopped him and they seize a half a pound of marijuana?

11      A.    Correct.

12      Q.    Two days later on March 17, 2014, what

13   happened to Christopher Ranfos, who's he with?

14      A.    Mr. Ranfos and Mr. Nakos actually were

15   traveling south on the Everett Turnpike in Nashua where

16   a Troop B New Hampshire state trooper stopped them for a

17   motor vehicle violation.  Upon stopping them there was

18   four cell phones seized from Mr. Nakos.  In addition

19   there was $19,000 total seized from both Mr. Ranfos and

20   Mr. Nakos, and I believe Mr. Nakos had 95 hundred of

21   that money.  They both said that they were going down to

22   Foxwoods.

23      Q.    Now, of the cell phones did law enforcement,

24   through the U.S. Attorney's Office, obtain search

25   warrants to execute on those telephones?

1        A.    Yes.

2        Q.    And so there are presently pending search

3    warrants.  Has law enforcement been successful in

4    breaking the codes or the password to get on those

5    phones?

6        A.    No.

7        Q.    Will that take at least three more months?

8        A.    Possibly.

9        Q.    Now, I want to talk a little bit now about

10   cocaine.  During the course of this investigation did

11   law enforcement intercept telephone calls between Kosmas

12   Koustas and Charles Fowle talking about cocaine?

13       A.    Yes.

14       Q.    And when did that occur, was that in March?

15       A.    Yes.

16       Q.    And what did law enforcement hear over the

17   wire?

18       A.    Mr. Koustas was trying to obtain what we

19   believe to be 1 or 2 kilograms of cocaine from a Mr.

20   Sanchez who resided in Massachusetts.  The conversations

21   went back and forth as far as Mr. Koustas being able to

22   actually get the product from Mr. Sanchez.  I believe at

23   one time Mr. Sanchez was ill.

24       Q.    Now, drug traffickers, when you arrange to

25   purchase a kilogram of cocaine, do you just say I'll

1  meet you here and then it happens, or is it an ongoing

2  process?

3        A.   No, typically they will meet ahead of time,

4  you know, make arrangements, especially for quantities

5  that large, you know, they will meet up first, discuss

6  prices, because again, they don't like to talk over the

7  phone.  So they will discuss prices, discuss where it's

8  going to happen and when it's going to happen.  I know

9  Mr. Koustas at one time did meet up with Mr. Sanchez at

10 the BJ's in Hooksett.

11       Q.   All right, now, you made mention to especially

12 to this type of quantity.  Is 1 or 2 kilograms a lot of

13 cocaine in New Hampshire?

14       A.   Yes.

15       Q.   How often do law enforcement see 1 or 2

16 kilograms of cocaine?

17       A.   Not often.

18       Q.   What does it cost to purchase a one-pound

19 quantity -- excuse me, one kilogram, approximately?

20       A.   Could be upwards of 40, $45,000.

21       Q.   Now, you just made mention that in March, was

22 it March 22nd, 2014, that Kosmas Koustas made

23 arrangements to meet with the cocaine source of supply

24 at a BJ's Wholesale in Hooksett?

25       A.   Yes.

1      Q.    Did law enforcement surveil that meet?

2      A.    Yes, we did.

3      Q.    Now, before the surveillance did law

4    enforcement monitor a telephone call that Kosmas Koustas

5    made to Alkis Nakos before the meeting between Koustas

6    and Jose Rodriguez Sanchez?

7      A.    Yes.

8      Q.    And I'll direct your attention to paragraph

9    107 of the affidavit.  At the very bottom page there's a

10   sentence that starts prior to the meeting law

11   enforcement intercepted a conversation between Koustas

12   and Nakos.

13     A.    Correct.

14     Q.    Where was Koustas physically located during

15   the interception of that call?

16     A.    He was inside the BJ's.

17     Q.    And what did Koustas say to Nakos during that

18   conversation?

19     A.    Basically they were talking about, you know,

20   Koustas getting the quantity, I think Nakos actually

21   said the other one, did he call, which Koustas then

22   replied he called me, he is outside himself now, which

23   was consistent with what we had seen.

24     Q.    All right, so Nakos said over the phone -- and

25   by the way, is this in English or in Greek?

1          A.    I believe this was in Greek.

2          Q.    Do you have, at the time you were monitoring

3    these conversations, did you have a certified Greek

4    interpreter?

5          A.    Yes, we did.

6          Q.    And was she present at all times interpreting

7    the conversations for law enforcement when you needed

8    them interpreted?

9          A.    Yes, she was.

10          Q.    And during this conversation Nakos stated the

11    other one, did he call.  What did you interpret that to

12    mean?

13          A.    I interpreted that to mean that Mr. Nakos knew

14    about Mr. Koustas's trying to get a quantity of cocaine

15    which we believed a kilo or two.

16          Q.    Now, when Koustas replied he called me a

17    minute ago, he is outside himself now, I spoke to him a

18    little ago, who was outside at that time waiting to meet

19    with Koustas?

20          A.    At that time it was Mr. Sanchez.

21          Q.    And does this say to a law enforcement officer

22    that Alkis Nakos knew about this transaction?

23          A.    Yes.

24          Q.    Now, is this what ultimately ended up with

25    Kosmas Koustas attempting to be stopped by law

1   enforcement?

2       A.   Yes.

3       Q.   Now, when did that happen?

4       A.   On March 30th.

5       Q.   When -- did law enforcement surveil Kosmas

6   Koustas travel to Massachusetts in order to pick up 1 or

7   2 kilograms of cocaine from Jose Rodriguez Sanchez?

8       A.   Yes, we had intercepted a phone call to

9   arrange Mr. Koustas to come down to Massachusetts and

10   pick up what we believed to be 1 or 2 kilos of cocaine.

11       Q.   When Kosmas Koustas arrived back in New

12   Hampshire, what did law enforcement do?

13       A.   We had arranged for a marked New Hampshire

14   state trooper to stop Mr. Koustas.  When the time came

15   that the trooper actually initiated the stop, activated

16   the emergency lights, Mr. Koustas did pull over briefly,

17   and when the trooper started getting out of his car Mr.

18   Koustas took off at a high rate of speed and --

19       Q.   Was there a pursuit?

20       A.   Yes, there was a very brief pursuit.  Due to

21   the fact that Mr. Koustas was driving in the breakdown

22   lane at a high rate of speed, weaving in and out of

23   traffic, we felt that it was a danger to the public at

24   that time and it was not worth it to engage in pursuit

25   and immediately terminated.

1      Q.    Why not, why won't law enforcement when

2  individuals are going in excess of a hundred miles an

3  hour, why don't law enforcement engage to follow them at

4  that rate?

5      A.    It's just not worth it, especially the state

6  police, we have very strict policy on pursuits, and

7  because we knew who the individual was, we knew it was

8  Kosmas Koustas, it just was not worth us pursuing him

9  based on the way he was driving.  We didn't want to

10  cause any harm to anybody else.

11      Q.    Did law enforcement ever recover any of the

12  cocaine?

13      A.    We did not.

14      Q.    What do you believe happened to the cocaine?

15      A.    Well, we lost him for a period of time, maybe

16  a half hour or so, before the Derry Police Department

17  actually found him again in Derry off Exit 4.  So, he

18  could have either thrown it out, he could have stashed

19  it somewhere, there are so many things he could have

20  done with that cocaine, but we weren't able to recover

21  it.

22      Q.    Before -- while Kosmas Koustas was engaged in

23  the pursuit, does he use his phone that law enforcement

24  are monitoring and contact anyone?

25      A.    Yes.

1      Q.   Who does he contact -- he doesn't contact

2  Alkis Nakos?

3      A.   No, James Johnson I believe.

4      Q.   Are you surprised that Kosmas Koustas didn't

5  contact Alkis Nakos?

