UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*
United States of America            \*
                                    \*
                                    \*   No:  1:14-cr-93-LM
v.                                  \*
                                    \*
Alkis Nakos                         \*
                                    \*
                                    \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ALKIS NAKOS'S MOTION TO SUPPRESS RE: SEARCH OF 366 ARAH STREET

### Introduction

To decide this Motion to Suppress, the Court need consider three issues:

**Affidavit did not establish probable cause.**  There was no direct evidence or reasonable inferences that connected Nakos's residence at 366 Arah Street with drug activity.  Did the lack of a nexus between 366 Arah Street and drug activity negate probable cause to search the residence?

**Information omitted from affidavit negates probable cause.**  Nakos called Koustas on the morning of December 6, 2013.  The content of the call is unknown.  Later in the day, Koustas called Sieger, in a call that was intercepted, allegedly to tell him a drug transaction was cancelled.   Based on Nakos's call to Koustas in the morning, Trooper Norris concluded that Nakos told Koustas about the cancelled drug transaction.  But Trooper Norris failed to mention the numerous text messages Koustas and Sieger exchanged after Koustas's call with Nakos.  When considered, do these omitted text messages negate a finding of probable cause?

**Lack of objective good faith.**  The lack of a nexus between 366 Arah Street and drug activity, plus the reckless omission of the Koustas-Sieger texts, undermined probable cause to search 366 Arah Street.  Must the evidence seized from 366 Arah Street be suppressed because the officers lacked objective good faith in relying upon the warrant?

## Facts[1]

On June 23, 2014, Trooper Norris applied for a search warrant for the property of Alkis Nakos ("Nakos") that may be found at 366 Arah Street in Manchester, New Hampshire.  Mr. Nakos lived at 366 Arah Street with his companion, Kalee Couture and her child.

In his affidavit, Trooper Norris said that law enforcement's investigation of Nakos began in 2009 when a defendant in a drug case told agents that Nakos received large quantities of marijuana from Canada.  No charges were brought against Nakos at that time.

In March 2012, law enforcement resumed its investigation of Nakos and his co-defendant Kosmas Koustas ("Koustas").  Law enforcement believed that Nakos and Koustas were involved in trafficking marijuana, which they obtained from Dean Sieger ("Sieger").  Law enforcement believed that Sieger, who lived in Millbury, Massachusetts, was a courier for a Canadian drug trafficking organization.

In his affidavit, Trooper Norris highlighted the following information regarding Nakos:

- <u>April 28, 2013</u> – Koustas and Nakos were seen meeting at Amory Street Pizza in Manchester.[2]

---

[1] These facts are taken from the discovery materials and Nakos's detention hearing.

- December 5, 2013 – At 7:18 p.m., Koustas was seen moving a gym bag and a cardboard box from the trunk of his car to rear passenger seat.  Sieger called Koustas at 7:53 p.m., while Koustas was in Millbury, Massachusetts.  No meeting between Koustas and Sieger was confirmed.  Koustas called Nakos at 9:37 p.m.

- December 5, 2013 – At 9:45 p.m. Koustas arrived at 140 South Porter Street.[3]  Agents did not see if Koustas had carried anything into the house.  At 10:00 p.m., Nakos's car arrived.  Agents did not identify Nakos in the car; did not see anyone get out of the car; and did not see anything transferred to or from the car.  At 11:25 p.m., Koustas's car left.  At 11:35 p.m., Nakos's car left the location and was followed to 366 Arah Street.  Agents made no further observations at 366 Arah Street.

- December 6, 2013 – At 10:41 a.m. Koustas received a call from Nakos.  The call's content in unknown.  At 4:57 p.m., in an intercepted call, Koustas called Sieger allegedly to inform him that their drug transaction had been cancelled.  Trooper Norris concluded that Nakos had told Koustas that the transaction had been cancelled.

- March 14, 2014 – In a telephone call at 8:37 p.m. between Koustas and his girlfriend, Trooper Norris believed he heard Koustas counting money.  In a telephone call at 8:45 p.m., Koustas told someone believed to be Nakos that he was pulling in front of Nakos's house.  No observations were made at 366 Arah Street.

---

[2] The business is owned by Nakos's father.
[3] 140 South Porter Road is the residence of Nicholas Koustas.

3

- March 17, 2014 – Nakos was pulled over for a traffic violation. $6,417 was seized from Nakos, and $9,451 from his passenger, Christopher Ranfos. A search warrant was issued. Four cell phones, additional currency, bank documents, and a quantify of marijuana in a bag were seized.[4]

- April 16, 2014 – As part of a financial investigation of Nakos, law enforcement obtained Nakos's gambling records from Foxwoods. Trooper Norris said the records showed large cash transactions typical of someone laundering illegal proceeds.

