UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| UNITED STATES OF AMERICA | ) | 2015 FEB -3 P 4: 21 |
|---|---|---|
| v. | ) No. 1:14-cr-93-04-LM | |
| JEREMY BLEVENS | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America, by its attorney, John Kacavas, United States Attorney for the District of New Hampshire, and the defendant, Jeremy Blevens, and his attorney, Benjamin Falkner, Esquire, enter into the following Plea Agreement.

1. **The Plea and Offense**.

The defendant, Jeremy Blevens, agrees to plead guilty to Count Two (2) of a six-count Indictment, which charges him with engaging in a conspiracy from in or about 2008 up to and including June 2014 in the District of New Hampshire, the District of Massachusetts, the District of New York, and the District of Vermont, to distribute, and possess with intent to distribute, marijuana, a schedule I controlled substance, and 3,4 methylenedioxymethamphetamine ("MDMA"), a schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2. **The Statute and Elements of the Offense**.

Title 21, United States Code, Section 846 provides that:

> [a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

See 21 U.S.C. § 846.

Title 21, United States Code, Section 841(a)(1) provides, in pertinent part, that:

1

> **(a)** Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally -
>
>> **(1)** to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

See 21 U.S.C. § 841(a)(1).

In order to prove that defendant engaged in a conspiracy from in or about 2008 up to and including June 2014 in the District of New Hampshire, the District of Massachusetts, the District of New York, and the District of Vermont, to distribute, and possess with intent to distribute, marijuana, a schedule I controlled substance, and MDMA , a schedule I controlled substance, as charged in Count Two (2) of the United States' six-count Indictment, the Government would have to prove the following four (4) essential elements beyond a reasonable doubt:

**One:** That a conspiracy involving two or more persons must have existed to commit the offense charged in the Indictment, that is, to distribute, and possess with intent to distribute, marijuana and MDMA;

**Two:** That defendant must have joined the conspiracy with knowledge of the existence of the conspiracy and its criminal objectives;

**Three:** That defendant must have knowingly, voluntarily and intentionally become a member of the conspiracy; and

**Four:** That in joining the conspiracy, defendant must have intended to achieve the unlawful objectives of the conspiracy.[1]

**3. Offense Conduct.**

The defendant stipulates and agrees that if the case proceeded to trial, the United States would prove the following facts beyond a reasonable doubt.

---

[1] Although the Indictment charges defendant Blevens and his coconspirators with the distribution of in excess of 1000 kilograms of marijuana, the United States cannot establish that defendant Blevens himself is subject to a 10 year minimum mandatory term of imprisonment, pursuant to 21 U.S.C.841(b)(1)(A)(vii), based upon the distribution of 1000 kilograms of marijuana, or a 5 year minimum mandatory term of imprisonment, pursuant to 21 U.S.C. 841(b)(1)(B)(vii), based upon the distribution of 100 kilograms of marijuana.

In March 2008, members of the Oklahoma State Police stopped a Toyota Tundra being driven by BRANDON ANDERSON and containing a New Hampshire registration in El Reno, Oklahoma, for a motor vehicle violation. A search of the vehicle resulted in the seizure of $2,001,550.00 in United States currency in vacuum-sealed bags which were secreted in the door panels and rear wall of the vehicle. An investigation conducted by the Drug Enforcement Administration ("DEA") following the seizure revealed the presence of a Drug Trafficking Organization ("DTO") centered in Canada and run by JEFFREY COLGROVE, a Canadian citizen. The investigation also disclosed that COLGROVE was responsible for the transportation of large quantities of marijuana into the United States. Once sold, the proceeds of the marijuana distribution would be transported to Canada and California. The currency transported to California was done in order for the DTO to obtain multi-kilogram quantities of cocaine, which would be transported back to New Hampshire and thereafter smuggled into Canada.

The investigation established that the marijuana supply side of the DTO was led by MIHAIL LEVENTIS, a Canadian citizen. LEVENTIS directed individuals to transport marijuana from within Canada to the border of the United States and Canada. Once the marijuana arrived inside the United States, the distribution responsibilities were led by STEVEN SARTI.

