```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   14-cr-93-01/02-LM
           v.                     *   April 3, 2015
                                  *   10:00 a.m.
ALKIS NAKOS and KOSMAS KOUSTAS    *
    *
* * * * * * * * * * * * * * * * * *




              TRANSCRIPT OF TESTIMONY OF
               TROOPER STEFAN CZYZOWKSI
         BEFORE THE HONORABLE LANDYA B. McCAFFERTY




Appearances:

For the Government:    Terry Ollila, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301


For the Defendant:     Robert L. Sheketoff, Esq.
                       Law Office of Robert L. Sheketoff
                       One McKinley Square
                       Boston, MA  02109


Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454
```

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|

STEFAN CZYZOWSKI

By Ms. Ollila           4
By Mr. Sheketoff              39

1          MS. OLLILA:  Thank you, your Honor.  The

2    United States calls New Hampshire State Trooper Stefan

3    Czyzowski to the stand.

4          THE CLERK:  Please stand and raise your right

5    hand.

6                    STEFAN CZYZOWSKI

7        having been duly sworn, testified as follows:

8          THE CLERK:  For the record could you please

9    state your name and spell your last name, please.

10          THE WITNESS:  Stefan Czyzowski,

11    C-Z-Y-Z-O-W-S-K-I.

12                  DIRECT EXAMINATION

13    BY MS. OLLILA:

14        Q.    Good morning, trooper.

15        A.    Good morning.

16        Q.    How are you employed?

17        A.    The New Hampshire Department of Safety,

18    Division of State Police as a state trooper.

19        Q.    How long have you been a state police trooper

20    with the New Hampshire State Police?

21        A.    Since August 2006.

22        Q.    What did you do prior to August of 2006?

23        A.    I was in the United States Coast Guard and

24    college.

25        Q.    What did you do in the United States Coast

1    Guard?

2        A.   I operated small gun boats.

3        Q.   I'm sorry?

4        A.   I operated small gun boats for the harbor

5    defense unit for the United States Coast Guard and was

6    deployed overseas.

7        Q.   You were deployed overseas where?

8        A.   Middle East and north Arabian Gulf in 2009.

9        Q.   For how long?

10       A.   For a year.

11       Q.   What did you do?

12       A.   I protected high value assets of the United

13   States.  I escorted vessels from 12 miles out into

14   harbors in and around the north Arabian Gulf.

15       Q.   Has that been your only deployment?

16       A.   Yes.

17       Q.   Now, being a trooper with the New Hampshire

18   State Police, what are your general duties?

19       A.   I'm a patrol trooper in Troop B which is based

20   out of Bedford.

21       Q.   What does a patrol trooper do?

22       A.   Drive around the highway, answer calls,

23   conduct motor vehicle stops.

24       Q.   Have you had any training with respect to any

25   other law enforcement departments in the state of New

1    Hampshire?

2         A.   I'm a graduate of the 141st New Hampshire

3    Police Academy.

4         Q.   Have you worked with any other law enforcement

5    departments within New Hampshire?

6         A.   Yes, I have.

7         Q.   Have you worked with members of the

8    Manchester, New Hampshire police department?

9         A.   Yes, I have.

10        Q.   When did you do that?

11        A.   I spent two summers in 2012 and 2013 in their

12   street crimes unit.

13        Q.   Why?

14        A.   I was assigned to a plain clothes assignment

15   to combat prostitution and drug activity in and around

16   the Manchester area.

17        Q.   So during the summers of 2012 and 2013 you

18   worked with members of the Manchester Police Department?

19        A.   Yes.

20        Q.   In the street crimes unit?

21        A.   Yes.

22        Q.   And again, what was the focus of the street

23   crimes unit?

24        A.   Drug and prostitution activity.

25        Q.   So did you operate in an undercover capacity

1    when you were employed with the street crimes unit?

2        A.    It was a plain clothes assignment, so I was

3    not in uniform.

4        Q.    Did you travel in and around Manchester much

5    during that period of time?

6        A.    The entire time we were assigned to the city.

7        Q.    Are you familiar with the area of Pine Street

8    in Manchester?

9        A.    Very well, yes.

10       Q.    You say very well, why very well?

11       A.    That was one of the high target areas where a

12   great deal of prostitution activity took place.  It was

13   a low income area where there was a lot of drug

14   activity.  Spent a lot of time on Pine Street.

15       Q.    Now, spanning forward to 2014, specifically

16   March 17, 2014, how were you employed then?

17       A.    As a state trooper.  I was working an extra

18   duty enforcement detail.

19       Q.    What does that mean, an extra duty

20   enforcement?

21       A.    It's hours in addition to your duty, overtime,

22   that you are specially assigned to go out and conduct

23   motor vehicle stops.

24       Q.    When you say conduct motor vehicle stops, are

25   you looking to stop people to cause trouble or do you

1  stop people because they are violating the laws of the

2  state of New Hampshire?

3      A.   Violating motor laws.  It's a safety issue.

4  You will see signs out there, Operation Safe Commute,

5  that people see all over the highways in New Hampshire.

6  That's the opportunity for us to go out and slow people

7  down, be proactive, be seen by members of the public so

8  they slow down and drive safely.

9      Q.   It's called Operation Safe Commute?

10     A.   That's one of the operations that they do,

11  yes.

12     Q.   Okay.  So on this date you were doing what's

13  called a detail, earning overtime hours in order to be

14  seen on the roads of New Hampshire?

15     A.   Yes.

16     Q.   And how many hours were you assigned to that

17  detail?

18     A.   Four hours.

19     Q.   Did something -- did you engage in any motor

20  vehicle stops on that, during that time frame?

21     A.   Yes.

22     Q.   Did you stop a vehicle, a Mercedes?

23     A.   Yes, I did.

24     Q.   Do you have any recollection before stopping

25  the Mercedes whether you stopped any other vehicles?

1    A.   Yes, I did.  This was towards the end of my

2    shift, of the four-hour block, so I don't know exactly

3    how many cars I stopped.  There had been several motor

4    vehicle stops before this.

5    Q.   Were you trying to do drug interdiction on

6    that date?

7    A.   No.

8    Q.   So, would you please testify, Trooper

9    Czyzowski, about why you stopped this Mercedes and

10    describe the motor vehicle?

11    A.   I was traveling southbound on the Everett

12    Turnpike in the city of Nashua.  I was in the area of

13    Exit 7 and I observed several vehicles that were

14    travelling southbound.  One of the vehicles was this

15    Mercedes.  It was a black Mercedes E350, and it was

16    following another vehicle, and I estimate the distance

17    between the vehicles to be approximately one car length

18    in between the vehicles.  To me that appeared to be

19    following the vehicle too closely in this area.  The

20    traffic was light.  There was no reason why it should

21    have been that close.  They were maintaining highway

22    speeds of 55 to 60 miles an hour, and there was ample

23    opportunity for the operator of the Mercedes to move

24    over and not follow the other vehicle so closely.

25    Q.   Is that a violation of the laws of the state

1    of New Hampshire when you follow a motor vehicle too

2    closely?

3         A.   Yes, it is.

4         Q.   Why?  What's the purpose of the law?

5         A.   The law states that you can follow a vehicle

6    safely and when it's reasonable and prudent for the

7    conditions.

8         Q.   And did you deem that the vehicle, the

9    Mercedes, was not acting in a prudent fashion, the

10   driver?

11        A.   Yes.  Because of the speeds, you're on the

12   highway, with stopping distances and reaction times it

13   would take that vehicle a little more than 300 feet to

14   come to a stop should the operator need to stop the

15   vehicle, and having a distance of less than a car length

16   in between the two vehicles I felt was unsafe.

17        Q.   So what did you do?

18        A.   I activated my emergency lights and pulled

19   the Mercedes over in the area of Exit 6.

20        Q.   Was there any problem with the Mercedes

21   pulling over to the side?

22        A.   No.

23        Q.   What happened then?

24        A.   I approached the vehicle on the passenger side

25   for my safety.  We do a lot of passenger side approaches

1   on the highway now because a lot of troopers are getting

2   struck.  When I approached on the passenger side, I

3   observed two occupants inside the vehicle.

4        Q.    You just testified a lot of troopers, a lot of

5   law enforcement are approaching motor vehicles that you

6   stop on the passenger side.  Can you explain why that

7   is?

8        A.    Because with the proximity on the breakdown

9   lane, a lot of these breakdown lanes are very narrow,

10  and when you're getting out of the car, if you're

11  standing at the driver's door you're standing basically

12  on the line of the roadway, on the white line, and

13  people passing by do not move over.  I've been struck

14  several times, and I don't want to get struck again.

15       Q.    You've been struck by a car several times?

16       A.    My cruiser has, yes.

17       Q.    Wow.  So you approached the motor vehicle on

18  the passenger side.  Was the window down or up when you

19  approached?

20       A.    It was down.

21       Q.    All right.  What did you notice right away?

22       A.    That the passenger already had his ID out in

23  his hand ready to hand to me.