6      A.   No, I'm not surprised at all.

7      Q.   Why?

8      A.   Because he also contacted another individual

9  by the name of Frank Fowle, and during that conversation

10 actually said the phones are bad, and then called James

11 Johnson and advised that he wanted Mr. Johnson to go to

12 his house and basically gave him a list of where things

13 were, as he said, his gat, which to me is a gun, advised

14 where that was, a moll, which to me is Molly, advised

15 where that was, because he wanted Mr. Johnson to go to

16 the residence to clean it out before law enforcement

17 went there.

18     Q.   Let me back you up again.  So when Kosmas

19 Koustas is engaged in a high speed chase, he contacts

20 someone who law enforcement knows as Frank Fowle.  Does

21 Frank Fowle have a brother?

22     A.   Yes, Charles Fowle.

23     Q.   Is Charles Fowle the individual who was at

24 Waverly Street in Manchester?

25     A.   Yes, he is.

1      Q.    Is Charles Fowle the individual who was

2  engaged in a lot of distribution of controlled

3  substances on behalf of Kosmas Koustas?

4      A.    Yes, he does.

5      Q.    So what did Kosmas Koustas say to Frank Fowle

6  as he's engaged in a pursuit?

7      A.    Basically he said that the phones were bad,

8  you know, basically that he was in a pursuit and

9  discontinued the call.

10     Q.    I'm going to refer your attention to paragraph

11  114 of the affidavit.  Now, four sentences down it says

12  30 seconds duration Kosmas Koustas told Frank Fowle.

13  What did he say to Frank Fowle?

14     A.    Let it be known I was arrested.  In response

15  Mr. Fowle says you were?  (Inaudible.) Terminate the

16  call.

17     Q.    What does that say to you as a law enforcement

18  officer?

19     A.    Basically Mr. Koustas is telling him to get

20  the word out that the phones are bad, he got arrested,

21  don't use the phones.

22     Q.    And you also made mention to Kosmas Koustas

23  having a communication with somebody by the name of

24  James Johnson?

25     A.    Correct.

1    Q.    Does James Johnson have a federal conviction

2    where he served 30 months for being a felon in

3    possession of a weapon?

4    A.    Yes.

5    Q.    Now, what did Mr. Koustas say to James

6    Johnson, and I'll refer your attention to paragraph 112

7    of the affidavit.  If you look four sentences, five

8    sentences from the bottom it starts at during the call.

9    Can you read that; please?

10    A.    So basically Mr. Koustas says during the call

11    with an individual believed to be James Johnson, Koustas

12    had stated that he's in a chase and he needs a pickup,

13    which to me meant that basically he had lost law

14    enforcement at the time and he needed someone to come

15    pick him up.

16    Q.    And then what else did he say to Johnson?

17    A.    And then he told Johnson to travel to his

18    residence and to remove the box from his bureau, the

19    shoe box in the downstairs closet, the moll which

20    clearly means Molly.

21    Q.    When you say the moll, you mean M-O-L-L, moll

22    as in Molly?

23    A.    Yes, M-O-L-L.

24    Q.    What else did he say?

25    A.    And also he wanted to remove inositol.

1      Q.   What's inositol?

2      A.   It's a substance typically that they add to

3   cocaine to actually increase the amount of cocaine.

4      Q.   What else did Koustas ask him to do?

5      A.   And then Koustas asked Mr. Johnson to have

6   Koustas's girlfriend, Jen Suk Day, to get the gat, which

7   I believe to be a gun.

8      Q.   All right, so Koustas says to James Johnson,

9   get the inositol, get the moll, get the bureau or the

10  box near the bureau, and he said tell Jenny, Jenny Suk

11  Day, to get the gat.

12     A.   Yes.

13     Q.   Is that a term used by individuals who are

14  involved in the drug trade?

15     A.   Yes.

16     Q.   What's a gat?

17     A.   A slang term for firearms.

18     Q.   And all these places that Koustas identified,

19  did law enforcement go and execute a search warrant and

20  find the controlled substances exactly where Koustas

21  described they would be to James Johnson?

22     A.   Yes, we did.

23     Q.   By the way, did James Johnson arrive at

24  Koustas's house and try to get in?

25     A.   There was a follow-up phone call and Mr.

1    Johnson told Mr. Koustas that he was not able to take

2    care of it, that law enforcement was already at the

3    house when he got there.

4         Q.   Was that true?

5         A.   Yes.

6         Q.   Now, in addition to seizing the drugs, was

7    there a money counter seized?

8         A.   Yes.

9         Q.   What's a money counter?

10        A.   Usually when somebody has large amounts of

11   currency they utilize a money counter.  It's easier to

12   count the money obviously.

13        Q.   What about weapons, how many weapons were

14   seized at Koustas's residence?

15        A.   Two firearms, two handguns.

16        Q.   Was one loaded and did one have a round in the

17   chamber?

18        A.   Yes.

19        Q.   Now, why do you think, Sergeant Mackenzie, was

20   law enforcement not ever able to get Alkis Nakos with

21   drugs in hand?

22        A.   Again, because I believe he was utilizing Mr.

23   Koustas to do the, quote, unquote, dirty work.

24             MS. OLLILA:  No further questions, your Honor.

25             THE COURT:  Attorney Carey.

1           MR. CAREY:  Thank you, your Honor.

2                      CROSS-EXAMINATION

3    BY MR. CAREY:

4       Q.   Good afternoon, Sergeant Mackenzie.

5       A.   Good afternoon.

6       Q.   Sergeant Mackenzie, you've been referring to

7    an affidavit during this hearing?

8       A.   Yes, sir.

9       Q.   And you did not sign this affidavit; correct?

10      A.   I did not.

11      Q.   Troop Norris did?

12      A.   Correct.

13      Q.   And Trooper Norris works under you?

14      A.   Correct.

15      Q.   And did you review the affidavit before he

16   signed it?

17      A.   Yes, I did.

18      Q.   What was your role in putting the affidavit

19   together?

20      A.   My role would be as far as like surveillance,

21   listening to, but actually the typing of the affidavit

22   would have been Mr. Norris.

23      Q.   How many other people were involved with

24   putting the information into the affidavit?

25      A.   There's numerous people involved as far as

1    providing information, but the actual physical typing of

2    the affidavit would have been Mr. Norris.

3         Q.    You stand by his accuracy?

4         A.    Yes.

5         Q.    And who decided what to -- strike that.  This

6    is a long investigation you talked about.  Went back to

7    2008 and became more active in 2012.  You couldn't put

8    everything in the affidavit that covered that time

9    period; correct?

10        A.    No.

11        Q.    Who decided what went in the affidavit and

12   what stayed out of the affidavit?

13        A.    I believe it was Attorney Ollila and Trooper

14   Norris.

15        Q.    And I believe you've been talking about

16   information involving Mr. Nakos back in 2008, 2009.

17   That time period is not something he's been charged

18   with; correct?

19        A.    No.

20        Q.    The affidavit charged him with October 13

21   through April 14; correct?

22        A.    Correct.

23        Q.    And so the -- and so the period of time the

24   court should consider here is the six-month period of

25   time; correct?

1      A.    Correct, but the other time establishes a

2   history.

3      Q.    Okay.  From which no charges were ever

4   pursued?

5      A.    Correct, but it still establishes a history of

6   pattern.

7      Q.    And the -- everything you believe supported --

8   that supported the charges against Mr. Nakos made its

9   way into this affidavit; correct?

10      A.    I believe so.

11      Q.    All right.  The most incriminating to Mr.

12   Nakos is in this affidavit; correct?

13      A.    Correct, correct.

14      Q.    Okay.  Now, you referred to some drugs that

15   were found in 140 Porter Street, which is Mr. Koustas's

16   home; right?

17      A.    I never said anything about any drugs in 140.

18      Q.    I thought there was a bag found with a small

19   quantity of marijuana?

20      A.    I know there was a hockey bag.

21      Q.    Hockey bag.  No marijuana?

22      A.    There was a small amount of marijuana was not

23   in that hockey bag.