On March 30, 2014, the same day Koustas was taken into custody and released, a search warrant was executed on his residence, car and van. Among the items seized were: two firearms, 2 pounds of MDMA, and 2 pounds of marijuana.

Trooper Norris's affidavit refers to no alleged drug activity occurring after March 30, 2014, and before he applied for a search warrant of 366 Arah Street on June 23, 2014.

**Argument**

1. **The affidavit did not establish a nexus between 366 Arah Street and Nakos's alleged criminal activity.**

There was no direct or indirect evidence to connect 366 Arah Street with drug activity. As a result, the affidavit failed to establish a nexus between Nakos's alleged drug activity and 366 Arah Street.

A search warrant application must establish probable cause to believe that: (1) a crime has been committed, and (2) evidence of the crime will be found in the place to be searched.[5] In reviewing the search warrant application, the magistrate must determine whether there is probable cause based on a "showing that the totality of the circumstances

---

[4] Nakos has moved to suppress evidence from this search.
[5] *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996).

4

gives rise to a fair probability that a search of the target premises will uncover evidence of a crime."[6] In reviewing the magistrate's decision, the court interprets the affidavit in a "common-sense" manner.[7]

But problems may arise when there is no direct information about the location of the alleged incriminatory objects, and "it must be determined what reasonable inferences may be entertained concerning the likely location of those items."[8] In such a case, "the nexus between the objects to be seized and the premises searched does not have to rest on direct observation, but can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]...."[9]

Here, there was no direct information about 366 Arah Street. No witness saw drug or money at the location. No witness claimed that Nakos had possessed drugs, or drug proceeds, at that location. In 2009, a defendant in another case told agents that Nakos had received drug proceeds at the pizza shop. Law enforcement received no such information regarding 366 Arah Street.

Nor were there any reasonable inferences to connect 366 Arah Street to drug activity.

First, the Nakos-Koustas interactions on December 5, 2013, did not establish a nexus with 366 Arah Street. Trooper Norris stated that Koustas had contacted Nakos after Koustas's "meeting" with Sieger. No such meeting was ever confirmed. Koustas

---

[6] *United States v. Jewell,* 60 F.3d 20, 22 (1st Cir. 1995).
[7] *Id.*
[8] *United States v. Rosario*, 918 F. Supp 524, 529 (D.R.I. 1986) quoting 2 Wayne R. LaFave, *Search and Seizure* § 3.7(d) at 103 (2d ed. 1987).
[9] *Rosario*, 918 F. Supp. at 529 quoting *United States v. Charest,* 602 F.2d 1015, 1017 (1st Cir. 1979).

5

was noted to be "located in the area of the Worcester-Providence Turnpike in Millbury, Massachusetts." But Sieger was not seen in the area. And no surveillance confirmed a Koustas-Sieger meeting. This undermined Trooper Norris's conclusion that Koustas's call to Nakos was connected to drug activity with Sieger.

But the lack of observations at 140 South Porter Street on December 5, 2013, also undermined the conclusion that Nakos was involved in Koustas's dealings with Sieger. Although Nakos's car was seen at 140 South Porter Street, Nakos was never identified. Nor did agents observe any items being transferred to or from Nakos's car at 140 South Porter Street or later at 366 Arah Street.

Second, Koustas's call to Nakos on March 14, 2014, did not link 366 Arah Street to drug trafficking. Trooper Norris said he heard the sound of Koustas counting money during his phone call with his girlfriend. This call followed an intercepted call between Koustas and Ranfos. Then, a short time later, in an intercepted call, Koustas was heard telling Nakos he was pulling in front of his house. Law enforcement made no observations of whether Koustas arrived and, if he did, whether he was seen carrying anything into the residence.

Third, if Nakos was involved in drug activity with Koustas, it is unlikely that there would have been any evidence at 366 Arah Street in June 2014, three months after Koustas's arrest and search of residence and vehicles in March 2014.

On this point, the Court of Appeals for the First Circuit's decision in *United States v. Feliz* provides a useful comparison.[10] In *Feliz*, agents applied for a search warrant after a confidential informant, who had bought drugs from the defendant in the past, made two controlled drug buys from the defendant in September 1997, and after

---

[10] 182 F.3d 82 (1st Cir. 1999).

6

receiving information in November 1997 that the defendant lived at a certain local address.[11]

The Court of Appeals concluded that there was a nexus between the defendant's apartment and drug activity.[12] The Court found reasonable the agent-affiant's belief that the defendant would likely keep drug proceeds and records in his apartment.[13] Rhetorically, the Court asked, where else would the defendant keep his account records and drug proceeds, if not his apartment?[14]

By comparison, there were no controlled buys involving Nakos. Nor did Trooper Norris identify any drug purchases from which it was reasonable to infer that Nakos received the proceeds, which would be found at 366 Arah Street. In fact, the only direct information law enforcement had regarding Nakos's alleged receipt of drug proceeds was from 2009, and involved the pizza shop. Unlike the defendant in *Feliz*, there was no evidence – or claim – that Nakos "operated" from 366 Arah Street.