The investigation revealed that the DTO utilized various methods with which to deliver the marijuana into the United States, including the use of couriers who traveled by foot across the border. The investigation also demonstrated that the DTO employed numerous individuals to deliver the marijuana and transport the proceeds of the marijuana distribution back into Canada. If the marijuana was transported into the United States by foot, the couriers stored the marijuana at various stash houses in New Hampshire, New York, and Vermont until such time as the marijuana could be transported to its ultimate destination by use of a rented vehicle, a vehicle containing a hide, or a tractor trailer. All marijuana destined for distribution in New Hampshire was packaged in large, black hockey bags and typically labeled "NH," a reference to the intended recipient of the marijuana, ALKIS NAKOS, a resident of Manchester, New Hampshire, who was responsible for the receipt and distribution of the marijuana supplied by the DTO and transported into the District of New Hampshire.

In June 2009, law enforcement executed a search warrant at two stash houses, one located in Canaan, Vermont, and another located in Sutton, Vermont. A member of the DTO was found and arrested at one of the stash houses. Following arrest, the member of the DTO, a confidential source ("CS"), cooperated with law enforcement and identified ALKIS NAKOS as the intended recipient of all marijuana which was smuggled into the United States from Canada and labeled "NH." The CS also revealed that NAKOS was a resident of Manchester, New Hampshire, who met LEVENTIS in 2006 while the two served a term of incarceration at the New Hampshire State Prison in Concord, New Hampshire. The CS informed law enforcement that NAKOS received approximately 100 – 200 pounds of marijuana each week from the organization during the approximate period of June 2008 through June 2009. The CS also stated: (1) that the price of the marijuana ranged from $2,300.00 - $3,700.00 in United States currency for each pound; (2) that the DTO was responsible for the shipment of approximately 4000 - 7000 pounds of marijuana to "NH;" and (3) that approximately $3,000,000.00 - $5,000,000.00 in marijuana proceeds were obtained from "NH" during an approximate one (1) year period of time.

Although many individuals were arrested and prosecuted for drug-related offenses throughout 2009 and 2010, ALKIS NAKOS, and individuals associated with him, were not apprehended and continued to engage in the distribution of marijuana. In 2012, law enforcement initiated another investigation in order to target and prosecute individuals who had not been arrested during the earlier investigation and who continued to receive and distribute significant quantities of marijuana in the District of New Hampshire. During the investigation, law enforcement received authorization from United States District Court, District of New Hampshire, Judge Paul J. Barbadoro for the interception of wire and electronic communications for six (6) separate telephones, each of which was being utilized by the coconspirators to communicate with one another in relation to the distribution of marijuana. During the period of the wire and electronic intercepts, law enforcement discovered that ALKIS NAKOS continued to obtain marijuana from the DTO. Law enforcement also discovered that NAKOS utilized KOSMAS KOUSTAS to obtain marijuana for distribution from DTO members located in Massachusetts. After KOUSTAS obtained the marijuana from Massachusetts on behalf of NAKOS, he transported it to New Hampshire and then distributed it to numerous coconspirators, including JEREMY BLEVENS and CHARLES FOWLE, who, in turn, distributed the marijuana to additional coconspirators. The wire intercepts also demonstrated that in addition to the distribution of marijuana, NAKOS and KOUSTAS obtained quantities of 3,4 methylenedioxymethamphetamine ("MDMA," a/k/a "Ecstasy," a/k/a "Molly") for distribution. Once received, the MDMA, like the marijuana, would be provided to coconspirators, including JEREMY BLEVENS, for distribution.