24       Q.    The passenger?

25       A.    Passenger.

 1          Q.    What about the driver?

 2          A.    He was acquiring his information.

 3          Q.    Did that strike you as unusual that the

 4   passenger had his license in his hand already?

 5          A.    Very.

 6          Q.    Why very unusual?

 7          A.    Because in almost nine years of doing this

 8   I've never had a passenger already have their ID ready

 9   to hand to me without me asking for it and without even

10   getting to the car first, they already had it out and

11   ready to go.

12               THE COURT:  That's true even when you

13   approached and the passenger --

14               THE WITNESS:  Even though the passenger, you

15   Honor, I've never had a passenger already ready to hand

16   me their identification.  Ordinarily if I find some

17   reason that I would ask them for it, if they weren't

18   wearing a seatbelt or if there was alcohol in the car

19   and they seemed underage and I would ask for the

20   identification, they would present it, but I've never

21   had somebody already have it out ready to hand to me.

22          Q.    So, when you saw that the passenger had -- and

23   by the way, the passenger, was it male or female?

24          A.    A male.

25          Q.    And did you obtain the license from the

1    passenger?

2         A.    Yes.

3         Q.    What was his name?

4         A.    Christopher Ranfos.

5         Q.    Did you obtain the license from the driver?

6         A.    Yes.

7         Q.    And by the way, do you see the driver in the

8    courtroom today?

9         A.    Yes, I do.

10        Q.    Could you please point to him and describe an

11   article of clothing that he is wearing.

12        A.    He's seated at defense table wearing an orange

13   shirt and he has a beard.

14             MS. OLLILA:  Your Honor, may the record

15   reflect that the witness has identified the defendant

16   Alkis Nakos.

17             THE COURT:  Yes.

18        Q.    Did you obtain Mr. Nakos's license?

19        A.    Yes, I did.

20        Q.    Did it list an address where he was living,

21   supposedly living?

22        A.    Yes.

23        Q.    And what was that address?

24        A.    It was on Pine Street, Manchester.

25        Q.    And what kind of vehicle was he driving?

1       A.    A brand new Mercedes E350.

2       Q.    Did it strike you as odd that a brand new

3 Mercedes 350, the owner might be living on Pine Street,

4 is that at all unusual?

5       A.    Yes.

6       Q.    Why is that unusual?

7       A.    Because of the nature of Pine Street.  It's a

8 low income area where there's a lot of drug and

9 prostitution activity, and people in that area do not

10 have a lot of money to buy a brand new Mercedes Benz.

11      Q.    Well, you didn't know whether he owned the

12 vehicle or leased the vehicle, did you?

13      A.    No.

14      Q.    So what did you do now that you have the

15 driver's license, Mr. Nakos's license, and the

16 passenger's license, Mr. Ranfos's license, what did you

17 then do, Trooper Czyzowski?

18      A.    I went back to my vehicle to conduct a motor

19 vehicle query.

20      Q.    And did you do that?

21      A.    Yes, I did.

22      Q.    What is a motor vehicle query?

23      A.    You have a computer in your car or you can use

24 the dispatcher to call and run these people to make sure

25 the licenses are valid, make sure they don't have any

1   warrants, make sure they're not wanted by any local

2   police department.

3        Q.   Do you do that on every motor vehicle stop?

4        A.   Ninety-nine percent of the time.  Sometimes

5   the computer system is not working.  Sometimes if we run

6   queries out of Massachusetts, the Massachusetts system

7   is down.  So, almost all the time you are running

8   people.

9        Q.   Trooper Czyzowski, did you learn any

10  information on either the passenger or the driver once

11  you ran their licenses?

12       A.   Yes.  The dispatcher informed me that the

13  passenger, Mr. Ranfos, has a non-extraditable warrant

14  out of Florida for dangerous drugs.

15       Q.   Did you have any other understanding what the

16  non-extraditable warrant for dangerous drugs was, what

17  kind of drug, did you know?

18       A.   It said sale and delivery of marijuana.

19       Q.   Now, I didn't ask you this, but do you have a

20  recollection as to what the time was when you stopped

21  the motor vehicle?

22       A.   Approximately 6:30 at night.

23       Q.   Once you saw that the passenger, Christopher

24  Ranfos, had a non-extraditable warrant, what did you do

25  as you were sitting in your car?

A.     I contacted members of the Manchester Police

Department that I had worked with the summer prior,

street crimes unit, to find out if they were familiar

with these two subjects.

Q.     Why would you do that?

A.     Because sometimes Manchester has

investigations running that either they want information

about or I don't want to step on their toes if they have

something going, or maybe they have an in-house warrant

on these people that I can pick up for them right there.

Q.     But why in this case of a vehicle you have

pulled on the side of the road, why would it occur to

you to contact other members of law enforcement.  Did

something strike you as unusual?

A.     The nature of the -- you have two subjects

coming from, they live on Pine Street, or one of them

lives on Pine Street with a brand new Mercedes, and the

passenger has a non-extraditable warrant for dangerous

drugs.

Q.     So who did you contact at the Manchester

Police Department?

A.     Officer Mike Donahue.

Q.     Did you know Officer Mike Donahue?

A.     I know him.

Q.     How do you know him?

1      A.    Through the street crimes unit.

2      Q.    Did you work with him when you worked in the

3   street crimes during 2012, 2013?

4      A.    Yes, I met him in 2012 when I -- my first year

5   going there.

6      Q.    Are you friendly with him?

7      A.    Yes.

8      Q.    When you contacted him, did you contact him at

9   the Manchester Police Department or on his cell phone,

10  how did you contact him?

11     A.    On his cell phone.

12     Q.    And what did you say to him?

13     A.    I asked him, I said, hey, I'm going to throw a

14  couple names at you to see if you're familiar with these

15  two subjects.

16     Q.    And did you throw the names at him?

17     A.    I did.

18     Q.    What did he say?

19     A.    He asked me if I was joking.

20     Q.    And what did you say?

21     A.    I said no, I'm not joking, and asked him --

22     Q.    And then what did he say?

23     A.    He asked me where I was right now.

24     Q.    What did you say?

25     A.    I told him I was in a car stop with these two

1    subjects in Nashua.

2         Q.   And what did he say?

3         A.   Again, he thought I was joking.

4         Q.   Did he tell you why he thought you were

5    joking?

6         A.   Yes.  He said that he was running surveillance

7    on those two subjects.

8         Q.   What does that mean to you, running

9    surveillance on those two subjects?

10        A.   Following them around.  Tracking their

11   movements.  They obviously have an investigation going.

12   There is some reason to believe that they are following

13   them around for some kind of activity.

14        Q.   Did you inquire further of Officer Donahue

15   about what the nature of their investigation was?

16        A.   At that point he said you need to contact your

17   drug unit immediately.

18        Q.   Now, let me back up.  How much time elapsed?

19   You said the motor vehicle stop occurred at 6:29 p.m.?

20        A.   Yes, around 6:30.

21        Q.   Okay.  So how much time elapsed from 6:30

22   until you had the conversation with Officer Donahue?

23        A.   A few minutes.

24        Q.   What does that mean to you, a few minutes?

25        A.   Less than five minutes.

1     Q.   Okay.  So now you see the passenger with the

2   license out the window, non-extraditable warrant, Pine

3   Street, brand new Mercedes, speaking to Officer Donahue,

4   he tells you to contact your drug unit.  What is the

5   name of your drug unit?

6     A.   NIU, Narcotics and Investigations Unit.

7     Q.   Have you ever worked in the NIU before?

8     A.   I did when I was in college, I was an intern

9   with the NIU.

10     Q.   As an intern what did you do?

11     A.   I followed them around their office, I went on

12   a few drug raids with them, I saw their daily

13   activities.

14     Q.   What type of investigations do members of the

15   NIU with the state police conduct?

16     A.   Narcotics investigations.

17     Q.   Only narcotics investigations?

18     A.   No.  Occasionally they will use them, I know

19   that the major crimes unit has used them before, our

20   SWAT team has used them before in an attempt to conduct

21   surveillance because of the capacity of their

22   undercovers, they can conduct surveillance.

23     Q.   You're a member of the state police?

24     A.   Yes.

25     Q.   Members of the NIU, is it a specialized

1   division of the New Hampshire State Police?

2        A.   Yes, it's a separate unit.

3        Q.   Do you have any ability as a member, as a

4   trooper with the New Hampshire State Police, to

5   understand on a daily basis what other units are doing;

6   for example, what the NIU would be doing?

7        A.   As far as investigations?

8        Q.   Yes.

9        A.   No.

10       Q.   Did you have any idea at all when you engaged

11  in that motor vehicle stop that members of the state

12  police in the Narcotics Investigation Unit were

13  conducting an inquiry into Alkis Nakos and/or

14  Christopher Ranfos?

15       A.   No.

16       Q.   None at all?

17       A.   Zero.

18       Q.   Did you contact the NIU?

19       A.   Yes, I did.

20       Q.   And who did you speak with?

21       A.   Sergeant Robert LeFoley.

22       Q.   Who is Sergeant Robert LeFoley?

23       A.   He's a detective sergeant in narcotics.

24       Q.   What did you say to him?

25       A.   I explained to him that I had a car stop, that

1    I spoke with Mike Donahue, he referred me to you

2    regarding Alkis Nakos and Christopher Ranfos.