24      Q.    Was it at that location?

25      A.    Again, I would have to refer to the evidence

1    report.  It would have been a very small amount if there

2    was.

3         Q.   Okay.  And MDMA was also found at that

4    location?

5         A.   It was found at Mr. Koustas's residence in

6    Hooksett.

7         Q.   Okay.  And I don't see that -- you talked a

8    lot about the distribution of MDMA of Mr. Koustas and

9    other associates.  Mr. Nakos was never charged with

10   being involved with the distribution of MDMA; correct?

11        A.   No.

12        Q.   He's not charged in the distribution of

13   oxycodone either; correct?

14        A.   Correct.

15        Q.   And that was something Mr. Koustas was

16   involved with?

17        A.   Correct.

18        Q.   It's in the affidavit?

19        A.   Correct.

20        Q.   Now, there were also weapons that were found

21   in Mr. Koustas's home when the search warrant was

22   executed; correct?

23        A.   Yes.

24        Q.   In the course of your investigation no weapons

25   were ever observed in the possession of Mr. Nakos;

1    correct?

2        A.    No, there were not.

3        Q.    And also according to your complaint no drugs

4    were ever found in his residence; correct?

5        A.    Correct.

6        Q.    Even when a search warrant was executed at his

7    residence on Arah Street no drugs were found; correct?

8        A.    Again, I would have to refer to the evidence

9    report.  If there was any, it would have been a small

10   amount.

11       Q.    And it would have been in the search warrant

12   -- it would have been in the affidavit; correct?

13       A.    Yes.

14       Q.    When did the surveillance of the Amory House

15   of Pizza begin?

16       A.    I don't know the exact date it what was but --

17       Q.    Ballpark.

18       A.    It was probably I'd say last fall of 2013 is

19   when it began.

20       Q.    And how active was the surveillance of the

21   Amory House of Pizza?

22       A.    Fairly active.

23       Q.    When you say active, you mean --

24       A.    Daily.

25       Q.    Daily?

1        A.    Yeah.

2        Q.    Would there be logs to show what times that

3   location was being surveilled?

4        A.    If something was observed, then we would note

5   it.

6        Q.    Okay.  And if nothing was observed what would

7   happen then?

8        A.    It wouldn't be noted.

9        Q.    Okay.  And in terms of what was being

10   observed, would it be incriminating things that would be

11   noted in the log if they were observed?

12        A.    If it was incriminating, yes.

13        Q.    Okay.  And so based on the fact that there's

14   only one reference to Amory House of Pizza on Monday in

15   the affidavit by Trooper Norris, is it fair to assume

16   that during that stretch of time there's nothing

17   incriminating about his --

18        A.    I couldn't answer that.  I don't know.

19        Q.    Well, if it's not in the affidavit?

20        A.    I'm just saying I can't say to you yes because

21   I don't know without reviewing other reports.

22        Q.    Do you agree with me that there's only one

23   reference to any activity on one day at the Amory House

24   of --

25        A.    Yes.

1      Q.    In the affidavit?

2      A.    Correct.

3      Q.    And you don't feel comfortable making the

4  logical inference that if there's nothing else observed

5  in that location that there wasn't incriminating

6  observations made during the surveillance?

7      A.    Yeah, I don't feel comfortable saying that

8  there were no other observations.

9      Q.    All right.  366 Arah Street, how long was that

10  location surveilled?

11      A.    I would say in late summer/fall of 2013.

12      Q.    And how active was the surveillance at that

13  location?

14      A.    Not as active as Amory House.  I can't give

15  you an exact.  Depends on what was going on at the time.

16      Q.    If Amory House was almost daily, how accurate

17  was the Arah Street location?

18      A.    Again, it would depend on what was happening

19  with information that we had at the time.  If it was

20  information at the time that made us think that

21  something was going to be happening in the area of Arah

22  Street, then we would have had surveillance on it.

23      Q.    Would it be surveilled at least once a week

24  during that six-month period that we're talking about?

25      A.    Possibly once a week, possibly once every two

1    weeks.  Again, it depends on what was happening at the

2    time.

3         Q.    117 Pine Street, who lives at that location?

4         A.    I'm not familiar with 117 Pine Street.

5         Q.    What time did law enforcement investigate what

6    vehicles were registered to Mr. Nakos?

7         A.    I'm sorry, can you repeat that?

8         Q.    That's a bad question.  There's reference to a

9    Mercedes that was registered to Mr. Nakos; correct?

10        A.    Correct.

11        Q.    Your law enforcement investigating began in

12   earnest in the fall of 2013.  When did law enforcement

13   try to determine what vehicles were registered to Mr.

14   Nakos?

15        A.    Again, I can't give you an exact date of when

16   the case agent actually physically ran, you know, Mr.

17   Nakos's vehicles.

18        Q.    Would it have been early on in the

19   investigation?

20        A.    I believe so, but I can't give you a date on

21   that.

22        Q.    That makes sense.  If you're going to surveil

23   Mr. Nakos, you have to know what he drives; right?

24        A.    Correct.

25        Q.    Were there any other vehicles that were

1   registered to him that you --

2         MS. OLLILA:  Your Honor, I object only because

3   it's beyond the scope of direct.  And oftentimes defense

4   counsel tries to make it a fishing expedition when we

5   have PC hearings and I think this is bordering perhaps

6   on this.

7         THE COURT:  Where are you going with this?

8         MR. CAREY:  I'm going on.

9         THE COURT:  Okay.

10    Q.    There was a van that you testified to earlier

11   that was involved in a transaction Mr. Koustas was

12   involved in.  That van was never registered to Mr.

13   Nakos; correct?

14    A.    Correct.

15    Q.    What was the relation between Mr. Nakos and

16   Mr. Koustas.  Was it a family relationship, neighbor

17   relationship?  What was it?

18    A.    I don't know if there's actually a family

19   relationship, but definitely a partnership and

20   friendship.

21    Q.    They both grew up in Manchester together?

22    A.    I believe so, yes.

23    Q.    Part of the Greek community in Manchester?

24    A.    Correct.

25    Q.    Do you believe that every interaction between

1  Mr. Nakos and Mr. Koustas involves some unlawful

2  activity?

3      A.   Do I believe every --

4      Q.   Yeah?

5      A.   No, I don't believe every interaction.

6      Q.   There are interactions they could have had

7  that could have been innocent or lawful; right?

8      A.   There could be, yes.

9      Q.   And without knowing, for example, there could

10  have been phone calls between Mr. Nakos and Mr. Koustas

11  that were innocent calls; correct?

12      A.   Correct.

13      Q.   Without knowing the specific content of that

14  call you can't say one way or the other whether it was a

15  lawful call or unlawful call; correct?

16      A.   Which call are you specifically referring to?

17      Q.   A call between the two of them.

18      A.   Yeah, I would say there were calls that were

19  innocent.

20      Q.   And without knowing the exact content of what

21  was discussed you can't say that was a call that was

22  innocent or that was a call that wasn't innocent;

23  correct?

24      A.   Again, what calls are you referring to?

25      Q.   Between the two of them.  We don't know the

1  contents of the call?

2      A.   Well, I think that the call goes in

3  correlation with the time that somebody is picking up a

4  load of marijuana based on history that Mr. Koustas and

5  Mr. Nakos had and the relationship they have, then, yes,

6  we would determine that that call would be related to

7  the actual call, the distribution.

8      Q.   The only way to know for sure would be to know

9  what the contents of that call was; correct?

10     A.   Well, based on the fact that there was a phone

11 call, there's a load of marijuana picked up and there's

12 a meeting late at night for a brief period of time,

13 based on my training and experience tells me that a lot

14 of activity occurred within that ten minutes.

15     Q.   Without knowing the content you can't say with

16 100 percent certainty?

17     A.   I'm basing it on my experience of being a

18 police officer for 19 years and being in a drug unit for

19 15 years.