Finally, Trooper Norris's conclusory statements about Nakos's gambling activities gave only generalized information from which no reasonable inferences could have been made. He noted that "Nakos is known to frequent casinos such as Foxwoods in Connecticut to launder his illegal drug proceeds" and the "records detail Nakos's financial activities at the casino (Foxwoods) which shows large cash transactions typical of someone laundering illegal proceeds."

But no facts were given to help the magistrate evaluate those broad statements. For example, Trooper Norris did not say how much Nakos earned from the pizza shop,

---

[11] *Id.* at 84-85.
[12] *Id.* at 88.
[13] *Id.*
[14] *Id.*

7

how much he gambled, how much he won, how much he lost, or what time frame the records covered. He described no specifics from the records he had received.

And although Trooper Norris noted that bank statements were seized during the traffic stop of Nakos on March 17, 2014, Trooper Norris did not connect the bank statements to Nakos's gambling and alleged money laundering.[15] Trooper Norris's admission that the "financial investigation [was] ongoing" may have explained the lack of details about the gambling records. But it cannot overcome his conclusory statements regarding Nakos's gambling and alleged money laundering or provide a nexus between 366 Arah Street and drug activity.[16]

2. **The omitted text messages between Koustas and Sieger on December 6, 2013, negate probable cause.**

The multiple text messages between Koustas and Sieger in the six hours after Koustas spoke with Nakos were critical to the probable cause determination because they undermined Trooper Norris's conclusion that Nakos was involved in Koustas's and Sieger's drug transaction. When added to the affidavit, these texts negate probable cause.

Where an affiant's "reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."[17] This principle also applies to information omitted

---

[15] Nor did Trooper Norris attempt to connect the cash seized from Nakos to drug activity at 366 Arah Street.
[16] *United States v. Vigeant*, 176 F.3d 565, 571 (1st Cir. 1999) ("unsupported conclusions are not entitled to any weight in the probable cause determination").
[17] *Franks v. Delaware*, 438 U.S. 154, 156 (1978).

8

from an affidavit.[18] If the search warrant application no longer establishes probable cause when the omitted information is added, the items seized should be suppressed.[19]

"'Recklessness may be inferred where the information was critical to the probable cause determination,'" i.e., consisted of "'facts that any reasonable person would know that a judge would want to know when deciding whether to issue a warrant.'"[20] To obtain an evidentiary hearing on the omission of information for an affidavit, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause."[21]

In his affidavit, Trooper Norris argued a direct connection between Nakos's call to Koustas and Koustas call to Sieger regarding a drug transaction. Referring to the intercepted conversation at 4:57 p.m. on December 6, 2013, between Koustas and Sieger, Trooper Norris concluded, "*Thus, based upon the conversation, I believe that Sieger's role is different than that previously believed I also believe that Koustas possessed greater contact with co-conspirators who are involved in the distribution of marijuana, and that Nakos, who spoke with Koustas prior to Sieger's call, informed Koustas that the transaction had been canceled.*"

Nakos did speak to Koustas "prior" to Koustas's intercepted call with Sieger later in the day. But it was six hours prior. And in between those calls, Koustas and Sieger

---

[18] 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.4(b), at 543-45 (4th ed. 2004).
[19] *United States v. Stewart,* 337 F.3d 103, 105 (1st Cir. 2003).
[20] *Burke v. Town of Walpole,* 405 F.3d 66, 82 (1st Cir. 2005) quoting *Golino v. New Haven,* 950 F.2d 864, 871 (2d Cir. 1991) and *Wilson v. Russo,* 212 F.3d 781 (3d Cir. 2000).
[21] *United States v. Cartagena*, 593 F.3d 104, 112 (1st Cir. 2010) quoting *Franks*, 438 U.S. at 155-56.

texted each other multiple times.[22] Specifically, Trooper Norris's affidavit omitted the following Koustas-Sieger contacts on December 6, 2013, after the 10:47 a.m. call from Nakos to Koustas:

- 10:49:05 – incoming call to Koustas from Sieger that went to voicemail[23]
- 12:09:31 – incoming text message to Koustas from Sieger
- 12:11:22 – outgoing text message from Koustas to Sieger
- 12:16:48 – incoming text message to Koustas from Sieger
- 12:20:27 – outgoing text message from Koustas to Sieger
- 12:21:59 – incoming text message to Koustas from Sieger

A reasonable person would know that a judge would want to know about these text messages when deciding whether to issue a warrant for two reasons.