During the course of the investigation, law enforcement obtained the assistance of a confidential informant, CI # 2. CI # 2 advised law enforcement that he had previously been involved with CHARLES FOWLE in the distribution of marijuana. According to CI # 2, he and FOWLE obtained marijuana from KOUSTAS and KOUSTAS served as the "boss" who coordinated the receipt and distribution of marijuana through a Canadian source of supply. Although CI # 2 advised law enforcement that he was no longer involved in the distribution of marijuana with FOWLE, he was aware, through conversations with FOWLE, that FOWLE continued to engage in the distribution of marijuana and maintained KOUSTAS as marijuana source of supply. CI # 2 also informed law enforcement that he owed a large amount of currency to KOUSTAS based upon a prior marijuana-related debt.

On October 9, 2013, law enforcement utilized CI # 2 in order to meet with CHARLES FOWLE for the purpose of providing FOWLE with a payment of $1,000.00 in United States currency toward CI # 2's debt to KOUSTAS. Following the meeting, CI # 2 met with law enforcement and relayed the conversation that it had with FOWLE. According to CI # 2, FOWLE stated that KOUSTAS could supply marijuana for $3,100.00 in United States currency for each pound. FOWLE also informed CI # 2 that KOUSTAS was selling MDMA.

On October 23, 2013, United States District Court, District of New Hampshire, Judge Paul J. Barbadoro granted the United States' request for the interception of wire and electronic communications over (508) 479-6296, a cellular telephone being utilized by KOUSTAS. At approximately 5:12 p.m. on October 23, 2013, law enforcement intercepted information which established that KOUSTAS was on his way to Massachusetts in order to obtain a quantity of marijuana from the DTO. Following receipt of the information, KOUSTAS' cellular telephone, (508) 479-6296, received an in-coming call at 6:32 p.m. from (603) 315-9033, a cellular telephone

being utilized by JEREMY BLEVENS ("BLEVENS"). During the call, KOUSTAS and BLEVENS engaged in a conversation involving the purchase and distribution of marijuana.

| | |
|---|---|
| BLEVENS: | I mean I, I finally got rid of the Jack. I still have some Kush left but I have, I have everything for you….you know and I still, I still have Orange which is like a mediocre f--kin I'm still stuck with it you know what I mean. I got this one kid that's slowly getting it off, he took Jack some of the Orange. Next time I see him again he's gonna take the Orange and most of the Kush and then I'll see him again which will be a month from now and then he'll finish off the Kush. I tried getting some people on the Kush but these people are f--kin wicked picky you know. I tried but. |
| KOUSTAS: | Bro my people love, ha ha. |
| BLEVENS: | (Inaudible). |
| KOUSTAS: | I don't, I might be getting some Purple. |
| BLEVENS: | Right. |
| KOUSTAS: | So I'll let you know. |
| . . . | |
| BLEVENS: | I mean once, once I run through this Orange and s--t you know I'll I'll probably take some then, but I mean if you could, if we can do this chick, this kid's back on and he has a few people and you know I might, and my other buddy was telling me he wants to chill with her to, so. |
| KOUSTAS: | Ok we can do that, let me ah find out and I'll let you know. |
| . . . | |
| KOUSTAS: | That's cool, what's up with ah, when were me and you gonna (inaudible) catch up? |
| BLEVENS: | Ahhmmm. Today, I wanna catch up with you today. I'm going and get your money right now so I can see you no matter what, you know. |

The intercepted conversation disclosed that BLEVENS' use of the terms Jack, Orange, and Kush were references to the distribution of different strains of marijuana. The term "Jack" is a reference to Jack Herrer, a potent, hybrid strain of marijuana. The conversation also established that BLEVENS had previously obtained a quantity of marijuana from KOUSTAS and successfully distributed it, stating that he (BLEVENS) "finally got rid of the Jack," a reference to his distribution of a quantity of Jack Herrer marijuana provided by KOUSTAS. In addition to engaging in a discussion involving the distribution of marijuana, the conversation confirmed that KOUSTAS was supplying BLEVENS with MDMA for distribution. BLEVENS' statement to KOUSTAS, "if we can do this chick," represented an inquiry into whether KOUSTAS had "Molly" (a colloquial term used to describe MDMA, commonly referred to as "Molly," a female name).