3         Q.   And what did Sergeant LeFoley say to you?

4         A.   He explained to me that he couldn't tell me

5    too much about what was going on but that there was a

6    federal wiretap on these two subjects and that they were

7    conducting investigations on them currently.

8         Q.   Did you learn what type of drug was being

9    investigated?

10        A.   I don't remember if at that point they told me

11   or not.

12        Q.   Was there any doubt in your mind that the

13   investigation involved narcotics?

14        A.   No.

15        Q.   So when you learned -- what did Sergeant

16   LeFoley tell you to do with respect to the stop.  Did he

17   give you instruction?

18        A.   He told me to continue the stop as if he

19   hadn't talked to me and that he was going to be

20   contacting the U.S. Attorney's Office.

21        Q.   Okay.  Do you know if he engaged in a

22   conversation with someone?

23        A.   Yes.

24        Q.   Who did he speak to?

25        A.   You.

1      Q.    Did you -- what did you do at that point in

2  time?

3      A.    He had told me to continue the investigation.

4  So at that point I approached the vehicle and asked to

5  speak with Mr. Ranfos outside.

6      Q.    Trooper Czyzowski, when you engage in motor

7  vehicle stops, you prepare reports; correct?

8      A.    Yes.

9      Q.    When you prepare reports do you provide all

10  the information that occurred during the motor vehicle

11  stop; correct?

12      A.    Yes.

13      Q.    And did you prepare a report in this case?

14      A.    Yes.

15      Q.    When you prepared the report did you include

16  in that report the information that you received from

17  Officer Donahue and Sergeant LeFoley?

18      A.    No.

19      Q.    And were you instructed not to do so?

20      A.    Yes.

21      Q.    Why?

22      A.    Because it was a current --

23            MR. SHEKETOFF:  Well --

24      Q.    What were you told?

25            THE COURT:  What's your objection?

1          MR. SHEKETOFF:  She asked him why he was

2     instructed by somebody else, so.

3          THE COURT:  Go ahead.

4     Q.    What were you told?

5     A.    Not to include any of that conversation in

6     there because the investigation into Mr. Nakos and Mr.

7     Ranfos was continuing.

8     Q.    So, once you have this information, you're in

9     your car, how much time had elapsed?  So you now speak

10    to Officer Donahue, you speak to Sergeant LeFoley, how

11    long was it from the initial motor vehicle stop to when

12    you're going to get out of the car again?

13    A.    That was maybe ten minutes total.

14    Q.    So what do you do?

15    A.    I asked Mr. Ranfos if I could speak to him

16    outside the car.

17    Q.    So you get out of your car and you approach

18    the passenger side window again?

19    A.    Yes.

20    Q.    And what happened?

21    A.    He exited the vehicle.

22         THE COURT:  May I ask a quick question.  Ten

23    minutes between the time of what, the time of the

24    initial stop or -- can you clarify that for me?  Less

25    than five minutes to the call Trooper LeFoley and

1    then --

2        Q.    Sure.   Now let me back up.   If you can testify

3    again when you engaged in the motor vehicle stop?

4        A.    Approximately 6:30.

5        Q.    How long was it until you spoke to Officer

6    Donahue?

7        A.    A few minutes.

8        Q.    And then how long after that was it until you

9    spoke to Sergeant LeFoley?

10       A.    As soon as I hung up the phone with Mike I

11   called Sergeant LeFoley.

12       Q.    So, once you're done with the conversation

13   with Sergeant LeFoley, how much time approximately

14   elapsed from 6:30 until right before you're going to get

15   out of the car again?

16       A.    Maybe ten minutes.

17       Q.    So you get out of the car and what do you do?

18       A.    I speak with Mr. Ranfos outside the car.

19       Q.    You ask him to get out?

20       A.    Yes.

21       Q.    Does he comply?

22       A.    Yes.

23       Q.    What is his demeanor when he gets out of the

24   car?

25       A.    Casual, not nervous, nothing.

1    Q.   As a trained trooper -- strike that.  Are you

2  provided with training as to what signs to look for when

3  individuals get out of motor vehicles?

4    A.   Yes.

5    Q.   And what is the training you receive, what are

6  you looking for?

7    A.   Depends on what the motor vehicle stop is for.

8  If it's looking for somebody driving under the influence

9  of alcoholic or drugs, you're looking to find out how

10  they climb out of the car, if they stumble, if they fall

11  out of the car.  If it's a drug-related stop you may

12  look for where their hands are positioned.  Are they

13  nervous.  Where they're looking.  If they're looking to

14  flee the area.  You have to be aware of everything

15  that's going on.  If somebody is constantly looking away

16  from you when they are stepping out talking to you,

17  there's a high probability they are going to take off on

18  you and start running.  So, these are just signs you

19  have to be aware of in looking for.

20    Q.   Are you at all times focused on the individual

21  and do you maintain a safe distance from them?

22    A.   You maintain a safe distance, but you have to

23  be looking at everything.  Like I said, you have another

24  person in the vehicle.  You've got cars driving by you.

25  You have to be aware of traffic around you.  You have to

1    be aware of everything.

2        Q.    Did you notice anything on Mr. Ranfos's person

3    once he stepped out of the motor vehicle?

4        A.    Yes, both of his front pants pockets had

5    bulges in them.

6        Q.    What did you do when you noticed that his

7    pants pockets had bulges?

8        A.    I conducted a pat frisk.

9        Q.    What is a pat frisk?

10       A.    It's an opportunity to check for weapons on a

11   person, pat the outside of their clothing.

12       Q.    And what did you find when you engaged in a

13   pat frisk?

14       A.    As soon as I touched Mr. Ranfos's right front

15   pocket where the first bulge was, I immediately

16   recognized it to be a large quantity of money.

17       Q.    What did you do?

18       A.    I asked him how much money he had with him.

19       Q.    What did he say?

20       A.    A few thousand, 2 to 3,000.

21       Q.    What was his demeanor when he was saying this?

22       A.    Calm.

23       Q.    What did you do at that point?

24       A.    I asked him if I could see the money.

25       Q.    And what did he say?

1    A.    At first he was hesitant, and I asked him why

2   he was hesitant about the money, and then he pulled it

3   out and showed me briefly.

4    Q.    And what did the money look like to you.  How

5   was it -- how was it, was it just loose in his pocket?

6    A.    It was a large stack of money that was folded

7   in half and bound by elastics.  And I saw hundred-

8   dollars bills and twenty-dollar bills.

9    Q.    You said it was bound by elastics, was that

10   unusual to you?

11    A.    It's common with drug-related activities.  I

12   wouldn't say it's unusual maybe because I had been

13   exposed to it, but I was familiar with it.

14    Q.    Now, what did you do when you saw that there

15   was a large wad of money in his right front pants

16   pocket?

17    A.    Yes.

18    Q.    What did you do then?

19    A.    I continued to pat frisk.  Checked his left

20   side.  And that's when his left front pants pocket also

21   had a large quantity of money.

22    Q.    Did he try to explain away why he had that

23   much money?

24    A.    I asked him, I asked how much he had in the

25   left pocket, and he said another few thousand, two to

1    three.  I asked him what he did for work.  He said that

2    he did HVAC and that he saves.

3         Q.   So when you did the pat frisk on the left

4    side, did you ask him to remove the money from his

5    pocket?

6         A.   Yes.

7         Q.   And did he?

8         A.   No.

9         Q.   Why not?  Did you ask him why he wouldn't?

10        A.   He just refused.

11        Q.   What did you do at that point?

12        A.   I asked him why he had so much money with him.

13        Q.   What did he say?

14        A.   He told me he was going to Foxwoods.

15        Q.   And did he say anything else?

16        A.   I asked him if he was planning on spending the

17   night there, and that he said that he was.  And he

18   showed me that he had a bag in the front of the vehicle,

19   a backpack.

20        Q.   Did you search that backpack?

21        A.   Not at that time.

22        Q.   Now, I neglected to ask you this, Trooper

23   Czyzowski, and I apologize, and I'm apologizing for

24   going back in time.  Now, you spoke to Officer Donahue

25   when you were in your car and you also spoke to Sergeant

1  LeFoley?

2      A.   Yes.

3      Q.   Did you do anything else before you got out of

4  the car with respect to calling for backup?

5      A.   I did.  I requested a state police K-9.

6      Q.   Why did you do that?

7      A.   Because of the nature of the situation where

8  it was drug-related.

9      Q.   What is a New Hampshire state police K-9, what

10  do they do?

11      A.   We have patrol dogs that, they are trained in

12  patrol work which is for searching people, doing K-9

13  tracking, searching buildings, as well as narcotics

14  detection.

15      Q.   So during the time when you were talking to

16  Officer Donahue and Sergeant LeFoley, at that same time

17  before you go out of the car during that approximate

18  ten-minute window, you had also radioed for a K-9 to be

19  sent to the area?