20     Q.   Let me ask a simpler question.  Without

21 knowing the content of the conversation between Mr.

22 Nakos and Mr. Koustas, can you say with a hundred

23 percent certainty that that call was unlawful?

24     A.   Again, I can say based on my training and

25 experience that's what I believe, that they were talking

1      about --

2          Q.    100 percent certainty?

3          A.    I won't say a hundred percent if that's what

4      you're trying to get at.  But based on everything that

5      occurred, that's what I believe happened.

6          Q.    I want to ask you, you talked about a

7      surveillance that was conducted on December 15, 2013, at

8      140 Porter Street.  I believe paragraph 52.  Do you

9      remember those questions?

10         A.    Yes.

11         Q.    Okay.  And that was, I believe you testified

12     that Mr. Nakos arrived at that location, got out of his

13     car and then later went back to his house on Arah

14     Street; correct?

15         A.    Correct.

16         Q.    And you testified that you believed that that

17     was, he was involved in retrieving drugs?

18         A.    Based on everything that occurred before, the

19     time of night and the duration of the visit, yes.

20         Q.    Okay.  Now, paragraph 52, that surveillance

21     that was referred to for that occasion on that date,

22     were you part of the surveillance team?

23         A.    I believe I was.

24         Q.    Okay.  In paragraph 52 of Trooper Norris's

25     sworn affidavit I notice he didn't mention him seeing

 1   anybody get out of the Mercedes at South Porter Street

 2   at the time that it was observed; is that correct?

 3        A.   Yeah, if that's what it says.

 4        Q.   I direct you to I think it's five lines up

 5   from the bottom of the page, paragraph 52.

 6        A.   Yup.  It says Alkis Nakos arrived.

 7        Q.   Correct.  The car arrived.  It doesn't refer

 8   to anybody getting out of the car; correct?

 9        A.   It does not refer, correct.

10        Q.   Doesn't refer to anybody putting anything into

11   the car; correct?

12        A.   Correct.

13        Q.   Doesn't refer to anybody taking something out

14   of the car; correct?

15        A.   Yeah, again, I believe I said that it was the

16   location we weren't able to sit directly on the house.

17        Q.   Correct.  And on direct examination you

18   testified that you saw Mr. Nakos get out of the car?

19        A.   Yeah, I believe what I said was I thought

20   somebody said they saw him get out of the car.  My

21   mistake.  It said he arrived.

22        Q.   And so there's no indication that he picked up

23   anything from Mr. Koustas on that date; correct?

24        A.   Again, we weren't on the house.  We did not

25   see him exit the house.  So I can't tell you that he did

1    or did not bring something out of the house because it

2    wasn't observed.  But I can tell you based on what

3    happened prior and the fact of the time of night and the

4    duration of the visit, that's what leads me to believe

5    that he did pick something up.

6         Q.    Even though Trooper Norris doesn't swear in

7    his affidavit that he saw Mr. Nakos ever get out of the

8    car at that location; correct?

9         A.    Again, he didn't see him get out of the car,

10   but again, I would have to refer to the surveillance

11   report to actually determine if anybody was actually in

12   the car when a second drive by was done.

13        Q.    And that would be an important thing to note

14   whether Mr. Nakos was observed getting out of that

15   Mercedes at that location; correct?

16        A.    But again, based on the way the area is,

17   you're not able to physically sit on the house, you

18   can't actually stare at the house, basically drive by

19   the house, so obviously you see limited stuff as you

20   drive by and then limited as you drive by again.

21        Q.    Correct.  Based on that manner of

22   surveillance, Trooper Norris did not swear that he saw

23   Mr. Nakos ever get out of his car at that location, get

24   back into his car, or take something out of his car or

25   put something into his car at that location.  That's not

1    in the affidavit; correct?

2          A.   Correct.

3          Q.   The next day, December 6, 2013, which is

4    referenced in paragraph 53 of Trooper Norris's

5    affidavit, on direct examination you said that you

6    believed based on that call that Mr. Nakos was in touch

7    with his Canadian sources; correct?

8          A.   Correct.

9          Q.   The phrase Canadian sources doesn't appear to

10   be anywhere in Trooper Norris's affidavit at paragraph

11   53 referencing that call, does it?

12         A.   Correct.

13         Q.   The second part about what you testified to

14   about December 5, 2013, is December 7, 2013, where you

15   mentioned Mr. Koustas going to Mr. Nakos's house on Arah

16   Street; correct?

17         A.   Correct.

18         Q.   And I believe you said your conclusion was

19   that in the first instance Mr. Nakos was picking up

20   something, and the second instance Mr. Koustas was

21   bringing something to Mr. Nakos at his house?

22         A.   Correct.

23         Q.   As I read the sworn affidavit, paragraph 53,

24   58, that surveillance conducted on December 7, 2013, at

25   Mr. Nakos's house, there's no information that Mr. Nakos

1    was even home at that time; correct?

2         A.   Correct.

3         Q.   There's no reference to a Mercedes being in

4    the driveway; correct?

5         A.   Not in this affidavit, no.

6         Q.   And in fact paragraph 58 concludes because

7    Koustas entered the residence, law enforcement could not

8    determine whether he met with Mr. Nakos; correct?

9         A.   And what we mean by that, obviously when he

10   goes in the house we can't visually see him being with

11   him.

12        Q.   And based on the surveillance and based on all

13   the information you compiled in your investigation, you

14   couldn't confirm that Mr. Nakos was even home when Mr.

15   Koustas went to that address?

16        A.   Well, we based it on the fact there was a

17   phone call prior to him going to the residence.

18        Q.   Okay.  But there's no hard facts that show Mr.

19   Nakos was even home at that time; correct?

20        A.   Correct.

21        Q.   Now, I understand you talked about some other

22   calls that are not, that you believe Mr. Nakos was

23   involved that were not in this affidavit.  As I recall

24   the affidavit, over a six-month period there's only four

25   calls referenced that involve Mr. Nakos and Mr. Koustas.

1    Does that sound accurate?

2          A.    In this affidavit?

3          Q.    In this affidavit.

4          A.    Yes, in this affidavit, but there were more

5    phone calls between the two.

6          Q.    During that time frame?

7          A.    Yes.

8          Q.    Why aren't those phone calls in the affidavit?

9          A.    I have no answer for that.

10         Q.    You talked in the beginning part of your

11   testimony about the network of a drug organization, do

12   you remember that, those questions?

13         A.    Yes.

14         Q.    And you talked about multiple personalities

15   being involved.  Do you remember saying that?

16         A.    Yes.

17         Q.    It's another way of saying multiple roles for

18   people to do different things?

19         A.    Correct.

20         Q.    And I think you talked about

21   compartmentalization is something you observed in a drug

22   organization?

23         A.    Correct.

24         Q.    So you have people that distribute the stuff,

25   the drugs, people that take the money, a different

1  person counts the money, a different person transports

2  the money.  There's multiple levels of

3  compartmentalization?

4       A.   Correct.

5       Q.   And based on your experience, because of that

6  compartmentalization, different people don't know what

7  other people's roles are; is that fair to say?

8       A.   Correct, sometimes that's what happens.

9       Q.   That's what you're telling us or concluded

10 based on your investigation of this particular case?

11      A.   Correct.

12      Q.   If some of those roles were compressed, you

13 have somebody who was doing distribution, collecting

14 money and taking money and counting money, what does

15 that tell you if multiple roles are folded into one

16 person?

17      A.   I don't know if I understand what you're --

18      Q.   It's a bad question.  I'll try to clear it up.

19 You say usually in a network you see different roles

20 assigned to different people and it's compartmentalized;

21 correct?

22      A.   Correct.

23      Q.   If you don't see compartmentalization, you see

24 somebody distributing drugs, picking up drugs,

25 collecting money, transporting money, counting money, if

1   one person is doing all of that kind of stuff what does

2   that tell you about the network?