First, the text messages undermine Trooper Norris's conclusion that on December 6, 2013, Nakos "informed Koustas that the transaction had been canceled."

Because the content of Nakos's call to Koustas is unknown, Trooper Norris was basing his conclusion on the fact of the call itself and the loose sequence of events, meaning Koustas spoke with Nakos before he spoke with Sieger. This logic compelled consideration not only of the fact of the five text messages Koustas and Sieger exchanged after the Nakos call, but also their role in the sequence of events. The texts made it reasonable to infer that Koustas cancelled the drug transaction on his own, or got word from someone other than Nakos. If Nakos had cancelled the drug transaction at 10:47 a.m., it would have been reasonable to expect an earlier call from Koustas to Sieger, instead of their text exchanges.

---

[22] At that time, law enforcement was not authorized to receive the content of the text messages, or the content of Nakos's call to Koustas.
[23] Per Trooper Norris's affidavit, Sieger's phone number was (508) 723-3101.

10

Second, when these texts are added to the affidavit, they also remove the "taint" of the interaction between Koustas and Nakos the day before, on December 5, 2013, when Trooper Norris attempted to link Nakos with an unconfirmed "meeting" between Koustas and Sieger.

### 3. The good faith exception does not save the lack of probable cause to search 366 Arah Street.

Because the affidavit failed to establish a nexus between 366 Arah Street and drug trafficking, and omitted critical Koustas-Sieger text messages, law enforcement agents did not act in objective good faith in searching 366 Arah Street. As a result, the evidence seized from 366 Arah Street must be suppressed.

Evidence from a search lacking in probable cause may still be admitted if the officer acted with "objective good faith."[24] To determine objective good faith, a court must consider whether the warrant was defective because the "law enforcement officers' acts or omissions [were] of a kind that a reasonably prudent officer would have avoided."[25] If their acts or omissions were what a "reasonably prudent officer would have avoided," the evidence will be excluded. "Suppression is still an appropriate remedy when 'the officers were…reckless in preparing their affidavit.'"[26]

Here, the defects in the warrant due were such that a reasonably prudent officer would not have applied for a search warrant.

First, there were no direct observations of drug-related activity connected to 366 Arah Street, and no reasonable inferences that supported any such connection.

---

[24] *United States v. Leon*, 468 U.S. 897, 920 (1984).
[25] *United States v. Ricciardelli*, 998 F.2d 8, 15 (1st Cir. 1993).
[26] *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987) quoting *Leon*, 468 U.S. at 926.

11

Second, Trooper Norris's conclusions regarding Nakos's gambling activities were conclusory statements to which no weight could have been given.

Third, the omitted Koustas-Sieger text messages undermined Trooper Norris's conclusion that Nakos was involved with the cancelled drug transaction on December 6, 2013, and Koustas's alleged involvement with Sieger on December 5, 2013.

In *United States v. Rosario*, the Court of Appeals for the First Circuit refused to apply the good faith exception to save an affidavit that lacked probable cause. In its decision, the Court mentioned several facts that weighed against a finding of objective good faith. One was the affidavit's omission of "indicia of [the confidential informant's] unreliability."[27] A second fact was the (false) implication that the confidential informant had personally witnessed a marijuana transaction and personally received money.[28] A third was the affiant's conclusory statements that amounted to "foundationless expert testimony."[29] As a result, the Court concluded that a person in the affiant's position – "that is, in possession of the omitted information – would have known that 'he should not have applied for a warrant'…without further investigation."[30]

Similarly, the affidavit here was flawed. Because Trooper Norris lacked objective good faith, the evidence from the search of 366 Arah Street must be suppressed.

## Conclusion

The affidavit, as submitted, failed to establish probable cause to search 366 Arah Street for evidence of drug activity. The lack of probable cause is even more apparent

---

[27] *Rosario*, 176 F.3d at 573.
[28] *Id*.
[29] *Id*. at 574.
[30] *Id*. quoting *Malley v. Briggs*, 475 U.S. 335,345 (1985)

when the omitted Koustas-Sieger text messages are considered. Finally, there was no "objective good faith" that would allow the evidence seized from 366 Arah Street to be admitted. Accordingly, the evidence seized from 366 Arah Street, and all fruits thereof, must be suppressed.

ALKIS NAKOS

By his Attorney,

Dated: January 7, 2015 /s/ Robert S. Carey_____
Robert S. Carey, NH Bar #11815
ORR & RENO, P.A.
45 S. Main Street
P.O. Box 3550
Concord, NH 03302
(603) 224-2381

CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2015, a copy of the within Motion was Electronically Served upon all counsel of record and Conventionally upon Alkis Nakos.

/s/ Robert S. Carey_____
Robert S. Carey, NH Bar #11815

1245383_1