Following the interception of the conversation between KOUSTAS and BLEVENS, law enforcement intercepted additional wire communications during the night of October 23, 2013, which revealed that KOUSTAS planned to meet with BLEVENS. At approximately 10:04 p.m., law enforcement monitored a conversation between KOUSTAS, who called BLEVENS at (603) 315-9033, during which BLEVENS stated, "I'm just doing a few more things to finish up and then

I'll come and see you." At 11:17 p.m., law enforcement intercepted a call made by BLEVENS to KOUSTAS in which BLEVENS stated, "I'm here." Law enforcement, who were conducting surveillance at KOUSTAS' residence, 1465 Hooksett Road, Apartment 141, Hooksett, New Hampshire, positively identified KOUSTAS as he exited the residence after receiving the call. KOUSTAS was also observed carrying a large plastic trash bag, which he placed in the front passenger side of a 2008 Mitsubishi Lancer, New Hampshire registration 249 1320, registered to Jennifer Day, 1465 Hooksett Road, Apartment 141, Hooksett, New Hampshire. KOUSTAS was then observed entering the driver's side of the vehicle and traveling a short distance to an area within the apartment complex. KOUSTAS parked the vehicle next to a 2006 Toyota Camry, New Hampshire registration 2544776, registered to JEREMY BLEVENS, 61 Plummer Road, Bedford, New Hampshire.

On October 24, 2013, KOUSTAS and BLEVENS engaged in a conversation in which BLEVENS asked KOUSTAS "did you grab that." KOUSTAS replied, "[he] was calling . . . to see if [BLEVENS] wanted any," to which BLEVENS replied, "I want to do two actually because my other buddy's gonna want a halfie, but, ah, I'm gonna cover the whole thing tomorrow so that way I won't owe you nothing, f—king good, you know . . . but, ah, so what I have planned with this kid, cause he's gonna take it with him to the Phish tour on Saturday, so I'm gonna, I'm gonna, I wanted to meet up with you, grab it tonight and I was gonna see him tomorrow at six when he's out of work." The information obtained during the investigation disclosed that BLEVENS' question to KOUSTAS regarding whether or not KOUSTAS "grab[bed] that," was a reference to BLEVENS' conversation with KOUSTAS on October 23, 2013, in which BLEVENS asked KOUSTAS to obtain "that girl," a reference to MDMA. The information also established that BLEVENS intended to distribute MDMA received from KOUSTAS to an individual, "that kid." Likewise, BLEVENS' statement that "I want to do two actually" was an indication that he was seeking to purchase two (2) ounces of MDMA from KOUSTAS. BLEVENS' intention to purchase two (2) ounces was further demonstrated by his statement to KOUSTAS that his "buddy's gonna want a halfie," which is a reference to the fact that BLEVENS intended to distribute ½ ounce of MDMA to "his buddy."

KOUSTAS' distribution of MDMA to BLEVENS was confirmed when BLEVENS and KOUSTAS engaged in additional contact and arranged to meet. At approximately 9:14 p.m., on October 24, 2013, BLEVENS sent KOUSTAS a text message which stated, "I'm ova at Boston Market gtng chcken." KOUSTAS replied to BLEVENS by stating, "15 mins." At approximately 9:39 p.m., law enforcement observed KOUSTAS, who was driving the same 2003 Volkswagen GTI, arrive at Boston Market Restaurant, 14 March Avenue, Manchester, New Hampshire, and park next to a 2006 Toyota Camry, New Hampshire registration 2544776, registered to JEREMY BLEVENS, 61 Plummer Road, Apartment 1, Bedford, New Hampshire. Law enforcement also observed BLEVENS exit the Boston Market Restaurant, walk to KOUSTAS' vehicle, and enter the passenger side of the vehicle. BLEVENS remained in KOUSTAS' vehicle for approximately two (2) minutes and then exited the vehicle.