20      A.   I think it was shortly thereafter.  I believe

21  it was around quarter to seven that I called for a K-9.

22      Q.   So, quarter to seven.  Maybe 15 minutes after

23  the initial stop?

24      A.   Yes.

25      Q.   So, when you were at the car with Mr. Ranfos,

1   after he refused to show you the money in the left side,

2   what did you do?

3        A.   I then returned to speak with Mr. Nakos.

4        Q.   What did you do with Mr. Ranfos?

5        A.   I had him stand in the front of the vehicle.

6        Q.   Why?  Why not get back in the vehicle?

7        A.   For safety purposes.  I don't know if his

8   backpack contains a gun, if there's a gun inside the

9   car, if he would try to take off.  It's for safety

10  purposes to separate him from the other party and just

11  have him go stand in the front where I can control the

12  situation.

13       Q.   What happened when you spoke to Mr. Nakos,

14  where did you go to speak to him?

15       A.   I had to go to his driver's door.

16       Q.   And how was his demeanor?

17       A.   Calm.

18       Q.   What did you say?

19       A.   I asked to speak with him outside the car.

20       Q.   What did he say?

21       A.   He asked me why.

22       Q.   What did you say?

23       A.   I explained to him it was for my safety, that

24  because we were on the side of the road, I was standing

25  pretty much in the travel lane on the line, and I didn't

1    want him taking off on me.

2        Q.    What was his response?

3        A.    He said that he wasn't going to take off on

4    me.  And I again asked him, explained you don't have to

5    get out of the car, but I'm asking you to speak with me.

6        Q.    And then what happened?

7        A.    He said for you, I will, and he exited.

8        Q.    Then what happened?

9        A.    When he got back to the rear of the car I

10   noticed that his pockets also had bulges in them, his

11   front pants pockets.

12       Q.    And did you do a pat frisk?

13       A.    Yes, I did.

14       Q.    What did you find?

15       A.    I immediately recognized a large quantity of

16   cash.

17       Q.    Did you ask him to take the cash out of his

18   pocket?

19       A.    Yes.

20       Q.    What did he do?

21       A.    He refused.

22       Q.    What happened then?

23       A.    I asked him why he had so much money with him

24   and what he did for work.

25       Q.    And what did he say?

1      A.    He said that his father owns a pizza

2  restaurant in Manchester.

3      Q.    And is that how he purportedly obtained the

4  money?

5      A.    Yes.

6      Q.    Did he indicate where he was going?

7      A.    Yes.

8      Q.    Where did he say he was going?

9      A.    Foxwoods.

10      Q.    What did you do then?

11      A.    I asked him if he was planning on spending the

12  night down there.

13      Q.    And?

14      A.    He said that he, at first he was a little

15  hesitant, and then he said that he was.

16      Q.    Then what happened?

17      A.    I noted that there was no other bags inside

18  the car that I could see from outside.  The vehicle

19  appeared pretty clean.  It was only the backpack in the

20  front seat.  So I asked him if he had any luggage with

21  him.

22      Q.    What did he say?

23      A.    He said that he did and it was in the trunk.

24      Q.    Then what happened?

25      A.    I asked him if I could see the luggage and he

1    said no.

2         Q.   Then what happened?

3         A.   I asked him about his knowledge of Ranfos's

4    drug history and the warrant specifically.

5         Q.   All right.  And what did he say?

6         A.   He said that he didn't know anything about

7    Ranfos's warrant.

8         Q.   Did you ask him whether he had had any prior

9    convictions?

10        A.   I asked him about his drug history.

11        Q.   And what did he say?

12        A.   He admitted to me that he spent seven years in

13   state prison for sale of crack.

14        Q.   Then what happened?

15        A.   I asked him for consent to search his vehicle.

16        Q.   What did he say?

17        A.   No.

18        Q.   Then what did you do?  Now, while you're

19   speaking to Mr. Nakos, does another trooper with a K-9

20   arrive on the scene?

21        A.   There was a few passing troopers that had

22   stopped by as they are patrolling that area.  They

23   stayed a few minutes and continued on.

24        Q.   Okay.

25        A.   But then after I had asked for consent to

1    search and he denied it, then I requested the K-9 along

2    with another trooper.

3        Q.   Okay.  I want to make sure we're clear on

4    that.  There seems to be some, I think I might have

5    heard you incorrectly.

6            When did you request the K-9, was it in the

7    car when you were speaking to Sergeant LeFoley or

8    Officer Donahue or after?

9        A.   I believe it was after.

10       Q.   Okay.

11       A.   After I had asked for consent to search and

12   explained that I could call the state police K-9 and

13   explained the whole, you know, you don't have to give me

14   consent to search, I will request a K-9.  If a K-9 comes

15   and alerts the presence of narcotics in the car, I will

16   be seizing your vehicle and applying for a search

17   warrant.

18       Q.   Okay.  So I apologize for the way I asked the

19   question.  So, you actually requested the K-9 after you

20   got out of the car when you spoke to Sergeant LeFoley;

21   is that correct?

22       A.   Yes.  After I had spoke with both Mr. Nakos

23   and Mr. Ranfos, that's when, because you don't need a

24   K-9 if they are going to give you consent to search.

25       Q.   Okay, okay.  So, how long did it take for the

1    K-9 to get there?

2         A.    Fifteen, 20 minutes.

3         Q.    What happened in the interim.  Were you

4    standing on the side of the road waiting for the K-9

5    unit?

6         A.    I was in my cruiser going back and forth with

7    Sergeant LeFoley who was contacting you, just giving an

8    update what was going on.

9         Q.    And where were Mr. Nakos and Mr. Ranfos at the

10   time?

11        A.    Standing outside.  Mr. Nakos was at the back

12   of his car, Mr. Ranfos was at the front.

13        Q.    Do you have any idea what time the K-9 unit

14   got there?

15        A.    Approximately 7.

16        Q.    So the motor vehicle stop happened at 6:29,

17   6:30, so it took approximately 30 minutes for the K-9

18   unit to get there?

19        A.    From the time that I stopped the car, yes.

20        Q.    Okay.  So when the K-9 unit got there was

21   there a search with the K-9?

22        A.    Yes.

23        Q.    Who was the trooper who arrived?

24        A.    Trooper Gary Ingham.

25        Q.    And how long did it take for the trooper to

1  bring his K-9 around the vehicle?

2      A.   A few minutes.  Typically when these K-9

3  troopers come out, they explain the situation to the

4  operator of the vehicle, the owner of the vehicle,

5  explain how they are going to do the search.  They are

6  going to walk around, ask them if there is any danger

7  around the vehicle for the dog's sake and ask them to

8  step away.

9      Q.   I neglected to ask you this, Trooper

10  Czyzowski, but from the moment you saw Mr. Ranfos with

11  his license in his hand, were you suspicious?

12      A.   I was suspicious of that behavior.  I thought

13  that that was odd.

14      Q.   Now, did you continue the detention or the

15  questioning because you believed something nefarious was

16  going?

17      A.   I don't know what nefarious means.

18      Q.   Oh, I'm sorry, because you believed they might

19  have been involved in illegal conduct?

20      A.   Yes.

21      Q.   And the entire time you engaged in

22  conversation with Mr. Ranfos and Mr. Nakos, was your

23  suspicion increasing or decreasing?

24      A.   Increasing.

25      Q.   Did your suspicion ever decrease at any point

1   in time during your entire encounter with Mr. Nakos or

2   Mr. Ranfos?

3        A.   No.

4        Q.   So, after Trooper Ingham ran his drug dog

5   around, did the drug dog hit?

6        A.   Yes.

7             MR. SHEKETOFF:  Well, objection, your Honor.

8   He doesn't -- he's not trained, unless she lays a

9   foundation, to know whether the drug dog hit or not.  If

10  he explains what he saw the dog do, I have no objection

11  whatsoever, but to interpret that behavior --

12            MS. OLLILA:  I will withdraw the question.

13            THE COURT:  Go ahead.

14       Q.   Were you advised that there was a positive

15  alert by Trooper Ingham?

16       A.   Yes.

17       Q.   What did you do at that point?

18       A.   I explained that to Mr. Nakos and Mr. Ranfos

19  and I explained to them that I was going to be seizing

20  the car and applying for the search warrant.

21       Q.   What did Mr. Nakos say?

22       A.   Mr. Nakos was kind of not bothered by the

23  situation at all.  Mr. Ranfos was upset because his cell

24  phone was in the car and his belongings were in the car.

25       Q.   Did you ask for the keys to the vehicle?

1       A.   Yes, I did.

2       Q.   Who did you ask?

3       A.   Mr. Nakos.

4       Q.   What did he say?

5       A.   He refused to give them to me.

6       Q.   Did he say why?

7       A.   No.

8       Q.   Did you explain what would happen if you

9   didn't get the key?

10      A.   Yes.  I explained the process with the tow

11  truck and I didn't want his vehicle to be damaged.

12      Q.   And what did he say?  Did he then turn over

13  the keys to you?