3       A.   Again, are you saying that one person is

4   involved?  I don't understand what you're trying to get

5   at.

6       Q.   I'll try again.  You have one person doing

7   multiple jobs as opposed to one person doing one

8   separate job.  What does that tell you when you have one

9   person doing multiple things, a lot of things?

10      A.   That they're the ones that are involved in, I

11  don't know what you're trying -- I mean, that has

12  nothing to do with this organization, so I don't know

13  what you're trying to say.

14      Q.   I'm just asking based on your experience, you

15  testified about your experience investigating these

16  kinds of cases, what does it tell you when you don't

17  have compartmentalization, what conclusion does that

18  make you --

19      A.   If you're telling me that one person is doing

20  everything, then obviously there's only one person

21  that's involved in it.

22      Q.   All right.  You were asked briefly about a

23  stop that Nashua PD made -- State Trooper Czyzowski made

24  in Nashua on St. Patrick's Day on 2004, March 17th?

25      A.   Correct.

1    Q.    And Mr. Nakos was stopped?

2    A.    Yes.

3    Q.    And can you tell me how many different law

4  enforcement officers were involved in planning that

5  stop?

6    A.    I can tell you that that was a completely

7  random stop.  That was not orchestrated by our unit.

8    Q.    Trooper Czyzowski was with Troop B?

9    A.    Yes.

10   Q.    And was Troop B aware of the investigation

11 going on of Mr. Nakos?

12   A.    No.  Again, it was a completely random stop.

13   Q.    Why wouldn't Troop B be aware of the

14 investigation?

15   A.    Because we don't, the Narcotics Unit doesn't

16 tell everybody about the cases that we're doing.  It's a

17 narcotics case.  We don't spread it throughout the state

18 police.

19   Q.    Don't you put out requests for information

20 about certain people --

21   A.    What I'm trying to tell you, I know you don't

22 believe it, but I'm telling you that was a completely

23 random stop.  It was not orchestrated by this

24 investigation.

25   Q.    And what can you tell us whether Mr. Nakos's

1  car was subject to surveillance that day?

2      A.   There aren't any records because, again, it

3  was a random thing.  We just found out.  I don't know

4  exactly how we found out that he was stopped but somehow

5  the Narcotics Unit found out that the trooper stopped

6  Mr. Nakos, but it was not orchestrated by our unit based

7  on this investigation.

8      Q.   When did your unit find out about the stop?

9      A.   Again, I wasn't the one that received the

10  phone call, but it was during the stop obviously.

11      Q.   And how -- I know you weren't the one who

12  received it, but how would your unit have found out --

13          MS. OLLILA:  Your Honor, objection to the line

14  of questioning.  I don't know what the relevance to this

15  is, but this is a fishing expectation.

16          MR. CAREY:  It was gone in to some detail

17  about what was found and the phones that were found,

18  what they could be used for, going to do a search,

19  search warrant used or was obtained for those phones.

20  There was talk about the money that was found.  The only

21  reason to talk about those things is to paint Mr. Nakos

22  as part of this conspiracy.  So I think I'm entitled to

23  go into a little bit of questioning about this stop and

24  what was found during the stop.

25          THE COURT:  Well, that's a different line of

1    questioning than what you've asked.  You've asked her

2    several times about the nature of the stop and what

3    prompted it, and she's told you several times that it

4    was random.  So if you want to ask her the question you

5    just asked, go right ahead, but that's a different line

6    of questions than the ones that you were going over

7    several times prior.

8             MR. CAREY:  All right.

9        Q.   When did your unit get involved with that

10   stop?

11       A.   Again, I wasn't --

12       Q.   I'm not talking about before, I'm talking he's

13   stopped --

14       A.    I wasn't the one who received the phone call.

15   I just had heard that, and I believe it was Sergeant

16   LaFoley received a phone call or somehow somebody heard

17   that Mr. Nakos had been stopped by Troop B, and then

18   Mister, I think it was Trooper Czyzowski contacted I

19   believe it was Sergeant LaFoley.  But again, I wasn't

20   part of the conversation, but I do know that that stop

21   was not orchestrated by us.

22       Q.   I'm past that.

23       A.   Okay.

24       Q.   I'm past that part of it.  The stop happens.

25   Trooper Czyzowski contacts somebody.  At that point your

1    unit gets involved.  Does your unit get involved at the

2    scene?

3        A.    No.

4        Q.    Does your unit get involved in applying for

5    the search warrants?

6        A.    No.  I believe Sergeant LaFoley just told

7    Trooper Czyzowski to do what he normally does when he

8    stops somebody who has suspicious activity, told to

9    treat it like a stop.

10       Q.    You're not aware of any, other than what was

11   found in the car, you don't know what was found in the

12   vehicle; correct?

13       A.    Maybe a small amount of marijuana from my

14   recollection, but I could be wrong.  I know the phone

15   and money.

16       Q.    No weapons found in the car?

17       A.    No, I don't believe so.

18       Q.    And did the surveillance of Mr. Nakos continue

19   after that stop?

20       A.    Continue?

21       Q.    In general as part of your investigation, that

22   was March of 2014, this complaint charges conduct April

23   2014.  Did your surveillance of Mr. Nakos continue?

24       A.    During that time period, yes.

25       Q.    And did you observe him flee the jurisdiction

1   at that time?

2        A.   I couldn't answer that.

3        Q.   Did he get on a plane and go over to a foreign

4   country?

5             MS. OLLILA:  Objection as to relevance.

6             MR. CAREY:  Some of this goes over to the bail

7   argument.

8             THE COURT:  Well, why don't we save that for

9   the bail argument, then you can make those by offers of

10  proof or if the sergeant is still here you can put her

11  back on the stand if you feel that that's necessary.

12       Q.   Sergeant, you testified earlier that Mr.

13  Koustas had been robbed at some point?  His house had

14  been broken into?

15       A.   I don't remember testifying to that.

16       Q.   It was in the affidavit; correct?

17            MS. OLLILA:  Objection as beyond the scope.

18            MR. CAREY:  It's in the affidavit, your Honor.

19            THE COURT:  There was not a line of

20  questioning that related to that whatsoever.

21            MR. CAREY:  I ask for a little latitude

22  because this is a criminal complaint, an affidavit that

23  is being used.

24            MS. OLLILA:  And I object because this is

25  defense counsel trying to get additional discovery that

 1    he's not entitled to.

 2              THE COURT:  How does this relate to Mr. Nakos?

 3    We're here about his particular circumstances, not Mr.

 4    Koustas's.

 5              MR. CAREY:  Because Mr. Koustas's

 6    circumstances are being used to bring Mr. Nakos into

 7    this case, and Mr. Koustas's circumstances are outlined

 8    in this affidavit.

 9              THE COURT:  The line of questioning that

10    relates to Mr. Koustas and Mr. Nakos really was

11    fundamentally focused on their interactions.

12              MR. CAREY:  Let me proceed with a different

13    line, your Honor.

14         Q.   In the course of your investigation are you

15    aware of any money going from Mr. Koustas to Mr. Nakos?

16         A.   As far as physically seeing, is that what

17    you're asking me?

18         Q.   Let's start with physical observations of

19    money changing hands from Koustas to Nakos.

20         A.   No physical observations.

21         Q.   And in the affidavit there's no observation

22    that there's -- of any belief that money is going from

23    Mr. Koustas to Mr. Nakos; correct?

24         A.   I don't believe so in the affidavit, no.

25         Q.   Okay.  And there's nothing in the affidavit

1    about money going from Mr. Nakos to Mr. Koustas;

2    correct?

3         A.    Correct.

4         Q.    And no direct dealings between Mr. Koustas and

5    Mr. Sieger, Dean Sieger?

6         A.    As far as money?

7         Q.    Any direct communications between Mr. Nakos

8    and Mr. Sieger?

9         A.    Mr. Nakos and Mr. Sieger, not that I know of.

10        Q.    Or Mr. Nakos and either one of the Fowle

11   brothers?