On November 10, 2013, KOUSTAS utilized (508) 479-6296 in order to contact BLEVENS. During the conversation, BLEVENS stated, "this kid was asking if I could get him something today. But he's gonna supposedly have a G for me, and I think I'll only have a G on me." The conversation between KOUSTAS and BLEVENS involved BLEVENS' request to purchase a quantity of MDMA from KOUSTAS. The conversation also demonstrated that in addition to BLEVENS' receipt of $1,000.00 in United States currency from

6

an unknown individual, he (BLEVENS) planned to purchase an additional quantity of MDMA from KOUSTAS based upon the utilization of his (BLEVENS') own currency ("I'll only have a G on me").

Following the conversation between KOUSTAS and BLEVENS, law enforcement, who were conducting surveillance of KOUSTAS in the area of KOUSTAS' residence, 1465 Hooksett Road, Apartment # 141, Hooksett, New Hampshire, observed KOUSTAS, who was operating his 2003 Volkswagen GTI, pull alongside a 2001 Chevrolet van, New Hampshire registration 2765950, registered to KOSMAS KOUSTAS, 1465 Hooksett Road, Apartment # 141, Hooksett, New Hampshire, which was located a short distance from KOUSTAS' residence. KOUSTAS exited the 2003 Volkswagen GTI, opened the rear door of the 2001 Chevrolet van, retrieved a white plastic bag, and re-entered the 2003 Volkswagen GTI. After KOUSTAS re-entered the 2003 Volkswagen GTI, he (KOUSTAS) contacted BLEVENS. During the conversation, BLEVENS asked KOUSTAS "do you have, ah, one of the number things with you . . . can you bring it real quick . . . just cuz this kid came from Concord, and I don't want to go back to Manch to my boy's house?"

BLEVENS' request for KOUSTAS to bring a "number thing" was a reference to KOUSTAS providing a scale to weigh MDMA. BLEVENS' statement involved his request for a scale because BLEVENS' comment that "I don't want to go back to Manch to my boy's house" reflected his intent to weigh the substance without having to transport it to another location ("to my boy's house"). Within approximately four (4) minutes of the conversation, law enforcement observed KOUSTAS and BLEVENS meet in an area located a short distance from KOUSTAS' residence. During the meeting, BLEVENS entered the front passenger side of KOUSTAS' vehicle and remained inside for approximately two (2) minutes. BLEVENS then exited KOUSTAS' vehicle, opened the trunk of his vehicle, and then re-entered KOUSTAS' vehicle. After remaining inside KOUSTAS' vehicle for approximately five (5) minutes, BLEVENS exited, re-entered his vehicle and left the area. KOUSTAS was then observed by law enforcement leaving the area and traveling back to the location of the 2001 Chevrolet van. Once at the van, KOUSTAS exited the 2003 Volkswagen GTI carrying a white plastic bag. KOUSTAS opened the driver's side door of the van and reached inside the vehicle. He then closed the door to the van, re-entered the 2003 Volkswagen GTI and left the area. When KOUSTAS re-entered the 2003 Volkswagen GTI, he was no longer carrying the white plastic bag.

On November 21, 2013, United States District Court, District of New Hampshire, Judge Paul J. Barbadoro issued an order authorizing the continued interception of wire communications over (508) 479-6296. The Court also issued an order authorizing the interception of wire and electronic communications over (603) 657-5195, the cellular telephone utilized by BLEVENS. During the intercepted wire and electronic communications, KOUSTAS spoke with BLEVENS about narcotics-related activity. Some of the communications involved KOUSTAS' contact with BLEVENS in order to make arrangements to distribute marijuana or MDMA or turn over proceeds from the distribution of marijuana or MDMA.