14      A.   No.

15      Q.   What happened to Mr. Nakos and Mr. Ranfos.

16  Were they given a ride off of the highway?

17      A.   No.  I told them that they were free to leave

18  because we were right at the Exit 6 off ramp, it was in

19  close proximity to businesses in Nashua, there's a gas

20  station right off of Exit 6, so they're not far away.

21      Q.   If they wanted a ride or needed a ride, would

22  you have had another trooper give them a ride off the

23  roadway?

24      A.   In that location, no.

25      Q.   So what happened then?

1    A.    They began to walk down the roadway.  I

2    returned to my cruiser.  I realized that I had their

3    identifications still with me.  So I spoke with Sergeant

4    LeFoley again, giving him an update, explained to him

5    that they had large quantities of cash, and made the

6    determination that we believed that that large quantity

7    of cash was related to drug activity.

8         Q.    And then what happened?

9         A.    I asked Trooper Ingham and the other trooper,

10   Aaran Richards, to return the items to Mr. Nakos and Mr.

11   Ranfos, their identifications, and to seize the money

12   that they had on them.

13        Q.    At some point in time after that did you apply

14   for a search warrant?

15        A.    Yes.

16        Q.    When was it?

17        A.    Within the next few days, I'm not sure of the

18   exact, I think it was the 8th or the 9th, but --

19        Q.    How did you get the motor vehicle off the side

20   of the road?

21        A.    It was towed.

22        Q.    Was there any damage to it?

23        A.    I think there was some damage to the

24   undercarriage when it was being pulled.  I know the tow

25   truck operator had some difficulty getting it on because

1    he didn't have the keys to the car.

2        Q.    When you executed a search, did you find

3    anything of evidentiary value in the motor vehicle?

4        A.    Yes.

5        Q.    What was found?

6        A.    It was a small quantity of marijuana in the

7    trunk, in the backpack, as well as cell phones and bank

8    statements and a large quantity of cash.

9             MS. OLLILA:   I have nothing further of this

10   witness.   Thank you, Trooper Czyzowski.

11            THE COURT:   Attorney Sheketoff.

12                          CROSS-EXAMINATION

13   BY MR. SHEKETOFF:

14       Q.    You say a small quantity of marijuana was

15   found?

16       A.    Yes.

17       Q.    How small a quantity?

18       A.    A joint size.

19       Q.    And were there rolling papers also in the

20   backpack, in the trunk?

21       A.    I believe that the marijuana was a small

22   quantity that was in the Zigzag rolling paper Ziploc

23   baggy.

24       Q.    So it was already rolled into a joint?

25       A.    No, it was just in that container.

1      Q.   So there was about a joint's worth of

2   marijuana in a Ziploc bag with rolling papers also in

3   the Ziploc bag?

4      A.   No.   The Zigzag rolling papers container is

5   like a foil bag that has a Ziploc on the end.   So when

6   you open that up you would have Zigzag rolling papers or

7   cigars or whatever inside.   This particular casing

8   contained a quantity of marijuana, small.

9      Q.   Now, sir, are you familiar with the New

10   Hampshire statute that makes following too closely a

11   motor vehicle violation to be punished by a fine of a

12   hundred dollars?

13      A.   Yes.

14      Q.   And do you know how the statute actually

15   reads?

16      A.   You have to follow the vehicle at a safe

17   distance which is reasonable and prudent for the

18   conditions at the time.

19      Q.   Okay.

20            MR. SHEKETOFF:  May I approach, your Honor?

21            THE COURT:  Yes.

22            MS. OLLILA:  Judge, I object to this line of

23   questioning because counsel for the defendant has never

24   raised that the reason for the motor vehicle stop was

25   illicit.   That's not their argument.   Their argument is

1    the time it took to engage in the continued detention.

2    So we are not put on notice.  I'm not sure what he's

3    trying to establish.  I just don't want him to try to

4    open up the arguments that have never been advanced to

5    your Honor.

6              MR. SHEKETOFF:  Well, the argument advanced in

7    the motion, which wasn't drafted by me, but it's still

8    my motion I guess, is that the search was warrantless

9    and it's their burden.  Now, listening to this

10   testimony, he went from a car length distance, that

11   maybe it was 55 miles an hour with very little traffic

12   to, well, it was less than a car length.  And it seems

13   to me since this was the subject of direct examination,

14   that I get to cross on it a little bit.  And it may be

15   that I will change the nature of my motion.  Obviously,

16   if it turns out that you don't credit that the stop was

17   legal at its inception --

18             THE COURT:  Objection overruled.  Go ahead.

19             MR. SHEKETOFF:  Thank you.

20        Q.   BY MR. SHEKETOFF:  I'm showing you this

21   document.  Do you recognize what it is?

22        A.   Yes.

23        Q.   And is it in fact the New Hampshire statute?

24        A.   Yes.

25        Q.   And it's the first paragraph that you say you

1    observed him violating?

2         A.   Yes.

3         Q.   All right.  And could you read for the record

4    and the Court what the statute actually says?

5         A.   265:25.  Following too closely, paragraph one.

6    "The driver of the vehicle shall not follow another

7    vehicle more closely than is reasonable and prudent

8    having due regard to the speed of such vehicles and the

9    traffic upon the conditions of the way."

10        Q.   Now, right before you noticed the Mercedes

11   vehicle that you eventually stopped, had you been off on

12   the side of the road having stopped another vehicle?

13        A.   No.

14        Q.   All right, so what attracted your attention to

15   the Mercedes?

16        A.   It was following a vehicle too closely.

17        Q.   Well, was it a car length, approximately a car

18   length?

19        A.   Approximately a car length, yes.

20        Q.   And do you remember saying in your report that

21   you observed this for several hundred feet?

22        A.   Yes.

23        Q.   And that the vehicle was traveling about 55 or

24   60 miles an hour?

25        A.   Yes.  I clocked it at highway speeds as I was

1    following, driving beside it.

2       Q.   Well, at 60 miles an hour do you know how long

3    it would take to go a few hundred feet?

4       A.   Yeah, you travel 90 feet per second at

5    60 miles an hour.

6       Q.   So you watched it for a few seconds following

7    too closely?

8       A.   Yes.

9       Q.   And where was this vehicle?  Is this a three

10   lane highway in that direction?

11      A.   It's four lanes and it opens up to five in

12   certain areas.

13      Q.   And where you were it's four lanes?

14      A.   Yes.

15      Q.   And what lane were you in?

16      A.   The high speed lane, far left lane.

17      Q.   And what lane was the Mercedes in?

18      A.   I remember being in lane two.

19      Q.   So, that would mean you were two lanes away

20   from it?

21      A.   No.  The high speed lane I refer to as lane

22   one.  The far left lane is lane one, two, three, four.

23      Q.   And what kind of car was it following too

24   close?

25      A.   I don't remember.

1      Q.   Was it light or dark out at this point?

2      A.   Evening.  It was dusk.

3      Q.   And you're in a marked cruiser?

4      A.   Yes.

5      Q.   Okay.  Did the car in front of the Mercedes

6 slow down at any point?

7      A.   Not that I noticed.

8      Q.   Are you aware -- by the way, this was a 2014

9 Mercedes?

10     A.   Yes.

11     Q.   Are you aware of the safety features that a

12 2014 Mercedes has in terms of warning systems for

13 drivers when they get too close to an object in front of

14 them?

15     A.   No.

16     Q.   So, you estimate that you watched it for 3 or

17 4 seconds?

18     A.   A few seconds.

19     Q.   And then you decide to pull it over?

20     A.   Yes.

21     Q.   Were you alongside the vehicle and slowed down

22 to get behind it, or were you behind it the whole time?

23     A.   Alongside towards the rear, the quarter panel.

24     Q.   And when you were alongside it towards the

25 rear, could you determine how many people were in that

vehicle?

A.    I know I saw a driver and a passenger.

Q.    All right.

A.    But I couldn't see if there was anybody in the back seat or anything.

Q.    Could you make any observations of who the driver was in terms of clothing or sex or age or race or anything of that nature?

A.    No.

Q.    And it's your testimony that you were not asked to stop this vehicle by anybody.  This was just for following too closely?

A.    Yes.

Q.    Now, what did you do, put on the blue lights and siren?

A.    No siren, just blue lights.

Q.    And the vehicle, the Mercedes, what did it do?

A.    Pulled over.

Q.    And you pulled in behind it?

A.    Yes.

Q.    All right.  Did you notice anything unusual about the way the Mercedes responded to your blue lights?

A.    No.

Q.    And because of your personal experience and I

1   suppose your training, you decided to approach on the

2   passenger side; correct?

3       A.   Yes.

4       Q.   What time was it that you actually left your

5   vehicle and approached on the passenger side?

6       A.   I have no idea.  It was in the area of 6:30.

7   I don't look at my watch when I get out of the car, so.

8       Q.   Is there anything that you do when you, as a

9   matter of routine when you stop a vehicle, that would

10  set the time first; in other words, do you call dispatch

11  and say I've just pulled somebody over.  Is there

12  anything that you do that would give us a firm time?