12        A.    Not that I know of.

13        Q.    Or Mr. Nakos and Mr. Sanchez?

14        A.    Again, not that I know of.

15        Q.    Or Mr. Nakos and Blevens?

16        A.    Not that I know of.

17        Q.    And during the time frame of October 13

18   through April 14th there were no, nothing in the

19   affidavit about any confidential source having any

20   direct contact with Mr. Nakos; correct?

21        A.    Correct, in this affidavit, no.

22        Q.    And if there were any direct contact between a

23   confidential source and Mr. Nakos, it would have been,

24   during that time frame, it would have been put in the

25   affidavit; correct?

1      A.    I couldn't answer that.

2             MR. CAREY:  Thank you.  I have no further

3  questions.

4             MS. OLLILA:  No further questions.  Thank you,

5  your Honor.

6             THE COURT:  Do either of you wish to add

7  anything additional in the argument regarding the

8  motion?

9             MS. OLLILA:  No, your Honor.  Is Trooper

10  Mackenzie finished and can she step down?  I don't know

11  whether your Honor has any questions.

12             THE COURT:  I don't have any questions for

13  her.   Thank you very much.

14             MS. OLLILA:  Thank you, your Honor.  I don't

15  know if your Honor would like the United States to tie

16  in the evidence.  I think that Trooper Mackenzie's

17  testimony has sufficiently established the use of the

18  telephone between Kosmas Koustas and Alkis Nakos in

19  order to talk about drug trafficking.  Specifically and

20  most appropriately when Kosmas Koustas is talking about

21  meeting with Jose Rodriguez Sanchez, there's a

22  communication on March 22, 2014, while law enforcement

23  are surveilling Jose Rodriguez Sanchez outside of the

24  BJ's Wholesale, Kosmas Koustas is inside waiting for

25  Jose Rodriguez Sanchez to arrive.  Kosmas Koustas

1   engages in a conversation with Alkis Nakos, and during

2   that conversation Alkis Nakos talks about the other one,

3   and Kosmas Koustas says he's outside.  That is a

4   conversation involved in the distribution of cocaine.

5   There's a reason why the complaint charges Alkis Nakos

6   with engaging in a conspiracy to distribute controlled

7   substances because he has involvement not only in

8   marijuana but also in this cocaine transaction.  We know

9   following that meeting on March 22nd, just nine days

10  later is when Kosmas Koustas is followed down to

11  Massachusetts, picks up a load of cocaine, is stopped by

12  law enforcement, and engages in a high speed chase,

13  calls on the telephone to Frank Fowle, says my phone has

14  been compromised, let it be known that I've been

15  arrested.  That is more than sufficient in this

16  affidavit to find the defendant has engaged in use of a

17  communication facility.  I think the rest is obvious

18  with respect to the conspiracy to distribute and possess

19  with intent to distribute controlled substances.  Of

20  course we're talking about marijuana.

21          All the information suggests that Alkis Nakos

22  is at the top of this organization.  There's no surprise

23  he's never really going to be in the mix by going to get

24  amounts of marijuana.  That's not his role.  He's too

25  high in the chain of command.  He has Kosmas Koustas do

1    it.  That's why Kosmas Koustas when he comes back on

2    December 5th with a load of marijuana, we know he has a

3    load, where does he go?  He does to 140 Porter Street.

4    It's not Koustas's residence.  It's not Nakos's

5    residence.  It's an independent place away from their

6    residences.  They do it on purpose because if they

7    believe law enforcement are watching, they would believe

8    that law enforcement are watching their residences.

9            Koustas calls Nakos when he is coming back on

10   December 5th.  Koustas calls Nakos right before he gets

11   to Porter Street on December 7th.  I think the

12   information is more than sufficient to establish that

13   Koustas and Nakos have engaged in a conspiracy to

14   distribute controlled substances, that Nakos has been

15   also involved in possessing controlled substances with

16   the intention of distributing them.  Thank you, judge.

17           THE COURT:  Attorney Carey.

18           MR. CAREY:  It's a hard argument to make, for

19   me to make because I'm having to respond to this

20   argument that he's involved, we know he's involved, but

21   there's no direct evidence that he's involved.  It's a

22   difficult position to be put in.  Most of the evidence

23   in this affidavit, almost all the evidence in the

24   affidavit involved direct handling of money, handling of

25   weapons, of drugs, the majority of the phone calls, the

1    majority of the surveillance all concerns Mr. Koustas,

2    not Mr. Nakos.  When I asked about on direct examination

3    there was testimony that Mr. Nakos was directly involved

4    with the Canadian suppliers, on cross-examination

5    Sergeant Mackenzie conceded that no, that wasn't in the

6    affidavit.  On direct examination she testified that on

7    December 5th Nakos was observed getting out of his car,

8    going into a house where Koustas was and had just

9    completed a drug deal down in Massachusetts.  On

10   cross-examination she conceded that there were no such

11   observation of Mr. Nakos going into that house, getting

12   out of his car, having anybody put anything into his car

13   on that day.  Same thing with the 7th when Mr. Koustas

14   travels to Mr. Nakos's home.  No evidence that Mr. Nakos

15   is at his home at that location.

16            The evidence here, and there was testimony

17   that the organization was compartmentalized, and if it's

18   compartmentalized why is everything found in one

19   location when the search warrant is executed, when the

20   arrest warrant is executed.  It's not found in Mr.

21   Nakos's business.  It's not found at Arah Street, his

22   home.  Nothing is found in his car.  And I believe, your

23   Honor, that looking at the totality of the evidence and

24   also trying to put in perspective the argument that he's

25   involved but no direct evidence of his involvement which

 1    is sort of a tautology, I think in the context of this

 2    affidavit and the testimony that was presented there is

 3    not probable cause to believe Mr. Nakos was involved in

 4    drug-related conduct from October 13th to April 2014.

 5    It just doesn't point to Mr. Nakos as being the source,

 6    the engineer, the one that is directly involved in that

 7    conduct.

 8              THE COURT:  Anything further?

 9              MS. OLLILA:  Not with respect to the issue of

10    probable cause, judge, thank you.

11              (Pause.)

12              THE COURT:  Based on the evidence that was

13    presented to the court starting this morning and moving

14    into this afternoon the court finds that the government

15    has established its burden that there's probable cause

16    to believe that the offenses set forth in the criminal

17    complaint as they relate to Alkis Nakos were committed

18    and that Mr. Nakos committed them.

19              MS. OLLILA:  Thank you, judge.  May we move

20    into the issue of detention?

21              THE COURT:  Yes.  Does anybody wish to have a

22    short break or should we move right ahead, and I'm happy

23    to continue to move forward.  I'm just not sure what

24    your preference is.

25              MR. CAREY:  We're happy to move forward on

1    offers of proof.

2              THE COURT:  Let's move forward with that,

3    then.

4              MS. OLLILA:  May I proceed?

5              THE COURT:  Please do.

6              MS. OLLILA:  Your Honor, you are aware that

7    this is a case that establishes that there's a rebuttal

8    presumption of detention under 3142 of Title 18, and

9    that is that there's no condition or combination of

10   conditions to assure the safety of the community or the

11   defendant will flee.

12             It is absolutely true that the defendant has

13   ties to the community.  I believe he presents a risk of

14   flight because there is an enormous sentence that Mr.

15   Nakos is looking at.  Your Honor is aware -- and let me

16   also back up.  The factors that your Honor relies on are

17   laid out in 3142, and a lot of those factors are the

18   weight of the evidence, some of the factors are history

19   and characteristics of the defendant.