On January 13, 2014, United States District Court, District of New Hampshire, Judge Paul J. Barbadoro issued an order authorizing the interception of wire and electronic communications over (508) 745-9616, a cellular telephone being utilized by KOUSTAS. On January 16, 2014, KOUSTAS utilized the cellular telephone to contact FOWLE and inquire about

7

FOWLE'S distribution of marijuana.   The conversation also confirmed KOUSTAS' distribution of what law enforcement believe was a quantity of MDMA, a/k/a "Molly." An additional conversation between KOUSTAS and FOWLE on January 19, 2014, confirmed that KOUSTAS provided a quantity of MDMA to FOWLE.

| | |
|---|---|
| FOWLE: | Hello. |
| KOUSTAS: | Hello. |
| FOWLE: | What's going on? |
| KOUSTAS: | What's going on, man? |
| FOWLE: | You know, same shit different day. |
| KOUSTAS: | Ya. |
| FOWLE: | Yup. |
| KOUSTAS: | So you changed your number? |
| FOWLE: | Ya, I got a new one. |
| KOUSTAS: | Alright, so the other one is gonna be off? |
| FOWLE: | Ya, it's gonna be off eventually.   It's still on right now, but it's gonna be off really soon. |
| KOUSTAS: | Ya, I'll go get a new one, too. |
| FOWLE: | Yup, ya, it feels a lot better having a new one. |
| KOUSTAS: | Ya. |
| FOWLE: | But I still got people on that one, so this one, I don't want to blow this one up, so I gotta get another new one. |
| KOUSTAS: | That's good.   What's going on, anything good? |
| FOWLE: | Oh, ya, everthing's going good.   Um, he's still, I think that went fine, but he say, he wants to let me know, know like, I already tried when he called me in a little while, let me know how, make sure everything went fine with that, so . . . but I think it's all set. |
| KOUSTAS: | Oh, ya.   Ya, just got, I was f—ked up all the way until now, bro.   I'm still a little bit f—ked up. |
| FOWLE: | Ya, from that? |
| KOUSTAS: | Yup. |
| FOWLE: | What, just from touching it? |
| KOUSTAS: | Yup. |
| FOWLE: | Me too. |
| KOUSTAS: | Huh? |
| FOWLE: | I think I feel it too. |
| KOUSTAS: | Ya, well you didn't even touch it. |
| FOWLE: | That stuff? |
| KOUSTAS: | Ya. |
| FOWLE: | No, I touched it a little bit . . . I pulled a little piece out and ate it. |
| KOUSTAS: | It didn't hit me hard this time because I washed my hands right away, but I was f—ked up.   Like literally right now I'm like coming down. |
| FOWLE: | Mm, I, I tried a little tiny little piece of it. |
| KOUSTAS: | Ah, you're f—king crazy.   You're crazy, bro. |

The conversation between KOUSTAS and FOWLE confirmed that KOUSTAS provided FOWLE with a quantity of what law enforcement believe was MDMA for distribution.

8

On March 30, 2014, a search warrant for KOUSTAS' residence, 465 Hooksett Road, Apartment # 141, Hooksett, New Hampshire, was issued by Judge Paul S. Moore, 9th Circuit Court, Merrimack, New Hampshire. During the course of the search, law enforcement seized a shoebox containing approximately two (2) pounds of MDMA, located in a first floor closet, a digital scale, located on a shelf in a bathroom on the first floor, two (2) bottles of Inositol, located in a bag on a desk which was located near the living room, and a Royal Sovereign money counter, located in the kitchen closet. Law enforcement also obtained a search warrant for one of KOUSTAS' vehicles, a Chevrolet C1500 van, New Hampshire registration 2765950. Located inside the Chevrolet C1500 van was a one (1) pound vacuum-sealed package containing marijuana, which was labeled as "NH" and "Grand Master." The labeling was consistent with the practice of the Canadian DTO, who labeled marijuana destined for New Hampshire with the letters "NH." Law enforcement also obtained a search warrant for 140 Porter Street, Manchester, New Hampshire, the residence of Nicholas Koustas, the father of KOSMAS KOUSTAS. Seized pursuant to the search was a large black empty duffle bag which was consistent with the duffle bags utilized by the Canadian DTO to transport significant quantities of marijuana. Although no marijuana was contained inside the bag, a small, hand-written piece of paper was located in the bag. On one side of the note was the word "Boston," and on the opposite side was the word "Diamond Kush x 50." Information obtained during the investigation established that the bag was utilized to hold and transport 50 pounds of marijuana. The term "Boston" was a reference by the Canadian DTO that the marijuana was smuggled from Canada into the United States and was destined for the Boston, Massachusetts, area.