13      A.   I would call dispatch, if I were to call some

14  information out on the vehicle, you know, particularly

15  if there is some reason I want to stop this car, if I'm

16  driving down the road and say I want to pull this car

17  over, sometimes I will call dispatch and say, hey, I'm

18  letting you know I'm stopping this car.  It's kind of

19  random.  Sometimes there's a reason to it.  We have a

20  policy that if it's in the hours of 1 o'clock in the

21  morning to 5 o'clock in the morning we are required to

22  call in all our stops.  So, it varies.

23      Q.   Okay.  So, on this particular occasion do you

24  recall whether or not you notified dispatch that you had

25  stopped the vehicle?

1    A.   I don't.  I know looking at the time card

2    later on that the dispatch log had that I called in a

3    car stop at 6:39 p.m.

4    Q.   Okay, so you've looked at some document that

5    indicates to you that you called in the car stop at

6    6:29, but you don't have an independent memory of that?

7    A.   Well, I do from reviewing my report.  When I

8    typed the report, I have the dispatch log.  I had that

9    information as I'm typing the report.

10    Q.   Right.  So, I guess what I'm asking you is, is

11    the 6:29 when you first talked to dispatch and/or is the

12    6:29 when you first stopped the vehicle?  Could be --

13    A.   Could be simultaneous.  I don't remember.  I

14    don't keep track of that time.  Dispatch logs that time.

15    They are the ones that have this CAD system, so when you

16    call it in they are the ones that sit there and type it

17    all out.

18    Q.   So it's clear to you based on the review of

19    that document that you called dispatch at 6:29?

20    A.   Yes.

21    Q.   It's just not clear to you whether you called

22    dispatch as you were stopping the vehicle, right after

23    you came to a rest on the side of the highway, or at

24    some later point in time?

25    A.   Correct.

1    Q.    Do you have any memory of having contact with

2  dispatch before you put on the blue lights?

3    A.    No.

4    Q.    Do you have the ability in your cruiser at

5  that time to run a records check of some sort on the

6  license plate of the vehicle that you're thinking about

7  stopping?

8    A.    The current policy is we're not allowed to use

9  our computers if we're operating the vehicle.

10    Q.    How about in March of 2014?

11    A.    I don't remember when that policy came out.

12  It was last year sometime.

13    Q.    In any event, you pulled the vehicle over and

14  approached the passenger side?

15    A.    Yes.

16    Q.    And you noticed that the passenger had his

17  license out already?

18    A.    Yes.

19    Q.    Now, at some point during your interaction

20  with the passenger did you smell the odor of alcohol on

21  his breath?

22    A.    No.

23    Q.    The passenger handed you his license?

24    A.    Yes.

25    Q.    The operator handed you his license.  You were

1  still on the passenger side?

2       A.    Yes.

3       Q.    And the registration for the vehicle?

4       A.    Yes.

5       Q.    And you took those items back to your cruiser?

6       A.    Yes.

7       Q.    And then you performed certain functions with

8  those items; correct?

9       A.    Yes.

10      Q.    What did you do?

11      A.    I ran the individuals through either my

12 computer or dispatch.  I'm not sure which one I did.

13      Q.    Okay.  You have the ability to do that in your

14 cruiser?

15      A.    Yes.

16      Q.    And you also can ask dispatch to do that for

17 you?

18      A.    Yes.

19      Q.    You don't have a specific memory on this

20 occasion which of the two you did?

21      A.    No, not in this particular one.

22      Q.    If you ran your computer, if you used your

23 computer would there be some sort of exact time on your

24 computer that would indicate when it was you ran your

25 computer?

1     A.    I have no idea.  That's well beyond me.

2     Q.    All right.  So, whether it was dispatch or on

3  your own computer, you're looking to see whether there's

4  -- the license is valid and whether or not the

5  registration is valid?

6     A.    Yes.  You run their motor vehicle information.

7  So when you ask for a name and date of birth, if

8  somebody says they have a New Hampshire driver's

9  license, you check to see if the license is valid.  You

10  check to see if they have any warrants, electronic bench

11  warrants.  It will tell you if the person is a sex

12  offender.  It will tell you if there's an out of state

13  warrant.  All this information will come up.  It will

14  tell you if the vehicle is stolen.  All kinds of

15  documents.  I've had stolen identity queries pop up that

16  are sound X hits where the name is similar or the date

17  of birth is similar, so all kinds of information would

18  come up on the computer.

19     Q.    And of all the information that came up in

20  this case, the only thing that interested you was that

21  there was an out of state non-extraditable warrant for

22  Mr. Ranfos, the passenger?

23     A.    Well, no, the information that they lived on

24  Pine Street, or at least Mr. Nakos lived on Pine Street

25  was something that was curious to me, and then the

1    information about the warrant.

2        Q.   Okay, so it was two things.  The fact that the

3    registration indicated the car was registered to a Pine

4    Street address?

5        A.   Yes.

6        Q.   By the way, the license came back to that same

7    address; correct?

8        A.   I believe so.

9        Q.   And that Mr. Ranfos had a non-extraditable

10   warrant.  Do you know what year that warrant was from?

11       A.   No.

12       Q.   But you knew it had something to do with

13   marijuana?

14       A.   Yes.

15       Q.   All right.  Anything else that was of interest

16   from those inquiries?

17       A.   Not that I can remember.

18       Q.   And how long a street, by the way, is that

19   street that you found so curious that a Mercedes could

20   be owned by someone who lived on that street?

21       A.   Pine Street?

22       Q.   Yes.

23       A.   I'd say it's a very long street.

24       Q.   It's about 4 miles long?

25       A.   Could be, 3 or 4.

1    Q.   Had you asked before you went back to your

2    cruiser, had you asked the driver or the passenger where

3    they were headed?

4    A.   I know at some point they said they were going

5    to Foxwoods, but I don't remember if I asked them

6    initially or if it was after I had separated them.  They

7    had told me that they were coming from being out in

8    Manchester, I believe, that they were heading to

9    Foxwoods.

10    Q.   Do you recall that in your report you

11    indicated that that was at the very beginning of your

12    interaction with them, that they both said they were

13    headed to Foxwoods?

14    A.   I'm not sure.

15    Q.   Do you have your report with you?

16    A.   I do.

17    Q.   With the Court's permission could you look at

18    the first page of your report, the sentence starting

19    with I clocked the above mentioned Mercedes.  It's at

20    the very end.  I would direct you, you can read any part

21    you want, but I would direct your attention to the last

22    sentence in that first paragraph I asked you to look at.

23    A.   Okay.  They said they were going to Foxwoods

24    from Manchester.

25    Q.   That was at the very beginning?

1      A.   Yes.

2      Q.   Okay.  So you've now learned that there's a

3  non-extraditable warrant.  You have suspicions about

4  somebody having a Mercedes on Pine Street in Manchester.

5  And you decide to call some Manchester police officer

6  that you've worked with in the past?

7      A.   Yes.

8      Q.   And is that a usual step that you take in

9  these circumstances?

10     A.   I call all the time.  I have a few guys that I

11 know that work there that I worked with that I call

12 routinely.

13     Q.   So, you would say that on most traffic

14 violation stops you make a call to other police

15 departments to see if they are interested in these

16 people for any reason whatsoever?

17     A.   Yes.  Specifically Manchester.  I almost

18 always call our dispatcher and say, hey, can you call

19 Manchester PD to find out if they have any information

20 on these people.  They will have an in-house system, so

21 if Manchester PD interacts with these people in any way

22 that they keep in-house, they will flag a person for

23 having dangerous needles, for having HIV, for having a

24 resisting arrest history.  They have all this

25 information that they keep in-house that the only way

54

1    that we would know about it is if we call them directly.

2         Q.   Okay, but in this particular case you called a

3    particular officer?

4         A.   Yes.

5         Q.   And you said, I believe, when the prosecutor

6    was asking you questions, that you called him on his

7    cell phone?

8         A.   Yes.

9         Q.   Did you use a cell phone of your own or did

10   you use the -- how did you accomplish that call?

11        A.   I used my phone.

12        Q.   You used your own cell phone?

13        A.   Yes.

14        Q.   All right, so your cell phone record would

15   indicate the exact time that you made that call?

16        A.   I suppose if they still have it.  I have no

17   idea.

18        Q.   Well, who is they?  I mean, was this your

19   personal cell phone?

20        A.   It's my personal cell phone.

21        Q.   Okay.  And when you get your cell phone bills,

22   do you have your calls listed?

23        A.   It stays automatically online.

24        Q.   In any event, there is a cell phone call from

25   your cell phone to a Manchester police officer's cell

1   phone, and one of the two records would have the exact

2   time; correct?

3        A.   It could I guess.

4        Q.   How long did it take you to find Officer

5   Donahue?  He just picked up the phone as soon as you

6   called him?

7        A.   I believe so.  I don't remember it being

8   difficult.  I had his cell phone number.  He usually

9   answers me, so.

10        Q.   Okay.  And how long was your conversation with

11   him?

12        A.   It was brief.  I explained to him what I had,

13   who I had.  It was the conversation that I had before

14   with the prosecutor.