20             One of the most important things for your

21   Honor to know is that the defendant already has a prior

22   conviction and he received a five to 10-year term of

23   incarceration based on the sale of crack cocaine.  That

24   means that the defendant knows he is going to look at a

25   significant period of incarceration if he's convicted

1    again.  He's not someone who would be deemed a Criminal

2    History Category I.  The sentencing guidelines regarding

3    Mr. Nakos's sentence here and the way the sentencing

4    guidelines operate is they take into account the drug

5    amount.  The drug amount is based upon something called

6    relevant conduct.  That is all conduct that was

7    reasonably foreseeable to this defendant.  So, at the

8    time of sentencing, regardless of what the United States

9    proves at trial, at the time of sentencing the United

10   States can offer relative conduct such as that

11   information provided by a confidential source.  Now just

12   for the record, obviously, at trial the United States

13   would establish the history since 2008.  The United

14   States would present the testimony of the confidential

15   source and the United States would ask the jury to find

16   the drug weight.  But, it is clear to the United States

17   that based upon the information in its possession, not

18   even talking about the additional information which the

19   United States will find out soon based upon cooperators,

20   Mr. Nakos is looking at a significant term of

21   incarceration.

22            Not only that, judge, he is what the United

23   States will argue at the time of sentencing, an

24   organizer or leader.  That will entitle him to a bump in

25   his sentence.  It is, to speak conservatively, the

1   United States believes that Mr. Nakos is looking at a

2   sentence far in excess of ten years.

3           Now, the other factors that your Honor relies

4   upon are the nature and history of the defendant.

5   What's real interesting about Alkis Nakos is that he

6   claims to have been employed at Amory Street Pizza

7   throughout his life.  That is the establishment that

8   sells zero food.  Twelve dollars a month in food,

9   currency that they're using to purchase food.  That is

10  the establishment that law enforcement has known since

11  2008 is a business front.  It is in the name of the

12  defendant's father, but the defendant's father is just

13  an individual who the defendant put his property in.

14  This defendant did the same thing with the Mercedes Benz

15  that he put in his mother's name, and that Mercedes Benz

16  in November of 2011, the defendant made one payment of

17  $17,500 for a lease vehicle.  Within six months he made

18  another cash payment of $28,000.  That's $45,000, judge,

19  over the course of six months that the defendant is

20  using to purchase one car that he placed in his mother's

21  name.

22          Why is that important?  Well, the defendant

23  claims that he's working at Amory Pizza making $30,000 a

24  year.  He's not doing that.  There's nothing being sold

25  out of Amory Pizza.  In addition, the defendant claims

1  that in his taxes he makes a total of $30,000 a year.

2  The defendant also claims that he makes an additional

3  amount of money by gambling.  But what the defendant is

4  doing, judge, the defendant is laundering money, and

5  he's laundered money since 2008, and what the United

6  States has information to suggest, and all of this

7  information has been laid out in the forfeiture

8  affidavit which has been filed by the court, accepted by

9  the court, so among other things Amory Street Pizza

10  there's a now a lis pendens on that because the United

11  States is going to seize it and sell it based upon the

12  proceeds there.

13          Mr. Nakos, the way he launders his money, the

14  way he's always been laundering his money, is not too

15  crafty, but what drug dealers do is they might take

16  $30,000 and they know they need to try to legitimize it.

17  What Mr. Nakos does is he takes that $30,000 and he goes

18  down to Foxwoods and buys chips in the amount of

19  $30,000, not intending to lose money.  He just wants to

20  wash the money.  Since 2008 Foxwoods Resorts and Casinos

21  has had Mr. Nakos gamble $550,000 since 2008.  And this

22  is someone who by his own taxes shows he is working at

23  Amory Pizza making $30,000 a year.  Amory Pizza makes no

24  money, judge, because there's nothing going on there.

25  So, since 2008 Mr. Nakos's has washed $550,000 through

1    Foxwoods.  He doesn't bring huge amounts of money and

2    lose it.  He goes and he essentially leaves with what he

3    puts in.  It's classic money laundering, judge.

4              Interestingly also the defendant has reported

5    that he owns real estate and that he owned it with

6    Alison Ouellette.  It's concerning because Alison

7    Ouellette is a bank employee and the United States found

8    out recently that she, as a bank representative,

9    obtained a safe deposit box for Mr. Nakos in February of

10   2014.  It's concerning because Alison Ouellette is the

11   defendant's ex-girlfriend.  She has been in contact.

12   We're not making any allegations about Alison Ouellette

13   at this point in time, but it is true that she works for

14   a bank and in 2000, February 2014 as a bank

15   representative got a safe deposit box for Mr. Nakos that

16   the United States has not gotten into yet.

17             This defendant claims that he has ties to the

18   community.  That's true, except that he now knows if he

19   is convicted he will serve a significant period of

20   incarceration.  That represents a powerful incentive for

21   Mr. Nakos to flee.  I submit to your Honor a lot of the

22   information provided by the defendant in this bail

23   report is not supported in any way based upon the

24   independent information.  In fact, the United States

25   would say that most of it is not accurate at all.  He

1    doesn't make a living playing blackjack.  He goes down

2    there to launder his drug proceeds.

3            And as late as March of 2014, this is someone

4    who just so happens to be with Christopher Ranfos, two

5    days after Ranfos supplied marijuana to John Horne that

6    he, Ranfos, got from Kosmas Koustas.  These two are the

7    in the same vehicle.  Each of them have $10,000 on their

8    person which they're going to Foxwoods to supposedly

9    gamble.  They weren't.  They are just laundering money,

10   judge.

11           I think the evidence would establish that this

12   defendant is a risk of flight and a danger to members of

13   the community because he makes his living by selling

14   drugs, and I therefore ask that he be detained pending

15   trial.

16           THE COURT:  Attorney Carey.

17           MR. CAREY:  Yes, your Honor.  At this stage of

18   any criminal proceeding the government always has more

19   information than either the court has or defense counsel

20   has.  And so part of what I suggest a way to look at the

21   situation, look at this question of whether he's a

22   flight risk is to look at what are proven facts.  And

23   what are proven facts are information that all sides

24   have access to, facts that have not changed because they

25   are historical facts.  Historical facts are this.  That

1    Mr. Nakos is 35 years old.  That Mr. Nakos has one

2    criminal conviction for drugs back in 1998.  He has no

3    convictions for threats, for threatening, for assault,

4    for any crimes of violence.  Those are proven facts.  He

5    has no default.  He has no failures to appear.  When he

6    pled guilty in 1998, he plead guilty to drug charges.

7    It's my understanding that he was out on bail pending

8    those charges.  He pled guilty and received a sentence

9    of 5 to 10 years with 10 to 20 suspended.  He showed up

10   to court to accept that sentence.  And when he got out

11   he had 10 to 20 years hanging over his head and there

12   was a parole violation filed.  Did he run?  Did he flee?

13   Did he threaten anybody?  Did he do anything other than

14   take his medicine?

15          There's no indication that he tried to flee

16   the jurisdiction looking at a possible 10 to 20 coming

17   down on a suspended sentence knowing that that was out

18   there.  He had got two more years for that, and after

19   that he was put on a bracelet.  There's no indication

20   that even when faced with substantial sentences of

21   incarceration that this individual flees or this

22   individual does anything that is a harm or a danger or a

23   threat to the community in terms of other people's

24   safety and direct safety.  Those are proven facts.

25   Those are known facts.  Those are facts that we all have

1  access to.

2         Looking at the information that was presented

3  here, some of the information presented here, some I

4  have never seen before, never heard before, don't have

5  access to because at this stage of the case I don't have

6  access to information, neither does the court, but if

7  you look at the stop on March 17, 2014, what happens?

8  Now, if Mr. Nakos believes that law enforcement is now

9  suspicious of him, they've searched his vehicle, they

10  searched it for drugs, does he flee?  No.  Does he

11  threaten witnesses?  No.  Does he do anything other than

12  continue to live in Manchester with his family, with his

13  girlfriend who is now probably ten days away from

14  delivering their first child, a baby girl.  Faced with,

15  well, what seemed to be a problem, he doesn't do

16  anything.  He stays put.  He stays in the community.