4. **Penalties**.

The defendant understands that the penalties for the offenses are:

A. With respect to Count Two (2) (Conspiracy to Distribute Marijuana and MDMA), pursuant to 21 U.S.C. 841(b)(1)(C):

> (1) a term of imprisonment which may not be more than twenty (20) years;
> (2) a fine of $1,000,000.00; and
> (3) a term of supervised release which may not be less than three (3) years nor more than life. The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release with no credit for time already spent on supervised release (18 U.S.C. §3583).

B. The defendant also understands that he will be required to pay a special assessment of $100.00 for each count of conviction ($100.00), which the defendant agrees to pay at or before the time of sentencing, and that the Court may order him to pay restitution to the victim of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

9

5. **Sentencing and Application of the Sentencing Guidelines.**

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that the defendant has no right to withdraw the defendant's guilty plea if the applicable advisory guideline range or the defendant's sentence is other than the defendant anticipated, except as expressly provided in this Plea Agreement.

The defendant also understands that the United States and the United States Probation Office shall:

    A.    advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

    B.    respond to questions from the Court;

    C.    correct any inaccuracies in the pre-sentence report;

    D.    respond to any statements made by the defendant or the defendant's counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant is aware that any estimate of the probable sentence or the probable sentencing range relating to the defendant pursuant to the advisory Sentencing Guidelines that the defendant may have received from any source is only a prediction and not a promise, and is not binding on the United States, the Probation Office, or the Court, except as expressly provided in this Plea Agreement.

6. **Stipulations and Other Agreements.**

The Government and the defendant have reached the following stipulation pursuant to Fed. R. Crim. P. 11(c)(1)(C).

A. The parties agree that defendant will be sentenced to a twenty-four (24) month period of imprisonment.

The parties intend the above stipulation to be binding under Fed. R. Crim. P 11(c)(1)(C). By using the word "binding," the parties mean that if the Court does not accept the stipulation, pursuant to Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void. The parties will not be allowed to vacate or withdraw from the Plea Agreement for any other reason.

7. **Acceptance of Responsibility.**

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A. fails to admit a complete factual basis for the plea at the time the defendant is sentenced or at any other time;

B. challenges the United States' offer of proof at any time after the plea is entered;

C. denies involvement in the offense;

D. gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E. fails to give complete and accurate information about the defendant's financial status to the Probation Office;

F. obstructs or attempts to obstruct justice, prior to sentencing;

G. has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to

fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.  fails to appear in court as required;

I.  after signing this Plea Agreement, engages in additional criminal conduct; or

J.  attempts to withdraw the plea of guilty.

The defendant understands and agrees that the defendant may not withdraw the defendant's guilty plea if, for any of the reasons listed above, the United States does not recommend that the defendant receive a reduction in the defendant's sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is under no obligation to reduce the offense level if it finds that the defendant has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and the defendant has assisted the United States in the investigation or prosecution of the defendant's own misconduct by timely notifying the United States of the defendant's intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

**8. Waiver of Trial Rights and Consequences of Plea.**

The defendant understands that the defendant has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent the defendant. The defendant understands that the defendant has the right:

A.  to plead not guilty or to maintain that plea if it has already been made;

B.  to be tried by a jury and, at that trial, the right to the assistance of counsel;

12

    C.    to confront and cross-examine witnesses against the defendant;

    D.    not to be compelled to provide testimony that may incriminate the defendant; and

    E.    to compulsory process for the attendance of witnesses to testify in the defendant's defense.

The defendant understands that by pleading guilty the defendant waives and gives up those rights and that if a plea of guilty is accepted by the Court, there will not be a trial of any kind.