15        Q.   How long would you estimate your conversation

16   was?

17        A.   From the time that he told me to call

18   narcotics, less than two minutes.

19        Q.   Okay.  So from beginning to end you estimate

20   your conversation with Officer Donahue to be

21   approximately two minutes?

22        A.   Yes.

23        Q.   You hang up from him and you call this special

24   unit of the New Hampshire State Police; correct?

25        A.   Yes.

1    Q.    And are you looking for someone specific when

2  you call that unit?

3    A.    Yes.  Officer Donahue directed me to Sergeant

4  LeFoley.

5    Q.    Had you had any previous interaction with that

6  particular sergeant?

7    A.    Yes.

8    Q.    So you knew him?

9    A.    I know he's a co-worker, I know who he is,

10  yes.

11    Q.    How did you contact him, using your cell phone

12  again?

13    A.    Yes.  Officer Donahue provided me with his

14  phone number.

15    Q.    So, did he answer right away?

16    A.    Yes.

17    Q.    And so your records would indicate what time

18  you called him?

19    A.    I believe so.

20    Q.    And his records, was it his personal cell

21  phone that you called?

22    A.    I have no idea.

23    Q.    In any event, you had a conversation with him.

24  Can you tell us again what that conversation was?

25    A.    I explained the situation that I had, where I

1    had stopped a vehicle operated by Mr. Nakos and the

2    passenger was Mr. Ranfos, and that Mike Donahue told me

3    to contact you immediately.

4        Q.   All right.  And what was said next the best

5    you remember?

6        A.   He asked me the reasons for the stop.  What

7    indicators I had.  What was going on with the stop.  And

8    then said I have to call the U.S. Attorney's Office.

9    Just continue it like any motor vehicle stop that you

10   would investigate for drugs.

11       Q.   Okay.  And that's the content of the

12   conversation as best as you can recall it?

13       A.   Yes.

14       Q.   All right.  Now, did he then hang up from you

15   and you waited for a call back from him or you called

16   him back after a minute or two?

17       A.   Throughout the motor vehicle stop we were

18   calling each other back and forth.  I knew that he was

19   calling Attorney Ollila several times, calling me back,

20   I was calling him.  We were kind of giving each other

21   updates as far as where we were going to go from here.

22   It was completely a surprise to them that I had stopped

23   the car, so I think if kind of caught them with their

24   pants down, they didn't know what to do in that

25   situation.  Should I continue the stop as if I were

 1   handling it on my own or should they tell me, I said

 2   look, sergeant, I don't know if you want me to kick them

 3   loose.  I don't want to ruin anything you guys got

 4   going.  He said no, to continue the investigation as if

 5   you hadn't talked to me and we will go from there.

 6        Q.    Okay.  Is that where you said sarge, should I

 7   kick them loose and the rest of that, was that in that

 8   first phone call?

 9        A.    Yes.

10        Q.    Okay.  And then the two of you hung up.  And

11   then I take it from what you just said, there are some

12   subsequent phone calls?

13        A.    Yes.

14        Q.    How many additional phone calls are there?

15        A.    I have no idea.

16        Q.    What's your best estimate, not guess, what is

17   your best estimate?

18        A.    Three or four conversations after that.

19        Q.    All right.  Were any of these -- and these

20   conversations all took place between you and that

21   sergeant over at least your personal cell phone and

22   whatever cell phone he was using?

23        A.    I believe so, yes.

24        Q.    Were any of these conversations in front of my

25   client?

1         A.    No, they were in my car.

2         Q.    Okay.  So, at the end of that first

3    conversation where you said no, don't kick them loose,

4    do whatever you would do, that's when you approached the

5    vehicle again?

6         A.    Yes.

7         Q.    And it's fair to say that you did not approach

8    with a ticket of any kind?

9         A.    I didn't give them a ticket, no.

10        Q.    Was there a reason you didn't give them a

11   ticket?

12        A.    My discretion.  Not everybody gets a ticket.

13        Q.    New Hampshire also has this concept of

14   warnings?

15        A.    Yes.

16        Q.    Are warnings written warnings or they can just

17   be verbal warnings?

18        A.    They can be either one.

19        Q.    And did you give him a written warning?

20        A.    No.

21        Q.    Did you give him a verbal warning?

22        A.    At that point I don't think, I had progressed

23   it from a following too closely stop to progressing from

24   there, I was not concerned about giving him a warning

25   for following too closely or writing a ticket for it, I

1    was concerned with my investigation from there.

2        Q.    Okay.  So after speaking to the sergeant with

3    the state police, hanging up from him, and you got out

4    of the car, at that point the traffic issue was gone and

5    this was a different investigation; is that fair to say?

6        A.    Yes, it was progressing from there.

7        Q.    And you got -- you coaxed or asked or ordered,

8    whichever you want to say, you got the passenger out of

9    the vehicle; correct?

10       A.    I asked him.

11       Q.    Okay.  And he cooperated, he got out?

12       A.    Yes.

13       Q.    You did the pat frisk thing, found the money?

14       A.    Yes.

15       Q.    Directed him to either the front or back of

16   the car?

17       A.    The front.

18       Q.    And now you were going to talk to the driver?

19       A.    Yes.

20       Q.    And did you, you actually got on the driver's

21   side or did you talk with him through the passenger side

22   window?

23       A.    I went to the driver's side window.

24       Q.    Okay.  And you ordered or coaxed or asked him

25   to get out of the car?

1        A.    I asked him.

2        Q.    And at first he said no, and then you engaged

3   in some more conversation, then he said he'd do it for

4   you and he got out?

5        A.    Yes.

6        Q.    And you saw a bulge on him?

7        A.    Yes.

8        Q.    And did you think it was possibly a weapon?

9        A.    It could be, yes.

10       Q.    Well, that's what I'm asking?

11       A.    Yes, somebody has bulges in their pockets,

12  that directs me.  I've pulled small handguns off people.

13  They make handguns that are actually concealed into

14  objects that would make it look like a wallet.  I've

15  pulled knives, razor blades out of people's wallets

16  before.  Weapons could be any shape or form.

17       Q.    So you saw a bulge and you believed that you

18  have a right to pat frisk him to see if that was a

19  weapon for your safety; correct?

20       A.    Yes.

21       Q.    And you pat-frisked and you realized right

22  away that it was not a weapon?

23       A.    Yes.

24       Q.    And it appeared to you from the feel of it

25  that it was money?

1      A.   Yes.

2      Q.   What happened next?

3      A.   After I pat-frisked him I asked him about the

4 money.  I asked him about his drug use.  I asked him

5 about Mr. Ranfos's warrant.  I asked him where he was

6 going.  I asked him if I could search his vehicle.

7      Q.   Okay.  And all of the questions he answered;

8 correct?

9      A.   Yes.

10     Q.   And they were consistent with what you knew

11 already based on the records check you had done.  Were

12 you aware that he had a prior conviction?

13     A.   No.

14     Q.   Oh, so that did not come up in the check of

15 his background?

16     A.   That would come up in a criminal records

17 check.  So I would have, if I run a criminal records

18 check on the side of the road, I would have to call in

19 to dispatch and dispatch would actually have to read it

20 and explain it to me on the phone.  There's no way of me

21 getting his criminal record in my car.

22     Q.   Okay.  So that was not one of the standard

23 things that you had done.  You had done a vehicle and

24 registration?

25     A.   Yes, motor vehicle.

1    Q.   All right.  And once he said that he wasn't

2  going to consent to a search of the vehicle, that's when

3  you decided that you were going to call for a dog;

4  correct?

5    A.   Yes.

6    Q.   And so you went back to your car and made a

7  call for the dog?

8    A.   Yes.

9    Q.   All right.  And in your report you said you

10 called for a dog to come down from Manchester.  Do you

11 recall that?

12   A.   I believe at that point that the K-9s were

13 training, they train in Manchester at the Youth

14 Development Center, that's their training facility.  So

15 that's where they oftentimes are.  Our K-9s are kind of

16 spread throughout the state.  We have a few in each

17 troop.  Some troops don't even have any, so they are

18 kind of all over the place.

19   Q.   All right.  Well, did the trooper that

20 eventually showed up with the K-9 come from Manchester?

21   A.   I believe he did, yes.

22   Q.   All right.  And you're at Exit 6 in Nashua?

23   A.   Yes.

24   Q.   And what would you estimate the amount of time

25 it would take to drive doing the speed limit from

1    Manchester to Nashua?

2         A.    Fifteen, 10, 15 minutes with no traffic.

3         Q.    Okay.  Well, you might drive faster than I do.

4         A.    Well, you asked me.  I can guarantee you that

5    the trooper that was responding was not driving the

6    speed limit to come down there.

7         Q.    So, this is the second time you've gone back

8    to the car when you go and call for the trooper to come

9    with the dog; correct?

10        A.    I believe so, yes.

11        Q.    And do you have further conversation at that

12   point with the sergeant from the state police?