17  That's a proven fact.  That's an established fact.

18  That's something this court can rely upon and look to in

19  determining whether any set of conditions will guarantee

20  or assure Mr. Nakos's return to court for his

21  appearances or pose any sort of threat to the community.

22         No weapons have ever been found on Mr. Nakos's

23  person, in his vehicles, at his house.  No drugs were

24  found at his house when it was searched.  And no

25  information came out of the six-month surveillance that

 1    the government suggests that Mr. Nakos was involved with

 2    weapons or involved with threats or involved with

 3    physical harm to do anything in connection with the

 4    activity that he's being charged with here today.

 5              I would suggest that looking at the facts that

 6    we know, facts that are historical facts, some of the

 7    facts that are uncontroverted, and looking at Mr.

 8    Nakos's ties to the community, his record of appearing

 9    for court, even looking at long, long sentences, that

10    this court can be assured that he will appear before all

11    scheduled court appearances and will not flee the

12    jurisdiction.  There are conditions that the court could

13    impose to assure that.  It can require him to surrender

14    his passport.  You could put him on a bracelet.  You

15    could confine his activities.

16              For all these reasons, your Honor, and for

17    what we know about Mr. Nakos at this stage of the

18    proceedings, I would suggest that the court grant him

19    bail either in a cash amount or subject to conditions

20    such as a bracelet or something like that.  Thank you,

21    your Honor.

22              THE COURT:  Thank you.  I have just a couple

23    of questions, Attorney Carey.  I'm assuming that you

24    have seen the pretrial services report in this case?

25              MR. CAREY:  I was provided a copy of it.  I

1    reviewed it with my client before I came down here, I

2    just skimmed it.

3             THE COURT:  But it was provided to you before

4    the hearing today; is that correct?

5             MR. CAREY:  Yes, it was.

6             THE COURT:  I note that on page three there's

7    a reference to the period of time where Mr. Nakos was at

8    the New Hampshire State Prison.  It indicates that in

9    addition to substance abuse therapy he participated in

10   an anger management program.  Do you know anything about

11   the circumstances of that program and why he was

12   referred to that program?

13            (Pause.)

14            MR. CAREY:  I know many inmates incarcerated

15   in state prison and in federal prison take advantage of

16   any program they possibly can to obtain certificates,

17   spend their time trying to improve themselves.  There is

18   no criteria as I understand to be admitted to one of

19   those programs other than to say I'd like to be part of

20   this program.  So I don't know the specifics of that

21   particular, his participation in the anger management

22   program at that facility.  I don't know whether he got a

23   certificate for completing that program, but I do know

24   that there were no -- there had been no crimes of

25   violence that are part of his record of conviction.

1          THE COURT:  And my understanding is that with

2     regard to the offer of proof as it relates to the dollar

3     amount that your client is alleged to have brought

4     through Foxwoods, is there additional information or

5     insight that you'd like to share with regard to that?

6          MR. CAREY:  No, your Honor, today is the first

7     day I've heard of that information.

8          THE COURT:  With regard to the, I'm going to

9     pronounce this wrong, it's Amory Street Pizza, I always

10    want to say Amory and I apologize, the Amory Street

11    House of Pizza, and that is an ongoing business entity,

12    do you have any information that you'd like to share or

13    that rebuts the allegations of the government that it's

14    not a legitimate business operation and that it only

15    spends $12 a month purchasing food over a certain period

16    of time?

17         MR. CAREY:  I don't know what period of time

18    that the government is referring to about the money

19    spent on food at that establishment.  I believe that

20    Amory House of Pizza was started by Mr. Nakos's father

21    even before Mr. Nakos's was born.  So I don't know what

22    content, I don't know what period of time the government

23    is alleging it was not a business or ongoing restaurant.

24         MS. OLLILA:  Your Honor, perhaps I can

25    elaborate.

1          THE COURT:  Please.

2          MS. OLLILA:  There has been a law enforcement

3   officer who has been in and out of that establishment,

4   and that law enforcement officer, and when I say in and

5   out I don't want to identify how long but it has been a

6   significant period of time, that law enforcement officer

7   would testify, for example, that there was one time when

8   someone called in to order a pizza and they said no,

9   we're not -- we don't serve pizza.  I can assure your

10  Honor that for a very long period of time that facility

11  had been monitored daily, and not once has there been

12  any food going in or out of there.  I can assure your

13  Honor that that law enforcement officer has been in

14  there a lot, and that law enforcement officer would

15  testify that although there are drinks, alcoholic

16  beverages at time provided, there's no food and that it

17  appears that this is not an ongoing business pizza

18  operation.  That was clear.  And I don't want to divulge

19  more for obvious reasons.

20          THE COURT:  Anything further, Attorney Carey?

21          MR. CAREY:  No, your Honor.

22          THE COURT:  Mr. Nakos, you heard a reference

23  earlier from Attorney Ollila as to the factors that the

24  court is obligated to consider as it makes its

25  determination as to whether there are any condition or

combination of conditions that will reasonably assure

your appearance, and whether there are any condition or

combination of conditions that will reasonably assure

the safety of another or the community.  The factors

that the court consider include the nature and

circumstances of the crime charged.  In this particular

instance the charges that you have been -- the complaint

charges you with various crimes related to drug

activity, and that's something that the court needs to

consider, and I'm considering that in the context of my

order.

There is also the weight of the evidence, and

again, in this particular instance, particularly given

the presumption in this case, this is a circumstance in

which the weight of the evidence is something that I

must consider, and in your scenario while your attorney

has presented some evidence particularly as it relates

to risk of flight, the burden of persuasion remains on

the government and the presumption still carries

evidentiary weight that I consider.

There's also the history and characteristics

of the defendant, and that includes your criminal

record.  And in this particular instance you do have

prior criminal activity, and in particular that activity

relates to the distribution and possession, if I have

1    that correct, excuse me, the sale of a narcotic drug and

2    the possession of a narcotic drug with intent to sell,

3    you pled guilty to those charges, and the narcotic was

4    crack cocaine.

5            In terms of your past conduct and also your

6    employment, those are other factors that I can consider.

7    The government has raised significant issues regarding

8    the legitimacy of your business and the nature of the

9    business that you're involved in, and in particular the

10   evidence as it relates to the surveillance and the lack

11   of what appears to be business, pizza business related

12   activity, something that the court is going to consider

13   very strongly as it looks at your release potentially

14   into the community.

15           In addition, there is at least the

16   government's proffer that while your representations to

17   pretrial services is that you have a net worth of

18   $15,200 and that your monthly income is $2,600, there's

19   an unexplained amount of gambling activity at Foxwoods

20   in a significant dollar amount, and the government has

21   represented that was at least $550,000.

22           With regard to history of drug and alcohol

23   abuse, your pretrial services report establishes a

24   regular use of marijuana.  That's another factor that

25   the court's considering.

1           And finally with regard to your finances,

2    there's been a representation proffered by the

3    government that there's an unexplained amount of funds

4    that you were able to purchase a vehicle and make a down

5    payment and the subsequent payment in cash on a vehicle,

6    and again that just doesn't seem to line up with your

7    earnings as they relate to what you've represented in

8    your pretrial services report.

9           As a result of those various findings that

10   I've made for the purposes of this hearing the court

11   concludes that there are no conditions, combination of

12   conditions that will reasonably assure your appearance,

13   nor are there any conditions or combination of

14   conditions that will reasonably assure the safety of

15   another or the community in the context of this case.

16          As a result, I remand you to the custody of

17   the United States Marshal.

18          MS. OLLILA:  Thank you, your Honor.

19

20

21

22

23

24

25

113

C E R T I F I C A T E

     I, Sandra L. Bailey, do hereby certify that the foregoing transcription from FTR Gold is to the best of my skill and ability.

Submitted: 11/5/2014

SANDRA L. BAILEY, LCR, CM, CRR
LICENSED COURT REPORTER, NO. 1
STATE OF NEW HAMPSHIRE