The defendant understands that if the defendant pleads guilty, the Court may ask the defendant questions about the offense, and if the defendant answers those questions falsely under oath, on the record, and in the presence of counsel, the defendant's answers may later be used against the defendant in a prosecution for perjury or making false statements.

**9. Acknowledgment of Guilt; Voluntariness of Plea.**

The defendant acknowledges that the defendant:

    A.    is entering into this Plea Agreement and is pleading guilty freely and voluntarily because the defendant is guilty;

    B.    is entering into this Plea Agreement without reliance upon any discussions with the United States, except as described in this Plea Agreement, and without promise of benefit of any kind except as described in this Plea Agreement;

    C.    is entering into this Plea Agreement without threats, force, intimidation, or coercion of any kind;

    D.    understands the nature of the offense to which the defendant is pleading guilty, including the penalties provided by law; and

    E.    is completely satisfied with the representation and advice received from the defendant's undersigned attorney.

10. **Scope of Agreement**.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from the defendant's plea of guilty. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

11. **Collateral Consequences**.

The defendant understands that the defendant will be adjudicated guilty of the offense to which the defendant will plead guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12. **Satisfaction of Federal Criminal Liability; Breach**.

The defendant's guilty plea, if accepted by the Court, will satisfy any and all federal criminal liability of the defendant in the District of New Hampshire as a result of the defendant's participation in the conduct which forms the basis of the Indictment in this case. The defendant understands that if, before sentencing, the defendant violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw from it.

13. **Waivers**.

A. Appeal

The defendant is aware that the defendant has the right to challenge the defendant's

sentence and guilty plea on direct appeal. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

1. The defendant's guilty plea and any other aspect of defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues; and

2. The defendant's sentence imposed by the Court if within the terms agreed upon and stipulated to in this Plea Agreement. The defendant retains the right to appeal any sentence imposed by the Court if such sentence consists of any term in excess of 24 months imprisonment. Such right is premised upon the Court's rejection of the parties stipulated sentence of 24 months and defendant's decision to nevertheless proceed with sentencing.

The defendant's waiver of rights does not operate to waive appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel.

### B. Collateral Review

The defendant understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., a motion under 28 U.S.C. 2255 or 2241. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1. The defendant's guilty plea and any other aspect of defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues; and

2. The defendant's sentence imposed by the Court if within the terms agreed upon and stipulated to in this Plea Agreement. The defendant retains the right to appeal any

15

sentence imposed by the Court if such sentence consists of any term in excess of 24 months imprisonment. Such right is premised upon the Court's rejection of the parties stipulated sentence of 24 months and defendant's decision to nevertheless proceed with sentencing.

The defendant's waiver of the right to collateral review does not extend to claims that the plea was unknowing or involuntary or to claims that the defendant received ineffective assistance of counsel. The defendant's waiver of his right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated by the Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C.     **Freedom of Information and Privacy Acts.**

The defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. 552, or the Privacy Act of 1974, 5 U.S.C. 522a.

D.     **Appeal by the Government**

This Plea Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. 3742(b), and the United States therefore retains its appeal rights.

14.    **No Other Promises.**

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15. **Final Binding Agreement**.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and his attorney and until signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16. **Agreement Provisions Not Severable**.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

Dated: January 20, 2015.

> JOHN KACAVAS
> United States Attorney
>
> By: /s/ Terry L. Ollila
> Terry L. Ollila
> Assistant U.S. Attorney
> U.S. Attorney's Office
> Bar No. 560603
> 55 Pleasant Street
> Concord, NH 03301
> (603) 225-1552

The defendant certifies that he has read this 17-page Plea Agreement and that he fully understands and accepts the terms thereof.

Jeremy Blevens, defendant /s/ Jeremy Blevens         Date: January 28, 2015.

I have read the above and explained it to my client, who advises me that he understands and accepts its terms.

Benjamin Falkner, Esquire, /s/                       Date: January 28, 2015.
Counsel for defendant

17