13        A.    Yes.  At that point, I mean, we were

14   contacting each other back and forth.  Every time I got

15   back in my car I would have communications with him.  He

16   would call me and say, you know, I have to call Attorney

17   Ollila, let me get back to you and, you know, I don't

18   remember exactly how many conversations we had or at

19   what point we had them, but I know I had more than one

20   conversation with Sergeant LeFoley.

21        Q.    Okay.  So when you get back in the car you

22   call for the K-9 and you talk to the sergeant again.  Do

23   you fill him in that, you know, I pat-frisked them,

24   there was money on both of them, and -- or do you

25   remember what the conversation was?

1    A.    I know I pulled him in on the money, yes.

2    Q.    And did you get any direction from him as to

3  what you should do?

4    A.    At that point, no.  He told me just continue

5  the stop.  Call the K-9.  Go about it as if we didn't

6  have this conversation.

7    Q.    All right.  So, did he ask you to call a K-9

8  or did you tell him you were going to call the K-9 and

9  he just said, oh, okay, that's a good idea, go ahead?

10   A.    I told him I was going to call a K-9 because

11  he told me to carry on this investigation just as if I

12  had no knowledge of what was going on.

13   Q.    So, the K-9 came, and you think it's around

14  7:00 that the K-9 showed up, approximately?

15   A.    Yes.

16   Q.    And then there's a few minutes discussion

17  between the K-9 officer and the passenger and driver of

18  the vehicle about how the K-9 is going to proceed?

19   A.    Yes.

20   Q.    Now, do you watch the K-9 or are you back in

21  your vehicle talking to the sergeant?

22   A.    No, we stand with the people who are operating

23  the vehicle.  We don't want them around the dog because

24  we don't want them to get bitten by the dog or screw up

25  the dog in any way.  So what we do is we will take the

 1  people who were operating the vehicle and the passengers

 2  away from the area, and we all just generally just watch

 3  the K-9.

 4       Q.   Okay, so you recall watching the K-9?

 5       A.   Yes.

 6       Q.   And do you recall the K-9 jumping inside the

 7  vehicle?

 8       A.   I don't remember.

 9       Q.   Well, you've seen your -- what's the name of

10  the trooper that brought the K-9?

11       A.   Gary Ingham

12       Q.   And you've seen his report, haven't you?

13       A.   I don't believe I read his report, no.

14            MS. OLLILA:  Objection, your Honor.  They are

15  not challenging the positive alert.  This is once again

16  Attorney Sheketoff trying to open up an issue that was

17  never argued.  I didn't talk to this witness with

18  respect to that testimony.  He's going beyond direct and

19  this is not relevant for our purposes today.

20            THE COURT:  Why are you asking?

21            MR. SHEKETOFF:  Because if the K-9 is inside

22  the vehicle, it's a different analysis than if the K-9

23  is outside the vehicle.

24            THE COURT:  And you had notice that the K-9

25  was inside the vehicle?

```
 1              MR. SHEKETOFF:  That's what the other

 2    trooper's --

 3              THE COURT:  Via some report?

 4              MR. SHEKETOFF:  The other trooper's report.

 5              THE COURT:  But you didn't raise that in any

 6    of your motions?

 7              MR. SHEKETOFF:  I didn't draft the motion,

 8    your Honor, but --

 9              MS. OLLILA:  Judge, he had every ability.  He

10    has been replacement counsel for over a month.  If he

11    wanted to add anything to the suppression argument, he

12    could have done so.  He's trying to make excuses now

13    because he wants to try to impeach the K-9 unit, and he

14    can't do that in this proceeding.

15              THE COURT:  Yeah, it's unfair to the

16    government, and as the burden she would have called this

17    other officer obviously.  But I will allow you to ask

18    questions that are relevant to the scope of the stop,

19    the timing, that kind of thing.  Go ahead.

20              MR. SHEKETOFF:  Thank you.  I think I'm

21    understanding what you're saying, so if I ask a bad

22    question here forgive me, but I think you're saying I

23    can ask him whether the K-9 went in, I just can't

24    challenge whether or not the K-9 made an alert?

25              THE COURT:  If he remembers and the timing of
```

 1    it is relevant to your argument.

 2         Q.    Did the K-9 go inside the car?

 3         A.    I don't remember.  This was over a year ago.

 4    I don't.

 5         Q.    Well, is it unusual --

 6               MS. OLLILA:  Objection, asked and answered.

 7               THE COURT:  Overruled.  Go ahead.

 8         Q.    Is it, would it be unusual for a -- this was a

 9    walk around, correct, that's what you understood it to

10    be?

11         A.    I'm not a K-9 handler.  When I call for a K-9

12    they walk around the car and let me know yes or no

13    whether the dog indicated narcotics in the car.

14         Q.    So I guess my question is, would it be unusual

15    in your experience to see from one of these where you've

16    called for a K-9, for the K-9 to actually go inside the

17    car during the walk around?

18         A.    No, it's not something that I routinely see

19    the dog jumping inside the car.  If it's a summer day

20    and all the windows are down and there's an overwhelming

21    odor coming from the car, would the dog jump in?  Yeah,

22    maybe.  I have no idea.

23         Q.    So it's your testimony you did not see the dog

24    jump into the car even though you were watching what the

25    K-9 did?

1    A.    Yeah, I don't remember that at all.

2    Q.    All right, what did you see the K-9 do?

3    A.    Walk around the car.

4    Q.    That's it?

5    A.    Sniff the tires, I mean, I don't know what --

6    the dog did its thing.  I'm focused on everything.  I'm

7    looking at the reaction from the operator, I'm looking

8    for reaction from the passenger, I'm watching traffic.

9    Occasionally if a K-9 will go on the driver's side, I

10   will step out into the roadway to prevent any cars from

11   coming in the right travel lane so the dog is safe.  I

12   mean, there are so many particulars that I'm not focused

13   on running the dog because that's not what I do.  I have

14   to focus on the rest of the scene to make sure

15   everything else is safe.

16   Q.    Okay.  And then the trooper that brought the K

17   -- by the way, did he arrive by himself or was there a

18   second trooper that came with him?

19   A.    There was a second trooper, Aaran Richards.  I

20   don't know if he came, I think he came just before

21   Trooper Ingham.  They drive separate cars, so they

22   didn't come in the same car.

23   Q.    And he was someone that, not him particular,

24   but you did call for backup?

25   A.    Yes.

1      Q.    When you called for the K-9?

2      A.    Yes.

3      Q.    Now, after you were told by the K-9 officer

4  that the dog hit, what happened next?

5      A.    I informed Mr. Nakos and Mr. Ranfos.

6      Q.    And did you ask them for their money?

7      A.    Not at that time, no.

8      Q.    Why not?

9      A.    I informed them that I was taking the car and

10  seizing it and applying for a search warrant.

11      Q.    Okay, but why didn't you ask them for the

12  money?

13      A.    It wasn't on my mind at that second.

14      Q.    Okay.  So, it was in a later phone call with

15  the sergeant that he told you to find them again and get

16  the money?

17      A.    Well, I still had their driver's licenses.

18  So, when I got back to my car after I had already kicked

19  them lose, I realized I had the driver's license.  I was

20  talking to Sergeant LeFoley on the phone letting him

21  know that I had seized the car, and he asked me about

22  the money, and I said no, I still have their licenses.

23  He says, well, you've got to make sure you get that

24  money.  So I went back and handed the information to

25  Trooper Ingham and Trooper Richards and asked them to

1    reapproach Mr. Nakos and Mr. Ranfos while I waited for

2    the tow truck.  I couldn't leave the scene with the tow

3    truck because I seized it, so for chain of custody

4    purposes I couldn't leave it, I had to send them to go

5    find these guys.

6         Q.   And did either of them ask for their cell

7    phones before they left the vicinity of the vehicle?

8         A.   I believe Mr. Ranfos did.

9         Q.   Did the driver have his cell phone with him?

10        A.   I don't remember.  I know after doing a search

11   of a vehicle there were cell phones found in the car.

12   I'm not sure -- there were several cell phones, so I

13   don't know if that was an additional one that he had on

14   his person, I don't remember.

15        Q.   Well, when he was pat-frisked did you notice a

16   cell phone on his person?

17        A.   I don't remember.

18        Q.   And Mr. Ranfos was denied reentry into the

19   vehicle to get his cell phone?

20        A.   Yes.

21             MR. SHEKETOFF:  Thank you.

22             MS. OLLILA:  Nothing further, your Honor.

23             THE COURT:  All right.  You may step down.

24             MS. OLLILA:  May Trooper Czyzowski be excused,

25   your Honor?

1          THE COURT:  Yes.  Any problem with that?

2          MR. SHEKETOFF:  I have no problem with that.

3          THE COURT:  All right.  Thank you, trooper.

4          THE WITNESS:  Thank you, your Honor.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4            I, Sandra L. Bailey, do hereby certify that

5    the foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 4/14/2015

11                            **SANDRA L. BAILEY, LCR, CM, CRR**

12                            LICENSED COURT REPORTER, NO. 15

13                            STATE OF NEW HAMPSHIRE

14

15

16

17

18

19

20

21

22

23

24

25